UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PFIZER INC, )
ROBERT JARVIK, M.D., )
JARVIK HEART, INC., )
)
        Plaintiffs, )
)
      v. )   Civil Action No.  08-cv-02018-LAK
)   ECF case
MATHEW I. GELFAND, M.D., )
)
        Defendant. )


## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS AND/OR STRIKE DEFENDANT'S COUNTERCLAIMS

David G. Ebert
**INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP**
250 Park Avenue - 6th Floor
New York, New York 10177
(212) 907-9603
debert@ingramllp.com
*Attorneys for Plaintiffs Pfizer Inc,  Robert Jarvik, M.D., and Jarvik Heart, Inc.*

Of Counsel:
Rudolf E. Hutz
Jeffrey B. Bove
Mary W. Bourke
**CONNOLLY BOVE LODGE & HUTZ LLP**
1007 North Orange Street
Wilmington, DE 19899
(302) 658-9141

DATED:  April 10, 2008

## TABLE OF CONTENTS

**Page**

INDEX OF UNREPORTED DECISIONS ............................................................... ii

TABLE OF AUTHORITIES ............................................................................. iii

I.     PRELIMINARY STATEMENT ................................................................ 1

II.    SUMMARY OF ARGUMENT ................................................................ 2

III.   STATEMENT OF FACTS ...................................................................... 2

     A.   The Parties .............................................................................. 2

     B.   The Litigation .......................................................................... 3

IV.   ARGUMENTS ................................................................................. 4

     A.   Standards Applicable To A Motion To Dismiss And/Or Strike ........... 4

         1.   The Standard on a Motion to Dismiss ................................. 4

         2.   The Standard on a Motion to Strike .................................... 4

     B.   Defendant's Counterclaims Are Improperly Filed Without An
        Answer ................................................................................... 5

V.    CONCLUSION ................................................................................ 9

## INDEX OF UNREPORTED DECISIONS

*In re Pfizer, Inc. Sec. Litig.,*
 ___ F. Supp. 2d ____, 2008 WL 540120 (S.D.N.Y., February 28, 2008)..............Ex. 1

*Sony Fin. Servs., LLC v. Multi Video Group, Ltd.,*
 No. 03 civ. 1730 (LAK)(GWG), 2003 WL 22928602 (S.D.N.Y. Dec. 12, 2003).......Ex. 2

*Ulla-Maija, Inc. v. Kivimaki,*
 No. 02 civ. 3640(AGS), 2003 WL 169777 (S.D.N.Y. Jan. 23, 2003)...................Ex. 3

*Pitts v. L. Epstein of New York, Inc.,*
 No. 92 civ. 0802 (RPP), 1993 WL 535120 (S.D.N.Y. Dec. 17, 1993).................Ex. 4

275074_3/02519-0003

## TABLE OF AUTHORITIES

Page

Cases

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
    493 F.3d 87 (2d Cir. 2007)...................................................................................... 4

Avent v. Solfaro,
    210 F.R.D. 91 (S.D.N.Y. 2002) ............................................................................. 5

Bell Atl. Corp. v. Twombly,
    ___ U.S. ____, 127 S. Ct. 1955 (2007) ................................................................. 4

Bernstein v. IDT Corp.,
    582 F. Supp. 1079 (D. Del. 1984)........................................................................... 7

Burns v. Lawther,
    53 F.3d 1237 (11th Cir. 1995) ................................................................................ 6

Estee Lauder, Inc. v. The Fragrance Counter, Inc.,
    189 F.R.D. 269 (S.D.N.Y. 1999) ........................................................................... 5

Flores v. S. Peru Copper Corp.,
    343 F.3d 140 (2d Cir. 2003)................................................................................... 4

Forschner Group, Inc. v. B-Line A.G.,
    943 F. Supp. 287 (S.D.N.Y. 1996) ........................................................................ 5

Hollander v. Amer. Cyanamid Co.,
    172 F.3d 192 (2d Cir. 1999)................................................................................... 5

In re Cessna Distributorship Antitrust Litig.,
    532 F.2d 64 (8th Cir. 1976) ................................................................................ 7, 8

In re Pfizer, Inc. Sec. Litig.,
    ___ F. Supp. 2d ____, 2008 WL 540120 (S.D.N.Y., Feb. 28, 2008) ...................... 4

Iqbal v. Hasty,
    490 F.3d 143 (2d Cir. 2007)................................................................................... 4

Langer v. Monarch Life Ins. Co.,
    966 F.2d 786 (3d Cir. 1992)................................................................................... 8

Levy v. Southbrook Int'l Invs., Ltd.,
    263 F.3d 10 (2d Cir. 2001), cert. denied,
    535 U.S. 1054, 122 S. Ct. 1911 (2002)................................................................. 4

Microsoft Corp. v. Ion Techs. Corp.,
    484 F. Supp. 2d 955 (D. Minn. 2007)..................................................................... 8

275074_3/02519-0003

*Pitts v. L. Epstein of New York, Inc.*,
    No. 92 civ. 0802 (RPP), 1993 WL 535120 (S.D.N.Y. Dec. 17, 1993)......................................8

*Polymer Indus. Prods. Co. v. Bridgestone/Firestone, Inc.*,
    347 F.3d 935 (Fed. Cir. 2003)................................................................6

*Sony Fin. Servs., LLC v. Multi Video Group, Ltd.*,
    No. 03 civ. 1730 (LAK)(GWG), 2003 WL 22928602 (S.D.N.Y. Dec. 12, 2003) ..................5

*Ulla-Maija, Inc. v. Kivimaki*,
    No. 02 civ. 3640 (AGS), 2003 WL 169777, at 4 (S.D.N.Y. Jan. 23, 2003) ...........................5

<u>Rules and Statutes</u>

28 U.S.C. § 2201 .......................................................................................3

Fed. R. Civ. P. 12(b)(6).........................................................................1, 5

Fed. R. Civ. P. 12(f)........................................................................1, 4, 5, 8

Fed. R. Civ. P. 13 .............................................................................1, 6, 7

Fed. R. Civ. P. 7(a) ...........................................................................1, 6, 7

<u>Other Authorities</u>

2 *Moore's Federal Practice* § 7.02[1][b] (Matthew Bender 3d ed.) ..............................6

3 *Moore's Federal Practice* § 13.90[1] (Matthew Bender 3d ed.)................................6

275074_3/02519-0003

## I.    <u>PRELIMINARY STATEMENT</u>

This is an action by Pfizer Inc ("Pfizer Inc"), Robert Jarvik, M.D. ("Dr. Jarvik"), and Jarvik Heart, Inc. ("JHI"), (collectively referred to as "Pfizer" or "Plaintiffs") against Mathew I. Gelfand, M.D. ("Gelfand" or "Defendant"), for a declaratory judgment of non-infringement, invalidity and unenforceability of United States Patent No. 5,837,688 ("the '688 patent").

Gelfand failed to file an answer to Pfizer's complaint. Instead, in an effort to substitute his allegations for Pfizer's, Gelfand filed a document titled "Defendant/Counter-Plaintiff's Counterclaim," unaccompanied by any answer. At the same time, Gelfand moved to dismiss Pfizer's complaint, a motion which, if granted, would leave a bare "counterclaim" pending with no associated complaint, answer or other pleading.

Gelfand precipitated Pfizer's complaint by repeatedly threatening Pfizer with patent infringement, seeking hundreds of millions of dollars in damages and an injunction against all future sales by Pfizer Inc of the world's most successful pharmaceutical, Lipitor®. When Plaintiffs sought to properly protect themselves and to promptly resolve the dispute by use of a complaint for declaratory judgment, Gelfand refused to file an answer, plunging this litigation into an immediate procedural quagmire to the detriment of the Court and Pfizer. In effect, Gelfand wants to substitute Pfizer's suit against him with one he, as Plaintiff, might have brought against Pfizer but did not. There is no basis in the Rules or in logic for that to be permitted.

Pfizer moves pursuant to Fed. R. Civ. P. 12(b)(6) and 12(f) to Dismiss and/or Strike Defendant's Counterclaims filed on March 24, 2008. Fed. R. Civ. P. 7(a) and 13 do not permit the pleading of a counterclaim separate from an answer or other pleading.

This is Pfizer's Memorandum in support of its Motion.

## II.    SUMMARY OF ARGUMENT

Pfizer's Motion to dismiss and/or strike all of Gelfand's counterclaims should be granted

because Defendant has improperly filed a document purporting to be "Counterclaims" without

filing an answer to the complaint

## III.    STATEMENT OF FACTS

### A.    The Parties

Pfizer Inc is a research-based pharmaceutical company that invents, develops,

manufactures and markets leading prescription medicines for humans and animals throughout the

world.  Its most important product, and the world's largest selling pharmaceutical, is Lipitor®, a

lifesaving cholesterol-lowering drug containing the active ingredient, atorvastatin calcium.

Complaint at ¶¶ 3, 11 (hereinafter "Com. ¶ __").[1]  Pfizer Inc introduced Lipitor® into the United

States market in 1996.  Com. ¶ 12.  Pfizer Inc also developed, manufactures and markets a

unique combination product comprised of two active ingredients, amlodipine besylate and

atorvastatin calcium, which it has sold in the United States since 2004 under the registered name

Caduet®.  Com. ¶¶ 13, 14.

Dr. Jarvik is an individual residing in New York, New York who serves as President and

Chief Executive Officer of JHI.  Com. ¶ 6.  Dr. Jarvik is widely respected and recognized as the

inventor of the Jarvik artificial heart.  Com. ¶ 9.  Dr. Jarvik has appeared in certain of Pfizer's

advertisements for Lipitor®.  Counterclaim at ¶¶ 4, 32 (hereinafter "Counterclaim ¶ __").[2]

JHI is a New York Corporation, with offices located at 333 West 52nd Street, New York,

New York 10019.  Com. ¶ 5.

---

[1] A copy of the Complaint has been annexed as Exhibit A to the accompanying affidavit of
David G. Ebert, sworn to April 10, 2008 (hereafter, "Ebert Affidavit").

[2] A copy of the Counterclaim has been annexed as Exhibit B to the Ebert Affidavit.

275074_3/02519-0003

Gelfand is a resident of the State of New York, with an address of 245 Fairway Road, Lido Beach, New York 11561. Com. ¶ 6; Counterclaim ¶ 2. Gelfand claims to be the inventor and owner of the '688 patent. Com. ¶ 9; Counterclaim ¶¶ 9, 10. The United States Patent and Trademark Office issued the '688 patent on November 17, 1998, entitled "Use of Thrombolytic Reagents for Prevention of Vascular Disease", on an application, Serial Number 758,615, filed by Gelfand on November 27, 1996. Com. ¶ 2; Counterclaim ¶¶ 9.

## B.    This Litigation

Beginning in August, 2005, Gelfand repeatedly accused one or more of the Plaintiffs in writing of infringing the '688 patent by reason of their activities in manufacturing, promoting and selling Lipitor® and Caduet®, threatening to seek millions in damages and an injunction against the future sale of these important, lifesaving drugs. Com. ¶¶ 9, 10, 17, 18, 19; Counterclaim ¶¶ 28, 43, 44. Gelfand even sent Pfizer a copy of a draft complaint which he threatened to file in this District.

Based upon these serious assertions of infringement, Pfizer properly brought this action for declaratory judgment of non-infringement, invalidity and unenforceability against Gelfand to resolve Gelfand's accusations. Pfizer even filed its complaint in Gelfand's choice of forum as stated in his own draft complaint. On March 24, 2008, although failing in violation of the Federal Rules of Civil Procedure to file an answer, Gelfand did respond to Pfizer's suit by filing: (1) Counterclaims, and (2) a Motion to Dismiss the Complaint, seeking to proceed solely on the counterclaims, while asserting that the complaint was "inconsistent with the Declaratory Judgment Act, 28 U.S.C. § 2201, et. seq." purportedly because the complaint is "merely pre-emptive" and "procedural fencing." Motion to Dismiss, p. 2.

Pfizer is responding separately to Gelfand's Motion to Dismiss, and addresses here solely the impropriety of a bare "counterclaim," unassociated with any answer.[3]

## IV.    ARGUMENT

### A.    Standards Applicable To A Motion To Dismiss And/Or Strike

#### 1.    The Standard on a Motion to Dismiss.

In deciding a motion to dismiss, a court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. *Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 143 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054, 122 S. Ct. 1911 (2002); *In re Pfizer, Inc. Sec. Litig.*, ___ F. Supp. 2d ___, 2008 WL 540120 (S.D.N.Y., Feb. 28, 2008).[4] In order to survive such a motion, however, the non-moving party (here Gelfand) "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (*quoting Bell Atl. Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1965 (2007)); *see also Iqbal v. Hasty*, 490 F.3d 143, 158-59 (2d Cir. 2007) (declining to limit *Bell Atl.* holding to the antitrust context).

#### 2.    The Standard on a Motion to Strike.

Federal Rule of Civil Procedure 12(f) provides:

> Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient

---

[3]  Pfizer will respond to the substantive allegations of Gelfand's counterclaims if and when they are presented in a legally recognizable pleading.

[4]  A copy of the decision in *In re Pfizer, Inc. Sec. Litig.*, ___ F. Supp. 2d ___, 2008 WL 540120 (S.D.N.Y., February 28, 2008) is annexed hereto as Exhibit 1.

defense or any redundant, immaterial, impertinent, or scandalous matter.

Whether to grant a motion to strike is vested in the trial court's sound discretion. *See, e.g., Hollander v. Amer. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999). The standard applied to a motion to strike is the "mirror image" of the standard on a 12(b)(6) motion to dismiss for failure to state a claim. *See Sony Fin. Servs., LLC v. Multi Video Group, Ltd.*, No. 03 civ. 1730 (LAK)(GWG), 2003 WL 22928602, at * 8 (S.D.N.Y. Dec. 12, 2003).[5] Although motions to strike are not generally favored, courts will strike pleadings where they are clearly insufficient as a matter of law. *See Avent v. Solfaro*, 210 F.R.D. 91, 94 (S.D.N.Y. 2002); *Forschner Group, Inc. v. B-Line A.G.*, 943 F. Supp. 287, 291 (S.D.N.Y. 1996). *See also Ulla-Maija, Inc. v. Kivimaki*, No. 02 civ. 3640(AGS), 2003 WL 169777, at * 4 (S.D.N.Y. Jan. 23, 2003).[6]

In addition, some courts require the moving party to show that it would be prejudiced if a pleading were to remain. *See Avent*, 210 F.R.D. at 94. Increased time and expense of trial justify a court's grant of a Rule 12(f) motion, and a court should strike a defense to eliminate the delay and unnecessary expense from litigating an invalid claim when it is insufficient as a matter of law. *See Estee Lauder, Inc. v. The Fragrance Counter, Inc.*, 189 F.R.D. 269, 272 (S.D.N.Y. 1999).

### B.    Defendant's Counterclaims Are Improperly Filed Without An Answer

Whether considered under the provisions of Federal Rules of Civil Procedure Rule 12(b)(6) or 12(f), Gelfand's so-called "Counterclaims" are improperly filed without an answer or

---

[5] A copy of the decision in *Sony Fin. Servs., LLC v. Multi Video Group, Ltd.*, No. 03 civ. 1730 (LAK)(GWG), 2003 WL 22928602 (S.D.N.Y. Dec. 12, 2003) is annexed hereto as Exhibit 2.

[6] A copy of the decision in *Ulla-Maija, Inc. v. Kivimaki*, No. 02 civ. 3640(AGS), 2003 WL 169777 (S.D.N.Y. Jan. 23, 2003) is annexed hereto as Exhibit 3.

any other pleading. Federal Rules of Civil Procedure Rule 7(a) precisely delineates the only

pleadings allowed:

> (a) Pleadings. Only these pleadings are allowed:
> (1) a complaint;
> (2) an answer to a complaint;
> (3) an answer to a counterclaim designated as such;
> (4) an answer to a crossclaim;
> (5) a third-party complaint;
> (6) an answer to a third-party complaint;
> (7) if the court orders one, a reply to an answer.

Unambiguously, a "counterclaim" without more is not a pleading. The list of pleadings

in Rule 7(a) is exclusive. *Burns v. Lawther*, 53 F.3d 1237, 1241 (11th Cir. 1995); 2 *Moore's*

*Federal Practice* § 7.02[1][b] (Matthew Bender 3d ed.).

The omission of counterclaims from the list of pleadings allowed under Rule 7(a) is no

accident. "A counterclaim is not a separate pleading, but must be made in a responsive pleading,

such as an answer." 3 *Moore's Federal Practice* § 13.90[1] (Matthew Bender 3d ed.). Courts

have long recognized that the Federal Rules require that counterclaims and crossclaims be

asserted in answers and other Rule 7 pleadings.

Gelfand's counterclaims purport to assert infringement by Pfizer of the '688 patent, the

same patent that is the subject of Pfizer's complaint. Thus, the counterclaims are compulsory

counterclaims under Fed. R. Civ. P. 13. *Polymer Indus. Prods. Co. v. Bridgestone/Firestone,*

*Inc.*, 347 F.3d 935, 938 (Fed. Cir. 2003) (establishing a "uniform national rule" that "[r]ule 13(a)

makes an infringement counterclaim to a declaratory judgment action for noninfringement

compulsory."). Fed. R. Civ. P. 13(a)(1) states that "[a] pleading must state as a counterclaim any

claim that – at the time of its service – the pleader has against an opposing party…" Thus, Rule

13 confirms that a "counterclaim" is not a "pleading" and it mandates that Gelfand's compulsory

counterclaim of patent infringement be stated in a "pleading." Similarly, Rule 13(b) provides

6

that "[a] pleading may state as a counterclaim against an opposing party any claim that is not compulsory." Subparagraphs (d), (e), (f) and (g) of Rule 13 are equally clear that counterclaims must be included in a pleading. Nothing in Rule 13 provides for a counterclaim to be separately filed from a proper pleading under Rule 7(a).

In *Bernstein v. IDT Corp.*, 582 F. Supp. 1079, 1089 (D. Del. 1984), the court dismissed counterclaims filed separately from any pleading. There, the plaintiff brought a lawsuit against defendants for RICO and pendent state law claims. One of the defendants brought a 12(b)(6) motion to dismiss prior to answering. Before the disposition of the motion to dismiss, the defendant filed its counterclaims and crossclaims. The court ruled:

> Special emphasis should be placed on the fact that General Dynamics [defendant] has filed no Answer to the complaint. Nonetheless, on October 25, 1983, General Dynamics filed an extensive document entitled "Counterclaims and Crossclaims of General Dynamics Corporation." The crossclaim is directed against [the other defendants]. This document has spawned a flurry of motions to dismiss or to strike. They will all be granted.

*Id.*

The *Bernstein* court proceeded to examine Fed. R. Civ. P. 13(a), 7(a), and 12(a), as well as relevant treatises, and found that all the relevant rules treat counterclaims as asserted in a pleading. The court also cited the 8th Circuit case in *In re Cessna Distributorship Antitrust Litigation*, 532 F.2d 64 (8th Cir. 1976), which considered the same issue for crossclaims, and which concluded that crossclaims could only be asserted in an answer; standing alone, a crossclaim was not a pleading. Finding that the rules for crossclaims cited by that court contained the same operative language as the rules for counterclaims, the *Bernstein* court held that "because General Dynamics has filed no pleading, its counterclaims must be dismissed and/or stricken at this juncture." *Id.*

Similarly, a Minnesota District Court in *Microsoft Corp. v. Ion Technologies Corp.*, 484 F. Supp. 2d 955, 965 (D. Minn. 2007), citing *Cessna*, also found that the defendants there improperly asserted their counterclaims when they "advanced their counterclaims in a separate document on the same day that they filed their Answer to Amended Complaint." Counterclaims must appear in a pleading, and "a separate document that contains counterclaims is not a permissible pleading." *Id.* at 965. The court found other procedural defects in addition to this defect and ultimately dismissed the counterclaims.

This Court has espoused the same view in *Pitts v. L. Epstein of New York, Inc.*, No. 92 civ. 0802 (RPP), 1993 WL 535120 (S.D.N.Y. Dec. 17, 1993).[7] In *Pitts*, defendant Epstein moved for summary judgment on its crossclaims against defendant Metro. Metro opposed the motion by arguing, *inter alia*, that Epstein's crossclaims were improperly pled because they were not contained in its answer filed earlier. Judge Patterson relied solely on *Langer v. Monarch Life Ins. Co.*, 966 F.2d 786 (3d Cir. 1992), which relied on *Cessna supra*, and found that crossclaims must be stated in a pleading. Thus, the Court dismissed Epstein's motion because "Epstein's motion for summary judgment is grounded on an improper cross-claim which is hereby stricken." *Pitts*, 1993 WL 535120 at *1.

Finally, to the extent that prejudice must be shown by the moving party to justify a motion to strike under Fed. R. Civ. P. 12(f), Plaintiffs have been prejudiced by Gelfand's failure to comply with the rules of pleading. Gelfand seeks to use his improper Counterclaims to assert that Pfizer's proper Complaint for Declaratory Judgment should be dismissed so that this matter is litigated solely upon Gelfand's improper Counterclaims. Motion to Dismiss, p 2. No answer has been filed, none of Pfizer's complaint allegations have been directly admitted or denied and

---

[7] A copy of the decision in *Pitts v. L. Epstein of New York, Inc.*, No. 92 civ. 0802 (RPP), 1993 WL 535120 (S.D.N.Y. Dec. 17, 1993) is annexed hereto as Exhibit 4.

Gelfand's improper actions have created, and will continue to create, wholly unnecessary procedural conundrums throughout this litigation.

## V.    **CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion to Dismiss and/or strike Defendant's counterclaims should be granted.

RESPECTFULLY SUBMITTED,

**INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP**
*Attorneys for Plaintiffs Pfizer Inc, Robert Jarvik, M.D., and Jarvik Heart, Inc.*

By:   David G. Ebert (DE 4078)
       250 Park Avenue - 6th Floor
       New York, New York 10177
       (212) 907-9603
       debert@ingramllp.com

Of Counsel:
Rudolf E. Hutz
Jeffrey B. Bove
Mary W. Bourke
William E. McShane
**CONNOLLY BOVE LODGE & HUTZ LLP**
1007 North Orange Street
Wilmington, DE 19899
(302) 658-9141

DATED:  April 10, 2008

9

## CERTIFICATE OF SERVICE

I am an attorney admitted to practice before this Court and am associated with Ingram Yuzek Gainen Carroll & Bertolotti, LLP, attorneys for plaintiffs, Pfizer Inc., Robert Jarvik, M.D., and Jarvik Heart, Inc. ("Plaintiffs"). I hereby certify that on April 10, 2008, I caused copies of Plaintiffs' **NOTICE OF MOTION**, dated April 10, 2008, **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS AND/OR STRIKE DEFENDANT'S COUNTERCLAIMS**, dated April 10, 2008, and **AFFIDAVIT OF DAVID G. EBERT IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS AND/OR STRIKE DEFENDANT'S COUNTERCLAIMS**, dated April 10, 2008, to be served by hand upon:

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street, Room 1310
New York, New York 10007

and also to be served, together with the **[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION TO DISMISS AND/OR STRIKE DEFENDANT'S COUNTERCLAIMS** upon the following:

Mitchell J. Rotbert
The Rotbert Law Group, LLC
*Attorneys for Defendant*
*Mathew I. Gelfand, M.D.*
7315 Wisconsin Avenue
Suite 1250 West
Bethesda, Maryland 20814

by depositing a true and correct copy of the same properly enclosed in a postpaid wrapper, in the official depository maintained and exclusively controlled by the United States.

Dated:  New York, New York
         April 10, 2008

Caitlin L. Bronner (CB - 4280)

1

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

Page 1

In re Pfizer, Inc. Securities Litigation
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re PFIZER, INC. SECURITIES LITIGATION.
This Document Relates to: All Cases.
No. 06 Civ. 14199(LAK).

Feb. 28, 2008.

**Background:** Shareholders brought class action against drug manufacturer and three of its current and former officers and directors, alleging claims for securities fraud and control person liability. Defendants moved to dismiss.

**Holdings:** The District Court, Lewis A. Kaplan, J., held that:

(1) shareholders failed to plead allegations of fraud with requisite particularity;

(2) shareholders failed to sufficiently allege motive to state securities fraud claim; and

(3) shareholders failed to sufficiently allege conscious misbehavior or recklessness to state securities fraud claim.

Motion granted.

**[1] Securities Regulation 349B €=60.53**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.53 k. Misrepresentation.
Most Cited Cases
To satisfy the Private Securities Litigation Reform Act (PSLRA) and rule requiring that, in all averments of fraud or mistake, the circumstances constituting fraud or mistake be stated with particularity, the complaint in a securities fraud case must: (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state

where and when the statements were made; and (4) explain why the statements were fraudulent. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[2] Securities Regulation 349B €=60.51**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.51 k. In General. Most Cited Cases
Under the Private Securities Litigation Reform Act (PSLRA), the complaint in a securities fraud case must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, i.e., an intent to deceive, manipulate, or defraud. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b)(2); 15 C.F.R. § 240.10b-5.

**[3] Securities Regulation 349B €=60.18**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
          349Bk60.18 k. In General. Most Cited Cases
To state a claim based on a misrepresentation or omission in violation of Rule 10b-5, one must allege that a defendant: (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                    Page 2
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

injury. 15 C.F.R. § 240.10b-5.

**[4] Securities Regulation 349B ☞60.53**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.53   k.   Misrepresentation.
Most Cited Cases
To plead securities fraud with requisite particularity, plaintiffs must do more than allege that statements were materially misleading, they must demonstrate with specificity why and how that is so. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[5] Securities Regulation 349B ☞60.51**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51   k.   In   General.   Most
Cited Cases
When factual allegations are made on information and belief, the Private Securities Litigation Reform Act (PSLRA) requires that the complaint in a securities fraud case include adequate bases for the allegations, and it must identify sufficiently the sources upon which plaintiffs' beliefs are based and those sources must have been likely to have known the relevant facts. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b)(1); 15 C.F.R. § 240.10b-5.

**[6] Securities Regulation 349B ☞60.51**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets

         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51   k.   In   General.   Most
Cited Cases
When factual allegations are made in a securities fraud case on information and belief, pursuant to the Private Securities Litigation Reform Act (PSLRA), the factual allegations that are based on adequate sources must justify plaintiffs' conclusion that defendants' statements were materially misleading. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[7] Securities Regulation 349B ☞60.28(11)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17   Manipulative,   Deceptive
or Fraudulent Conduct
               349Bk60.28   Nondisclosure;   Insider
Trading
                 349Bk60.28(10)   Matters   to   Be
Disclosed
                 349Bk60.28(11)   k.   Materiality. Most Cited Cases
An omission is materially misleading, for purposes of a securities fraud claim, if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[8] Securities Regulation 349B ☞60.51**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51   k.   In   General.   Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
**(Cite as: --- F.Supp.2d ----)**

Page 3

Cited Cases
Shareholders failed to plead with particularity facts sufficient to support allegation that statements of drug manufacturer and three of its current and former officers and directors regarding drug's efficacy were materially misleading, as required to plead a securities fraud claim under the Private Securities Litigation Reform Act (PSLRA), where studies cited by shareholders did not support their allegation that the drug was not effective, and shareholders did not allege how source who asserted that defendants had been warned of drug's shortcomings was likely to know the relevant facts. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[9] Securities Regulation 349B ☞60.53**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.53 k. Misrepresentation. Most Cited Cases
Facts alleged did not support shareholders' inference that drug intended to reduce coronary heart disease by raising so-called "good" cholesterol was unlikely to reduce artherosclerosis and thus made drug manufacturer and its officers and directors' positive statements about drug's efficacy materially misleading, as required to satisfy requirements of pleading securities fraud with particularity; rather, allegations supported at most an inference that evidence available during the class period was inconclusive on drug's efficacy, which would not support an inference that defendants actually drew a negative conclusion from inconclusive evidence. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[10] Securities Regulation 349B ☞60.28(11)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
               349Bk60.28 Nondisclosure; Insider Trading
                  349Bk60.28(10) Matters to Be Disclosed
                     349Bk60.28(11) k. Materiality. Most Cited Cases
An omission is material, for purposes of a securities fraud claim, if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[11] Securities Regulation 349B ☞60.28(13)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
               349Bk60.28 Nondisclosure; Insider Trading
                  349Bk60.28(10) Matters to Be Disclosed
                     349Bk60.28(13) k. Particular Matters. Most Cited Cases
Sudden drop in stock price after revelation of previously undisclosed information did not prevent conclusion that allegedly omitted information was absorbed by the market, such that it was not material for purposes of shareholders' securities fraud claim, where drop in stock price did not follow revelation of allegedly omitted fact that there was conflicting evidence about efficacy of drug manufacturer's drug, but, rather, it followed sudden news that clinical trials were being halted, a development that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                            Page 4
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

was significant independent of whether there previously had been conflicting evidence of drug's efficacy. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[12] Securities Regulation 349B** ☞60.53

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.53  k.  Misrepresentation.
Most Cited Cases
Shareholders failed to plead with particularity facts sufficient to support allegation that optimistic statements of drug manufacturer and three of its current and former officers and directors regarding drug's side effects were materially misleading, as required to plead a securities fraud claim under the Private Securities Litigation Reform Act (PSLRA), where studies cited by shareholders did not support their allegation that drug's side effects were unmanageable, and shareholders did not allege how source who asserted that defendants had been warned of drug's side effects had personal knowledge of relevant facts. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[13] Securities Regulation 349B** ☞60.53

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.53  k.  Misrepresentation.
Most Cited Cases
Shareholders failed to plead with particularity facts supporting their allegation that optimistic statements of drug manufacturer and three of its current and former officers and directors regarding drug's side effects were materially misleading when made, as required to plead a securities fraud claim under

the Private Securities Litigation Reform Act (PSLRA), where even shareholders' own source undermined any inference that defendants believed side effects of drug were unmanageable, and drug's ultimate failure was not evidence that side effects were thought to be unmanageable at time alleged misstatements were made. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[14] Securities Regulation 349B** ☞60.51

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.51  k.  In General. Most
Cited Cases
To state a securities fraud claim under the Private Securities Litigation Reform Act (PSLRA), plaintiffs must state with particularity facts giving rise to a strong inference that each defendant acted with the required state of mind, by alleging facts: (1) showing that defendants had both motive and opportunity to commit the fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[15] Securities Regulation 349B** ☞60.51

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.51  k.  In General. Most
Cited Cases
A complaint gives rise to a strong inference of scienter, as required to state a claim for securities fraud under the Private Securities Litigation Reform Act (PSLRA), only if a reasonable person

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[16] Securities Regulation 349B ⬨═60.53**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.53  k.  Misrepresentation.
Most Cited Cases
Even if statements made by drug manufacturer's officers and directors about drug intended to reduce coronary heart disease by raising so-called "good" cholesterol were actionable, shareholders failed to sufficiently allege motive to state securities fraud claim; defendants' alleged motives to portray likelihood of prosperity, and to increase value of their performance based compensation plans, were typical of every corporation and executive. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[17] Securities Regulation 349B ⬨═60.53**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.53  k.  Misrepresentation.
Most Cited Cases
To plead motive sufficiently to give rise to strong inference of scienter, securities fraud plaintiffs must allege facts demonstrating concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged; it is not sufficient to allege motives that are generally possessed by most corporate directors and officers, and general allegations that the defendants acted in

their economic self-interest are insufficient. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[18] Securities Regulation 349B ⬨═60.53**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.53  k.  Misrepresentation.
Most Cited Cases
Even if statements made by drug manufacturer's officers and directors about drug intended to reduce coronary heart disease by raising so-called "good" cholesterol were actionable, shareholders failed to sufficiently allege conscious misbehavior or recklessness to state securities fraud claim, where their factual allegations and sources did not support inference that defendants' statements were materially misleading, and those facts could not support an inference that defendants knew or should have known their statements were false or misleading when made. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[19] Securities Regulation 349B ⬨═60.45(1)**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.43 Grounds of and Defenses to Liability
        349Bk60.45  Scienter, Intent, Knowledge, Negligence or Recklessness
          349Bk60.45(1)  k.  In  General.
Most Cited Cases
To raise a strong inference of scienter based on recklessness, securities fraud plaintiffs must allege conduct that is highly unreasonable and which represents an extreme departure from the standards of ordinary care. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

**[20] Securities Regulation 349B ⟐60.51**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 k. In General. Most
Cited Cases
If a complaint in a securities fraud case fails adequately to allege motive, the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[21] Securities Regulation 349B ⟐60.53**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.53 k. Misrepresentation.
Most Cited Cases
When the complaint in a securities fraud case alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

Samuel P. Sporn, Joel P. Laitman, Christopher Lometti, Jay P. Saltzman, Kurt Hunciker, Frank R. Schirripa, Daniel B. Rehns, Schoengold Sporn Laitman & Lometti, P.C., for Plaintiffs.
Dennis J. Block, Gregory A. Markel, Martin L. Seidel, Mollie E. O'Rourke, Cadwalader, Wickersham & Taft LLP, for Defendants.

### MEMORANDUM OPINION

LEWIS A. KAPLAN, District Judge.
*1 On December 2, 2006, Pfizer, Inc. ("Pfizer") announced that it was halting clinical trials of the developmental drug torcetrapib.[FN1] By the close of the next trading day, the price of Pfizer common stock had declined by 10.62 percent.[FN2] Plaintiffs then brought a class action against Pfizer and three of its current and former officers and directors (collectively, the "Individual Defendants").[FN3] Plaintiffs seek recovery against defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [FN4] and Rule 10b-5 thereunder.[FN5] They assert an additional claim against the Individual Defendants under Section 20(a) of the Exchange Act.[FN6] The case is before the Court on defendants' motion to dismiss.

*Facts*

The lead plaintiff in this action is the Uniformed Sanitationmen's Association Compensation Accrual Fund. It purports to represent a class of all individuals and entities who purchased Pfizer securities between January 19, 2005, and December 2, 2006, (the "Class Period"). Pfizer is a Delaware corporation that develops, manufactures, and markets prescription medicines and consumer healthcare products.[FN7]

During the class period, Pfizer was developing torcetrapib, a drug intended to reduce coronary heart disease ("CHD") by raising so-called "good" cholesterol.

In colloquial terms, there are two varieties of cholesterol: "good" and "bad" cholesterol. Whether cholesterol is good or bad is defined by the type of lipoprotein to which the cholesterol is attached. Low density lipoproteins ("LDLs") carry cholesterol into arteries, where excess cholesterol often is deposited as plaque on arterial walls. The deposition of plaque-a process known as atherogenesis[FN8]-narrows arteries and restricts the flow of blood and oxygen to the heart.[FN9] Thus, the cholesterol attached to LDLs ("LDL-cholesterol") is known popularly as bad cholesterol. In contrast, high density lipoproteins ("HDLs") remove choles-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
**(Cite as: --- F.Supp.2d ----)**

terol from the blood, transporting it to the liver for excretion, a process known as reverse cholesterol transport ("RCT").[FN10] Thus, the cholesterol attached to HDLs ("HDL-cholesterol") is known popularly as good cholesterol.

High HDL-cholesterol levels correlate generally with low cardiovascular risk, [FN11] a fact attributed to HDL's role in RCT.[FN12] Pfizer developed torcetrapib to raise HDL-cholesterol. It anticipated that torcetrapib would accomplish this by inhibiting the cholesterol ester transfer protein ("CETP"), which transfers cholesterol between HDLs and LDLs. This was intended to raise HDL-cholesterol levels by causing cholesterol to accumulate on HDL particles. Ultimately, Pfizer hoped artificially raising HDL-cholesterol would increase RCT and correlate with low cardiovascular risk.[FN13]

Phase II clinical tests of torcetrapib were designed to determine whether torcetrapib raised HDL-cholesterol levels.[FN14]Those trials showed that torcetrapib was effective at raising HDL-cholesterol, but they showed also a 2-3 mm increase in systolic blood pressure.[FN15]

*2 By 2004, Pfizer began Phase III of the clinical trials. As the clinical trials progressed, Pfizer updated the medical and financial communities on torcetrapib's development through public statements and press releases.

On December 2, 2006, Pfizer announced that it was "stopping all torcetrapib clinical trials" based on the recommendation of the Data Safety Monitoring Board ("DSMB") that monitored the trials. The recommendation was made "because of an imbalance of mortality and cardiovascular events."[FN16]Following this announcement, shares of Pfizer common stock declined by $2.96 per share, from a closing price of $27.86 per share on December 1, 2006, to a closing price of $24.90 per share on December 4, 2006.[FN17]

Plaintiffs allege that defendants, in the period prior to the cessation of Phase III trials, intentionally or recklessly made statements that were misleading because they failed to disclose facts that lessened the likelihood that torcetrapib ultimately would prove safe and efficacious. The misleading statements, plaintiffs claim, were "designed to artificially inflate the price of Pfizer securities" and were part of a "desperate effort to avert significant market loss due to the impending loss of patent protection by principal Pfizer drugs ...."[FN18] Plaintiffs allege that defendant McKinnell was motivated to maximize his severance package, but do not allege that any Individual Defendant sold stock during the class period.[FN19]

*Discussion*

*I. Standard Governing Motions to Dismiss*

In deciding a motion to dismiss, the Court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiffs' favor.[FN20]In order to survive such a motion, however, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' "[FN21]

Although this motion is addressed to the face of the pleadings, the Court may consider also the full text of "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[FN22]Defendants have submitted many exhibits in support of their motion, including Pfizer press releases and analyst call transcripts, academic literature, and analyst reports. The parties agreed that all of these documents could be considered on this motion to dismiss,[FN23] and the Court considers those documents that the complaint incorporates by reference or are amenable to judicial notice.

[1][2] As this is a securities fraud case, the complaint must satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").[FN24] It must state

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 8
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

the circumstances constituting fraud with particularity. In particular, it "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[FN25] Where an allegation regarding a misstatement or omission is made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed."[FN26] Finally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[FN27]

*II. Plaintiffs' Section 10(b) Claims*

*A. Elements of a 10(b) Claim*

**\*3** Section 10(b) makes it unlawful "for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Rule 10b-5 in turn provides:

"It shall be unlawful for any person ...
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security."[FN28]

**[3]** To state a claim based on a misrepresentation or omission in violation of Rule 10b-5, as plaintiffs purport to do here, one must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the

purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."[FN29]

*B. Allegations that Statements were Materially Misleading*

Defendants argue that plaintiffs have not pleaded with particularity facts sufficient to support the belief that defendants' statements were materially misleading. Plaintiffs, however, contend that they have alleged sufficiently that defendants' statements misrepresented (1) torcetrapib's potential for reducing artherosclerosis, and (2) the seriousness of its side effects.

**[4][5][6][7]** Plaintiffs must do more than allege that statements were materially misleading: "they must demonstrate with specificity why and how that is so."[FN30] Where, as here, factual allegations are made on information and belief, the complaint must allege adequate bases for the allegations.[FN31] It "must identify sufficiently the sources upon which [plaintiffs'] beliefs are based and those sources must have been likely to have known the relevant facts."[FN32] Second, the factual allegations that are based on adequate sources must justify plaintiffs' conclusion that defendants' statements about torcetrapib's were materially misleading.[FN33] An omission is materially misleading if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."[FN34]

*1. Torcetrapib's Efficacy*

**[8]** Plaintiffs allege, on information and belief, that defendants' statements were misleading because they cast the likelihood that torcetrapib would prove to be effective in a positive light when in fact this was unlikely.[FN35] They rest this allegation on four subsidiary assertions: (1) a study showed that "RCT was not increased by torcetrapib,"[FN36] (2) another study "demonstrated only that the patients

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
**(Cite as: --- F.Supp.2d ----)**

who took torcetrapib were no worse off than those who did not in terms of cholesterol removal ...,"FN37 (3) "there was conflicting evidence on whether CETP inhibition [the mechanism by which torcetrapib raised HDL] was pro- or anti-atherogenic,"FN38 and (4) "Pfizer had been warned internally that CETP inhibition would not work."FN39None, however, withstands analysis.

*(a) Do the Cited Sources Support Plaintiffs' Subsidiary Allegations?*

**\*4** The allegation that RCT was not increased by torcetrapib is said to be based on the Brousseau study.FN40Contrary to plaintiffs' allegation, however, Brousseau did not reach any conclusion about whether torcetrapib increased RCT.FN41 In fact, the study observed only that torcetrapib did not affect fecal concentrations of neutral sterols and bile acids, which it used to assess RCT indirectly. But it noted also that these surrogates might not be affected by an increase in RCT if torcetrapib were associated with "a decrease in hepatic cholesterol synthesis and a proportional increase in cholesterol synthesis in the peripheral tissues."FN42The complaint's reliance on Brousseau therefore is misplaced.

The claim that another study showed only that patients on torcetrapib were no worse off in terms of cholesterol removal than others rests on the Bamberger study abstract.FN43Plaintiffs suggest that Bamberger observed no affirmative evidence of cholesterol removal. In fact, however, the abstract reported statistically significant increases in the two measures of cholesterol removal that were observed and concluded that "partial inhibition of CETP with T[orcetrapib] does not compromise, *and may enhance,* the cholesterol efflux potential of HDL, which is considered the first step in reverse cholesterol transport."FN44Thus, plaintiffs' characterization of Bamberger, like their characterization of Brousseau, is misleading.

Plaintiffs' third allegation is based on scientific art-

icles published between 1993 and 2006.FN45These sources support plaintiffs' allegation "that there was conflicting evidence" about torcetrapib's potential efficacy.

Plaintiffs' final and most significant allegation-viz. that Pfizer had been warned internally that CETP inhibition would not work-is based entirely on an anonymous blog post.FN46Plaintiffs have identified their source-the text of the blog post-and included its full text in their complaint. But this is not sufficient.

In addition to identifying the source, the source must be shown to have been likely to know the relevant facts.FN47There is no reason to believe that the author of this blog, identified only as RADman-Zulu, is likely to have known the relevant facts.

Plaintiffs try to avoid this inevitable conclusion by attributing characteristics to the blog's anonymous author. They assert that RADmanZulu is "a former Pfizer Vice-President and Medical Therapeutic Head of Pfizer's Cardiovascular & Metabolic Group, who also acted as medical director of Pfizer's Cardiovascular Risk Factors Group in the [United States] ... [through the second half of 2002]."FN48 But the blog post, plaintiffs' purported source, does not contain any information about RADmanZulu's identity, and plaintiffs do not articulate any other basis for their belief.FN49

Even if we credited plaintiffs' assertion that RADmanZulu was employed at Pfizer through the end of 2002, the question of whether he would have been likely to know the relevant facts would remain. In the blog post, RADmanZulu claims that, "[e]arly in the program, people like Brian Brewer and Michael Brown warned Pfizer that blocking CETP was likely to accelerate atherosclerosis."FN50To support the inference that RADmanZulu would have been likely to know the relevant facts, plaintiffs rely entirely on his alleged positions at Pfizer.FN51But the complaint does not describe RADmanZulu's role at Pfizer or his participation in relevant events. Moreover, RADmanZulu's allega-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
**(Cite as: --- F.Supp.2d ----)**

Page 10

tion does not claim to be based on personal know-ledge and lacks detail that might suggest personal knowledge. For example, the blog post does not de-scribe when,[FN52] how, on what basis, by whom, or to whom the alleged warning was communicated. Even setting aside the numerous deficiencies with this source, RADmanZulu's assertion that someone warned Pfizer that CETP inhibition was likely to accelerate atherosclerosis does not support plaintiffs' larger claim that Pfizer was warned it would not work.

*(b) Does the Sufficiently Sourced Subsidiary Alleg-ation Justify Plaintiffs' Inference?*

**\*5 [9]** The next question is whether the facts al-leged, to the extent they are based on adequate sources, support plaintiffs' inference that torcetrap-ib was unlikely to reduce artherosclerosis and thus made defendants' positive statements materially misleading.

Only one of plaintiffs' subsidiary allegations is sup-ported by adequate sources-viz. that there was con-flicting evidence on whether CETP inhibition was pro- or anti-atherogenic. Drawing all inferences in plaintiffs' favor, the most this allegation supports is an inference that evidence available during the class period was inconclusive on torcetrapib's po-tential efficacy.

Defendants' knowledge that evidence of torcetrap-ib's efficacy was inconclusive does not support an inference that their optimistic statements were ma-terially misleading. Defendants were entitled to take an optimistic view of inconclusive evidence, so long as they did not make positive statements while withholding negative information that would have been material to an investor.[FN53] "[C]orporate officials need not present an overly gloomy or cau-tious picture" so long as "public statements are con-sistent with reasonably available data."[FN54]

This principle is applicable in the drug development context. In the *Carter-Wallace* cases, "the Second

Circuit concluded that the drug manufacturer's as-surances about safety 'did not become materially misleading until [it] had information that [the drug] had caused a statistically significant number of ... deaths and therefore had reason to believe that the commercial viability of [the drug] was threatened.'"[FN55]

To be sure, *Carter-Wallace* did not adopt a bright-line rule that a statement is materially misleading only if it conflicts with statistically significant evid-ence.[FN56] Thus, if a drug manufacturer in fact draws a pessimistic conclusion from statistically in-significant evidence, any optimistic statements it makes could be rendered materially misleading if it were to omit even statistically insignificant negat-ive evidence.[FN57] But plaintiffs' allegations do not support an inference that defendants actually drew a negative conclusion from the inconclusive evid-ence.[FN58] They allege only that Pfizer's optimistic statements were misleading because it failed to state also that there was conflicting evidence as to whether CETP inhibition would be pro- or anti-atherogenic. This is insufficient under *Carter-Wallace*.

**[10]** Furthermore, while plaintiffs assert that the al-legedly omitted facts relating to torcetrapib's effic-acy were material, allegations in the complaint be-lie that claim.[FN59] An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reason-able investor as having significantly altered the 'total mix' of information made available."[FN60] In this case, it is clear that the conflicting evidence of torcetrapib's efficacy was part of the total mix of in-formation available to the market.[FN61]

**\*6** Plaintiffs argue that there is a factual question about whether investors "read and digested" the available information.[FN62] But the relevant inquiry is not whether the truth was absorbed by the mar-ket, but whether it was available to the market.FN63 Moreover, the complaint here alleges that the market absorbed all available information.FN64 This allegation allows plaintiffs

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590

**(Cite as: --- F.Supp.2d ----)**

to avoid a fact intensive question of whether the market actually was aware of defendants' alleged misstatements. But it simplifies also the question of whether the market was aware of the allegedly omitted facts.

It is evident that the allegedly omitted information was available to the market because plaintiffs, in their effort to identify allegedly omitted information, rely entirely on sources that were available publicly during the class period.[FN65] Indeed, analysts' reports acknowledged the conflicting evidence of torcetrapib's efficacy.[FN66] According to plaintiffs, such reports were "publicly available and entered the public marketplace."[FN67]

[11] Finally, plaintiffs argue that the sudden drop in stock price after the "revelation of previously undisclosed information" prevents a conclusion that the allegedly omitted information was absorbed by the market. This is not persuasive. The drop in stock price did not follow the revelation of the allegedly omitted fact-that there was conflicting evidence about torcetrapib's efficacy. Rather, as plaintiffs explain elsewhere in the complaint, it followed the "sudden news ... that the clinical trials were being halted," a development that was significant independent of whether there previously had been conflicting evidence of torcetrapib's efficacy.FN68

### 2. Blood Pressure Side Effect

Plaintiffs allege, on information and belief,[FN69] that defendants' optimistic statements about torcetrapib's side effects were misleading because its side effects were unmanageable.[FN70] This assertion rests on subsidiary assertions that: (1) even small increases in systolic blood pressure may be dangerous,[FN71] and (2) "Pfizer believed, but did not disclose, that the metabolite(s) of torcetrapib could inhibit [monoamine oxidase], thereby causing increased blood pressure ...."[FN72]

### (a) Do the Cited Sources Support Plaintiffs' Subsi-

*diary Allegations?*

[12] Plaintiffs' first allegation is based on scientific research and statements made by Pfizer in other contexts.[FN73] These sources support plaintiffs' factual allegation that even small increases in blood pressure may be dangerous. However, this does not lead inevitably to the inference that the side effect was unmanageable or unjustifiable.

Plaintiffs' second allegation is based on the same RADmanZulu blog post discussed above.[FN74] RADmanZulu asserted that "[t]he current wisdom of the time is that one of the metabolites inhibited mono amine oxidase."[FN75] Even if we assume, as plaintiffs do, that RADmanZulu was employed at Pfizer through the second half of 2002, this source would be insufficient to support plaintiffs' allegation that "Pfizer believed" that torcetrapib could inhibit monoamine oxidase. RADmanZulu's assertion is vague: it does not claim a basis for personal knowledge, nor does it explain when, by whom, or on what basis the "current wisdom of the time" was held.

### (b) Does the Sufficiently Sourced Subsidiary Allegation Justify Plaintiffs' Inference?

*7 [13] Drawing all inferences in plaintiffs' favor, the plaintiffs' factual allegations and sources support an inference that small increases in blood pressure can be dangerous. But plaintiffs' sources and factual allegations do not support the inference that torcetrapib's side effects were unmanageable. Nor do the sources or factual allegations support an inference that defendants actually believed the side effect was unmanageable. Indeed, plaintiffs' own source, the blog post, undermines any inference that Pfizer believed the blood pressure side effect was unmanageable. According to RADmanZulu: "The Groton team felt that [blood pressure] could be managed by lowering the dose and hoped that atorvastatin would also lower [blood pressure]."[FN76]

Finally, torcetrapib's ultimate failure is not evid-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
**(Cite as: --- F.Supp.2d ----)**

Page 12

ence that the side effects were thought to be unmanageable at the time the alleged misstatements were made. Fraud-by-hindsight is not sufficient to establish liability under Rule 10b-5.[FN77]In any case, plaintiffs have not alleged that torcetrapib failed because its side effects were unmanageable.[FN78]They acknowledge that the most they can allege is that torcetrapib failed because "there was a difference in deaths between the group which got the drug and the group that didn't."[FN79]

Plaintiffs have not pleaded with particularity facts sufficient to support their allegation that defendants' statements were materially misleading. Many of plaintiffs' factual allegations are not based on an adequate source or are unsupported by the purported source. Those allegations that are based on adequate sources do not support the inference that defendants' statements about torcetrapib's safety or efficacy were materially misleading. For the foregoing reasons, the complaint fails to state the circumstances constituting fraud with particularity as required by Rule 9(b) and the PSLRA.

*C. Scienter*

[14][15] Even if the complaint had pleaded adequately the circumstances constituting fraud, it would be insufficient nonetheless. Plaintiffs must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind."[FN80]A complaint may satisfy this requirement "by alleging facts (1) showing that defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior."[FN81]A complaint gives rise to a strong inference of *scienter*"only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[FN82]

*1. Motive and Opportunity*

[16][17] To plead motive, plaintiffs must allege facts demonstrating "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[FN83]It is not sufficient to allege motives that are "generally possessed by most corporate directors and officers."[FN84]And "[g]eneral allegations that the defendants acted in their economic self-interest" are insufficient.[FN85]

*8 Plaintiffs attempt to plead motive by alleging that Pfizer had a "desperate need ... to assure the financial community of the existence of a new blockbuster drug."[FN86]This is not a unique motive. Rather, it is a way of saying, in a manner tailored to a pharmaceutical company, something that is true for all profit enterprises-each has an incentive to portray the likelihood that it will continue to prosper.

Courts in this district have found similar allegations of motive insufficient. For example, plaintiffs in *In re Bayer* sought to plead motive by alleging that "[Bayer] was under pressure to bring a 'blockbuster drug to market.' "[FN87] And in *In re Bristol-Myers Squibb,* the plaintiffs alleged motive based on the defendants' desire to " 'maintain a facade of future potential' for [its] drug pipeline, ... [and to] address potential concerns about patent expirations ...."[FN88] Both courts found these allegations insufficient. The latter court described such allegations as "nothing more than a pejorative characterization of ... ordinary corporate desires."[FN89]

Plaintiffs argue that McKinnell had motive to commit fraud in order to increase his severance package.[FN90]Performance based compensation plans "are typical of nearly every corporation" and are usually insufficient to plead motive.[FN91]"If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."[FN92]Plaintiffs' attempt to distinguish McKinnell's severance agreement from generic performance-based compensation plans is disingenuous.[FN93]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
**(Cite as: --- F.Supp.2d ----)**

Page 13

*2. Conscious Misbehavior or Recklessness*

[18][19][20][21] To raise a strong inference of *scienter* based on recklessness, plaintiffs must allege conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care."[FN94]If a complaint fails adequately to allege motive, "the strength of the circumstantial allegations of conscious misbehavior or recklessness 'must be correspondingly greater.' "[FN95]"Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts ...."[FN96]

Plaintiffs attempt create a strong inference of *scienter* by alleging that: (1) defendants had knowledge or access to information contradicting their public statements,[FN97] (2) "Pfizer intentionally established endpoints for the Phase II trial of increased HDL-[cholesterol] in order to ensure that the endpoints would be obtained, knowing full well that such endpoints ... potentially were associated with increased coronary heart risk,"[FN98] (3) "Pfizer intentionally violated AHA [American Heart Association] Rules in order to pre-announce its Phase III clinical results in order to 'spin' the adverse blood pressure side effect results found therein,"[FN99] and (4) "Pfizer knowingly designed the torcetrapib Phase III trials to allow the trial to continue until an unreasonably high statistical certainty was met."[FN100]

*9 Plaintiffs rely on the same factual allegations and sources to assert defendants' knowledge of or access to information contradicting their public statements. As addressed above, plaintiffs' factual allegations and sources do not support the inference that defendants' statements were materially misleading. "If the facts alleged in the Complaint are insufficient to support Plaintiffs' belief that false or misleading statements were made, those facts cannot support an inference that Defendants knew or should have known their statements were false or

misleading when Defendants made them."[FN101]

Even if plaintiffs' factual allegations about torcetrapib's efficacy and safety could be understood as contradicting defendants' statements, the contradictory information was publicly available.[FN102]Numerous courts have suggested or assumed that the contradictory information must have been non-public in order to raise a strong inference of intent.[FN103]That the information was publicly available when the allegedly misleading statements were made weakens any inference that defendants intended to defraud the market.

Plaintiffs' remaining allegations are conclusory statements of defendants' intent. The complaint makes no factual allegations that suggest that Pfizer violated AHA rules in order to spin the results, or that Pfizer designed Phase II studies to avoid uncovering adverse clinical results, or that Pfizer used an unreasonably high measure of statistical significance to postpone termination of Phase III.[FN104]Conclusory allegations of intent are not sufficient.[FN105] Plaintiffs cannot circumvent this requirement by providing subsidiary allegations that merely are conclusory allegations of intent.

*III. Plaintiffs' Section 20(a) Claims*

Plaintiffs assert also claims under Section 20(a) of the Exchange Act [FN106] against the individual defendants. Section 20(a) claims are necessarily predicated on a primary violation of securities law and impose "control person" liability on individual defendants.[FN107]Because plaintiffs have failed to state a claim for a primary violation of Section 10(b) of the Exchange Act, their Section 20(a) claim must be dismissed against all defendants.

*Conclusion*

For the foregoing reasons, defendants' motion to dismiss the amended complaint [docket item 13] is granted. Plaintiffs' request for leave to amend FN108 is denied without prejudice to a motion for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
**(Cite as: --- F.Supp.2d ----)**

leave to amend supported by a proposed amended complaint.

SO ORDERED.

FN1. Amended Class Action Complaint ("Cpt.") ¶ 17.

FN2. Cpt. ¶¶ 17, 153.

FN3. The Individual Defendants are: (1) Henry A. McKinnell, former chairman of the board of directors, and former chief executive officer; (2) John LaMattina, president of Pfizer global research and development; and (3) Joseph Feczko, chief medical officer.

FN4. 15 U.S.C. § 78j(b).

FN5. 17 C.F.R. § 240.10b-5.

FN6. 15 U.S.C. § 78t(a).

FN7. Cpt. ¶ 25.

FN8. *Id.* ¶ 57 n. 4. An anti-atherogenic compound curbs the accumulation of plaque while a pro-atherogenic promotes accumulation. *Id.*

FN9. *Id.* ¶¶ 54-56.

FN10. *Id.* ¶ 59.

FN11. *Id.* ¶¶ 2 n. 2; 58-59.

FN12. *Id.* ¶ 59.

FN13. *Id.*

FN14. *Id.* ¶ 162(d).

FN15. *Id.* ¶ 9.

FN16. *Id.* ¶ 151, Seidel Decl. (DI 15) Ex. 39.

FN17. Cpt. ¶ 153.

FN18. *Id.* ¶ 1-3.

FN19. *Id.* ¶ 28.

FN20. *Flores v. S. Peru Copper Corp.,* 343 F.3d 140, 143 (2d Cir.2003); *Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001), *cert. denied,* 535 U.S. 1054, 122 S.Ct. 1911, 152 L.Ed.2d 821 (2002).

FN21. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Iqbal v. Hasty,* 490 F.3d 143, 158-59 (2d Cir.2007) (declining to limit *Bell Atl.* holding to the antitrust context).

FN22. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* --- U.S. ----, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007) (citing 5B CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1357) (3d ed.2004 and Supp.2007); *see also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir.2002).

FN23. The parties agreed that defendants' exhibits could be considered on the motion to dismiss without converting the motion into a motion for summary judgment. Tr., Nov. 7, 2007, at 20:13-23; *see* FED. R. CIV. P. 12(b), (c); *Gurary v. Winehouse,* 190 F.3d 37, 42 (2d Cir.1999).

FN24. Pub.L. No. 104-67, 109 Stat. 737 (1995).

FN25. *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.) *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000); *accord In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69-70 (2d Cir.), *cert. denied,* 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

(2001).

FN26.15 U.S.C. § 78u-4(b)(1). The requirement of stating "all facts" is not applied literally. *See Novak,* 216 F.3d at 313-14.

FN27.15 U.S.C. § 78u-4(b)(2). The required state of mind is "an intent to deceive, manipulate, or defraud."*Ganino,* 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (internal quotation marks omitted)); *accord Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001).

FN28.17 C.F.R. § 240.10b-5 (2007).

FN29.*Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.) (quoting *In re IBM Corp. Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998) (internal quotation marks omitted)), *cert. denied,*546 U.S. 935, 126 S.Ct. 421, 163 L.Ed.2d 321 (2005); *accord Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000).

FN30.*Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir.2004); *see In re IAC/InterActiveCorp Sec. Litig.,* 478 F.Supp.2d 574, 591 (S.D.N.Y.2007).

FN31.*See Novak,* 216 F.3d at 306 (quoting 15 U.S.C. § 78u-4(b) (1)); *see also In re IAC/InterActiveCorp,* 478 F.Supp.2d at 591.

FN32.*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F.Supp.2d 385, 395 (S.D.N.Y.2005).

FN33.*In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d 15, 23 (S.D.N.Y.2004); *Fraternity Fund Ltd.,* 376 F.Supp.2d at 395.

FN34.*Starr v. Georgeson S'holder, Inc.,*

412 F.3d 103, 110 (2d Cir.2005) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation omitted and internal quotation marks omitted)).

FN35.*See* Cpt. ¶ 1, 6 (describing how omission made statements misleading); Pl. Mem. at 2 (same); *id.* at 11-12 (asserting materiality of omissions).

FN36. See Cpt. ¶¶ 116; 124; 135; 141; 149; 100; 113 (alleging that statements are misleading for this reason); *id.* ¶¶ 109; 111; 118; 122 (alleging that statements are misleading because "Phase II trials did not find any correlation between CETP inhibition and increased RCT").

FN37.*See id.* ¶ 113; 124; 12 (alleging that statements are misleading for this reason).

FN38.*See id.* ¶¶ 103; 116; 135; 141; 149 (alleging that statements are misleading for this reason); *Id.* ¶¶ 107; 120; 137 (alleging that statements are misleading because CETP inhibition "was equally likely to be linked to adverse coronary risks"); *Id.* ¶¶ 129; 131 (alleging that statements are misleading because studies suggested that CETP inhibition "could well increase coronary heart disease.").

FN39.*See id.* ¶¶ 103; 116; 135; 141; 149 (alleging that statements are misleading for this reason).

FN40.*See id.* ¶ 100-01 (citing the Brousseau study); ¶¶ 111; 113; 116; 118; 122; 124; 135; 141; 149; 109 (citing no source or paragraphs 100-01).

FN41. Seidel Decl. Ex. 12, at 1062.

FN42.*Id.*

FN43.*See* Cpt. ¶¶ 113, 124, 12 (quoting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

Page 16

from the abstract to the Bamberger study). Based on the facts alleged in the complaint, defendants identify plaintiffs' source as the Bamberger study, which was presented by Pfizer at the November 2005 Conference of the American Heart Association. *See* Seidel Decl. ¶ 14; Def. Mem. at 9, 23. Plaintiffs do not contest that this was their source.

FN44. Seidel Decl. Ex. 13 (emphasis added).

FN45.*See* Cpt. ¶¶ 63-76 (summarizing studies from 1996 to 2006 that found CETP deficiency due to a genetic mutation was correlated with an increased risk of CHD); ¶¶ 103, 116; 135; 141; 149 (citing to paragraphs 63-76); ¶¶ 107, 120; 137 (citing to no source); ¶¶ 129; 131 (citing to paragraphs 12; 44; 54-87, but only paragraphs 63-76 support fact alleged).

FN46.*See id.* ¶¶ 44 (reprinting the text of the blog post); ¶¶ 103; 116; 135; 141; 149 (citing to paragraph 44; 100-02).

FN47.*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F.Supp.2d 385, 395 (S.D.N.Y.2005); *In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d 15, 23 (S.D.N.Y.2004).

FN48. Cpt. ¶ 43. The complaint alleges that RADmanZulu held these positions "during the relevant period," but at oral argument, plaintiffs specified that he was employed at Pfizer through the "second half of 2002." Tr., Nov. 7, 2007, at 21:15-17.

FN49. At oral argument, plaintiffs explained that they alleged RADmanZulu's identity based on "an investigation." Tr., Nov. 7, 2007, at 21:5-10. Plaintiffs did not elaborate on this investigation, and they do not claim to have spoken to the man they

assume to be the author of the blog. *Id.*

FN50. Cpt. ¶ 44.

FN51.*See, e.g.,* Pl. Mem. at 10 ("Needless to say, [RADmanZulu's] position ... makes him eminently qualified to know about adverse effects of Pfizer principal cardiovascular drug and the status of clinical tri- als.").

FN52. Although according to plaintiffs' own assertions, RADmanZulu left Pfizer during second half of 2002, and would have no basis for knowledge after that time.

FN53.*See, e.g., In re IAC/InterActiveCorp., Sec. Litig.,* 478 F.Supp.2d 574, 591 (S.D.N.Y.2007) (citing *Rombach v. Chang,* 355 F.3d 164, 173 (2d Cir.2004); *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002)).

FN54.*Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000) (citing *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 85 (2d Cir.1999); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129-30 (2d Cir.1994)).

FN55.*In re Bayer AG Sec. Litig.,* 03 Civ.2004(WHP), 2004 WL 2190357, at *8 (S.D.N.Y. Sept. 30, 2004) (quoting *In re Carter-Wallace Sec. Litig.,* 150 F.3d 153, 157 (2d Cir.1998))

FN56.*See, e.g., In Re Bayer AG,* 2004 WL 2190357, at *9;*In re Corning, Inc. Sec. Litig.,* Nos. 92 Civ. 345(TPG), 92 Civ. 1103(TPG), 2001 WL 986782, at *2 (S.D.N.Y. Aug. 27, 2001).

FN57.*See, e.g., In Re Bayer AG,* 2004 WL 2190357, at *9-10.

FN58. Plaintiffs argue otherwise in their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

Page 17

memorandum: "Defendants had actual knowledge that ... CETP-inhibition would increase atherosclerosis and that torcetrapib did not increase the rate of RCT." Pl. Mem. at 15-16. But this assertion is not supported by the adequately sourced subsidiary allegation of the complaint and falls short of the circumstances in *In re Regeneron*, on which plaintiffs rely. In that case, the court observed that "[t]he key allegation is that the Defendants knew of the existence of the ... problem, rather than being aware of the possibility of the problem."*In re Regeneron Pharms., Inc. Sec. Litig.,* No. 03 Civ. 3111(RWS), 2005 WL 225288, at *24 (S.D.N.Y. Feb.1, 2005). Here, the most plaintiffs have alleged, even if one were to consider RADmanZulu's assertions, is that defendants were aware of the possibility of a problem.

FN59. Pl. Mem. at 12 (asserting materiality).

FN60.*Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000).

FN61. The Court is aware that whether an allegedly omitted fact was available to the market often is a fact intensive inquiry that is "rarely an appropriate basis for dismissing."*Id.* at 167."However, 'rarely appropriate' is not the same as 'never appropriate,' and '[m]ateriality is a mixed question of law and fact.'"*White v. H & R Block, Inc.,* No. 02 Civ. 8965(MBM), 2004 WL 1698628, at * 12 (S.D.N.Y. July 28, 2004).

FN62. Pl. Mem. at 30 n. 27.

FN63.*Starr v. Georgeson S'holder, Inc.,* 412 F.3d 103, 110 (2d Cir.2005) ("the relevant question is not whether the market 'truly knew' any specific piece of information, but whether the information was 'reasonably available.' ").

FN64. Cpt. ¶ 167.

FN65. The sole exception is that the RADmanZulu blog post was not available to the market during the class period.

FN66.*See, e.g.,* Seidel Decl. Exs. 14, 15, 24, 30; *see also* Seidel Decl. Exs. 5, at 22; 28.

FN67. Cpt. ¶ 166(d).

FN68.*Id.* ¶ 17.

FN69. Cpt. Preamble.

FN70.*Id.* ¶ 6;*see also id.* ¶ 1 (defendants misrepresented "that blood pressure side effects found in the clinical trials ... were of little concern"); Pl. Mem. at 2 (defendants "falsely minimized the significance of increased blood pressure").

FN71.*See* Cpt. ¶¶ 103; 105; 116; 127; 137; 141; 149 (emphasis added) (alleging that statements are misleading for this reason). The complaint alleges also that defendants failed to disclose that torcetrapib raised blood pressure and that Phase II studies had outliers who experienced larger increases in blood pressure. Plaintiffs make clear, however, that they do not allege a failure to disclose these facts. Pl. Mem. at 3 n. 2; Tr., Nov. 7, 2007, at 26:19-22. Thus the key to plaintiffs' allegations is that defendants omitted that the blood pressure increase was "dangerous" and "threatened the efficacy and approval of [torcetrapib]."*See, e.g.,* Cpt. ¶¶ 103, 127.

FN72.*See* Cpt. ¶¶ 103, 105; 111; 116; 118; 122; 127; 133; 141; 145; 149 (alleging that statements are misleading for this reason).

FN73.*See id.* ¶¶ 77-87 (citing studies and Pfizer statements made in other contexts); ¶¶ 103; 105; 116; 127; 137; 141; 149; 9;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
**(Cite as: --- F.Supp.2d ----)**

Page 18

162 (citing to paragraphs 77-87).

FN74.*See id.* ¶ 44 (reprinting weblog post of RADmanZulu); ¶¶ 85; 103; 105; 111; 116; 118; 122; 127; 133; 141; 145; 149 (citing to paragraph 44).

FN75.*Id.* ¶ 44.

FN76.*Id.*

FN77.*See In re Carter-Wallace, Inc. Sec. Litig.,* 220 F.3d 36, 41-42 (2d Cir.2000) ("the eventual linking of [a side effect] to [a drug] cannot relate back to the time of the statements ... and reflect on [defendant's] reasonable belief").

FN78. Tr., Nov. 7, 2007, at 32:13-14.

FN79.*Id.* at 27:4-7.

FN80.15 U.S.C. § 78u-4(b)(2).

FN81.*ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007) (citing *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168-69 (2d Cir.2000)).

FN82.*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* --- U.S. ----, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007).

FN83.*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994); *see also Ganino,* 228 F.3d at 170;*Novak v. Kasaks,* 216 F.3d 300, 307 (2d. Cir.2000).

FN84.*Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001).

FN85.*Ganino,* 228 F.3d at 170.

FN86. Pl. Mem. at 21.

FN87.*In re Bayer AG Sec. Litig.,* 03 Civ.2004(WHP), 2004 WL 2190357, at *14 (S.D.N.Y. Sept. 30, 2004).

FN88.*In re Bristol-Myers Squibb Sec. Litig.,* 312 F.Supp.2d 549, 560-61 (S.D.N.Y.2004).

FN89.*Id.* at 561.

FN90. Pl. Mem. at 22; Pl. Reply at 4. Plaintiffs do not allege motive for the other individual defendants.

FN91.*In re Bristol-Myers Squibb,* 312 F.Supp.2d at 561.

FN92.*Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995).

FN93. Pl. Mem. at 22-23. Plaintiffs argue that McKinnell had a motive to commit fraud because he was awarded a severance package "which was dependent, in part, upon 'Pfizer's actual [stock] performance relative to the pharmaceutical peer group.'" Cpt. ¶ 28. But this portion of McKinnell's severance package reflects "McKinnell's outstanding performance-contingent share and performance share awards ... settled in accordance with the original terms and conditions of such awards."Pfizer's Dec. 21, 2006 Form 8-K.

FN94.*Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000) (internal quotation omitted).

FN95.*In re Bayer AG Sec. Litig.,* 03 Civ.2004(WHP), 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004) (quoting *Beck v. Mfrs. Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987)); *see also Kalnit v. Eichler,* 264 F.3d 131, 141 (2d Cir.2001); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* --- U.S. ----, 127 S.Ct. 2499, 2511, 168 L.Ed.2d 179 (2007).

FN96.*In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 76 (2d Cir.2001).

FN97. Cpt. ¶ 162(a)-(c).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 19

FN98.*Id.* ¶ 162(d).

FN99.*Id.* ¶ 162(e).

FN100.*Id.* ¶ 162(f).

FN101.*Feasby v. Industri-Matematik Intern. Corp.,* 99 Civ. 8761(LTS), 2003 WL 22976327, at *5 (S.D.N.Y. Dec. 19, 2003) (quoting *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 813 (2d Cir.1996)).

FN102. With the exception of the allegations supported by RADmanZulu's blog.

FN103.*In re GeoPharma, Inc. Sec. Litig.,* 399 F.Supp.2d 432, 452-53 (S.D.N.Y.2005); *accord Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 758-59 (7th Cir.2007).

FN104. Plaintiffs' source suggests that Phase III used an appropriate measure of statistical significance. *See* Seidel Decl. Ex. 42, at 1144 (cited in Cpt. ¶ 91).

FN105.*Rombach v. Chang,* 355 F.3d 164, 176-77 (2d Cir.2004) (a "pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent" is insufficient to "support the inference that the defendants acted recklessly or with fraudulent intent.") (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994)).

FN106.15 U.S.C. § 78t(a).

FN107.*Rombach,* 355 F.3d at 177-78.

FN108. Plaintiffs requested leave to amend in a footnote of their memorandum. Pl. Mem. at 35 n. 36.
S.D.N.Y.,2008.
In re Pfizer, Inc. Securities Litigation

--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 22928602 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Sony Financial Services, LLC v. Multi Video
Group, Ltd.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
        United States District Court,S.D. New York.
    SONY FINANCIAL SERVICES, LLC, Plaintiff,
                            v.
    MULTI VIDEO GROUP, LTD., Rhinoceros Visual
       Effects & Design, LLC, and Cool Beans Digital
                 Audio, Inc., Defendants.
       MULTI VIDEO GROUP, LTD. and Rhinoceros
   Visual Effects & Design, LLC, Counterclaimants,
                            v.
     SONY ELECTRONICS, INC. and Sony Financial
          Services, LLC, Counterdefendants.
            **No. 03Civ.1730(LAK)(GWG).**

                     Dec. 12, 2003.

              *REPORT AND RECOMMENDATION*

GORENSTEIN, Magistrate J.
*1 Plaintiff Sony Financial Services, LLC ("Sony
Financial") brought this action against Multi Video
Group, Ltd. ("Multi Video"), Rhinoceros Visual Ef-
fects & Design, LLC ("Rhinoceros") and Cool
Beans Digital Audio, Inc. ("Cool Beans") for
breach of contract. Multi Video and Rhinoceros
(collectively, the "counterclaimants") interposed a
counterclaim against Sony Financial and Sony
Electronics, Inc. ("Sony Electronics") for fraud and
deceit. Additionally, they asserted a counterclaim
solely against Sony Electronics for breach of con-
tract. By order dated June 17, 2003, Judge Lewis A.
Kaplan dismissed the counterclaims as insufficient
but granted leave to replead. *Sony Fin. Servs. v.
Multi Video Group, Ltd.,* 2003 WL 21396690
(S.D.N.Y. June 17, 2003). Multi Video and Rhino-
ceros thereafter reasserted their counterclaims.

Now Sony Electronics and Sony Financial again
move for judgment on the pleadings under

Fed.R.Civ.P. 12(c) dismissing the counterclaims.
Sony Financial also moves to strike one of the af-
firmative defenses pursuant to Fed.R.Civ.P.
12(f).*See* Notice of Motion for Judgment on the
Pleadings Dismissing Amended Counterclaims and
to Strike First Affirmative Defense, filed July 17,
2003 (Docket # 26). For the reasons below, their
motion should be granted in its entirety.

*I. BACKGROUND*

The counterclaims in this case involve what the
counterclaimants refer to as the "Beta Test Site
Agreement." A "beta test" is the second phase of
testing for an experimental product. After a product
has been through the first, or "alpha," test, but be-
fore it is ready for the market, the product is made
available to select members of the intended audi-
ence, who use the product and provide feedback.
*See* Answer and Amended Counterclaims, filed July
7, 2003 (Docket # 24) ("Am.Countercl."), ¶ 44(1)
n. 1.

In the summer of 1999, Sony Electronics ap-
proached Multi Video with an offer to enter into an
agreement to beta test new equipment. Am. Coun-
tercl. ¶ 44. Sony Electronics would install certain
equipment in Multi Video's business premises and
the equipment would be "used, studied, upgraded,
modified and tailored."*Id.* ¶ 44(2). In order to enter
into this arrangement, however, Sony Electronics
required Multi Video to enter into certain equip-
ment leases and a Master Lease "relating to a cer-
tain Telecine Suite" with plaintiff Sony Financial.
*Id.* ¶ 44(v). Multi Video entered into these agree-
ments. *Id.* ¶ 46. In addition, in early 2000, Rhino-
ceros and Cool Beans each executed a guaranty in
favor of Sony Financial. *Id.;* Amended Complaint,
filed March 26, 2003 (Docket # 7) ("Am.Compl."),
¶¶ 11-12.

Sony Financial's complaint in this action alleges
that Multi Video breached the Master Lease by fail-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22928602 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

ing to make all payments, Am. Compl. ¶¶ 21-29, and that Rhinoceros and Cool Beans breached their guaranties, *id.* ¶¶ 30-34. As an affirmative defense, defendants allege that the Master Lease is a product of deceit and was induced by fraud and misrepresentations. Am. Countercl. ¶ 35. In addition, Multi Video and Rhinoceros assert counterclaims for breach of the Beta Test Site Agreement and for fraud related to that agreement. *Id.* ¶¶ 39-62.

## II. APPLICABLE LEGAL STANDARD

*2 In resolving a motion for judgment on the pleadings under Fed.R.Civ.P. 12(c), the standard is the same as that used for a motion to dismiss for failure to state a claim under 12(b)(6).*Oneida Indian Nation of N.Y. v. City of Sherrill,* 337 F.3d 139, 152 (2d Cir.2003) (citing *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999)). Thus, the Court must accept the factual allegations set forth in the non-moving party's pleading as true and draw all reasonable inferences in favor of the non-moving party. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). Dismissal is not appropriate "unless it appears beyond doubt that the [non-movant] can prove no set of facts in support of [its] claim which would entitle [it] to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

For purposes of this motion, a party's pleading "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."*Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert.denied,*503 U.S. 960 (1992); *accordChambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002); *seealso*Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes .").

## III. THE COUNTERCLAIM FOR BREACH OF CONTRACT

A. *The Pleading*

The breach of contract counterclaim is brought only against Sony Electronics. It alleges that in the summer of 1999, representatives of Sony Electronics approached Multi Video and offered to enter into a "Beta Test Site Agreement" pursuant to which Sony Electronics would install certain state-of-the-art equipment in the business premises of Multi Video. Am. Countercl. ¶ 44(1). The equipment was to be "used, studied, upgraded, modified and tailored" to the mutual benefit of both parties. *Id.* ¶ 44(2). As part of the offer, Sony Electronics in substance agreed that:

1. The price given to Multi Video for the equipment would be below the list price for customers once the product was ready for sale to the market.
2. Sony Electronics would develop the equipment with Multi Video for their mutual benefit by enabling Multi Video to use the equipment while Sony Electronics tested, debugged and improved it.
3. Sony Electronics would advertise the availability of such equipment at Multi Video's businesses.
4. Sony Electronics had the available technical know-how, engineers and technical support to provide the service and repairs needed to keep the equipment in working order, allowing Multi Video to enter into contracts with their customers requiring the use of such equipment.

*See*id. ¶¶ 44(3)(i)-(iv). The counterclaim goes on to allege that as a condition precedent to accepting Sony Electronics' offer, Multi Video was required to enter into equipment leases with Sony Financial relating to an "HD Edit Room" and a "Telecine Suite," both encompassed in the Master Lease, and to make certain advance payments. *Id.* ¶ 44(3)(v). Multi Video alleges that no payments were required during the beta test stage and that payments under the equipment leases were only due upon successful completion of the beta test stage. *Id.* ¶ 44(3)(vi).

*3 Multi Video performed its obligations under the Beta Test Site Agreement by executing the Master Lease and the guaranties and by making the required advance payments. Am. Countercl. ¶ 46. Multi Video also made its premises available for in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22928602 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

stallation. *Id.* ¶ 47.

The counterclaim alleges that Sony Electronics breached the Beta Test Site Agreement by failing to improve and upgrade the equipment and maintain it in working order. *Id.* ¶ 48. Sony Electronics repeatedly assured Multi Video that it would render the equipment in working order yet failed to provide technicians with the skill, knowledge or ability to do so. *Id.* ¶ 49. As a result, Multi Video was unable to provide contracted-for services to its clients. *Id.* ¶¶ 50, 62.

### B. *Failure to State a Claim*

To state a claim for breach of contract under New York law, a party must allege: (1) the existence of an agreement, (2) adequate performance of the contract by the party alleging the breach, (3) breach and (4) damages caused by the breach. *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996); *Leber Assocs., LLC v. Entm't Group Fund, Inc.,* 2003 WL 21750211, at *15 (S.D.N.Y. July 29, 2003); *R.H. Damon & Co. v. Softkey Software Prods., Inc.,* 811 F.Supp. 986, 991 (S.D.N.Y.1993). As detailed above, the first amended counterclaim satisfies this standard. Multi Video and Rhinoceros have alleged the terms of the Beta Test Site Agreement, Am. Countercl. ¶¶ 44-45, their performance pursuant to those terms, *id.* ¶¶ 46-47, the nature of the breach, *id.* ¶¶ 48-49, and the damages caused by it, *id.* ¶¶ 50, 62.

The breach of contract counterclaim is based on the Beta Test Site Agreement, an agreement allegedly between Multi Video and Sony Electronics. Multi Video alleges that entering the Master Lease, which is the subject of Sony Financial's complaint in this action, was a condition precedent to, and thus only one aspect of, the Beta Test Site Agreement. *See* Am. Countercl. ¶¶ 44(3)(v), 46. Sony Electronics contends that there is no "Beta Test Site Agreement" between Sony Electronics and Multi Video, and thus it cannot be the basis of a breach of contract claim. *See* Memorandum of Law in Support of

Motion for Judgment on the Pleadings Dismissing Amended Counterclaims and Motion to Strike First Affirmative Defense, filed July 17, 2003 (Docket # 27) ("Counterdef.Mem."), at 12. Sony Electronics' argument is based on a written contract entitled the "System Sales Agreement," which Sony Electronics argues is the only written, fully integrated contract between Sony Electronics and Multi Video. *Id.* at 12-15. However, Multi Video has not referred to or relied on the System Sales Agreement in its pleading. Because the System Sales Agreement is not properly considered by the Court on this motion for judgment on the pleadings, determining the relationship between the System Sales Agreement and the Beta Test Site Agreement could only await a motion made on a proper record. Accordingly, the claim against Sony Electronics has been properly stated.

### C. *Whether Sony Electronics Is an "Opposing Party"*

*4 Sony Electronics also argues that, even if it is properly alleged, the breach of contract counterclaim must be dismissed because it names only Sony Electronics as a counterdefendant and Sony Electronics is not an "opposing party" within the meaning of Fed.R.Civ.P. 13. *See* Counterdef. Mem. at 15 (incorporating by reference arguments made in original Memorandum of Law in Support of Motion for Judgment on the Pleadings Dismissing Counterclaims, filed May 12, 2003 (Docket # 15), at 3-4). This argument is persuasive.

A counterclaim, whether permissive or compulsory, may be asserted only against an "opposing party." Fed.R.Civ.P. 13(a)-(b). While Rule 13(h) allows additional parties to be joined in accordance with Fed.R.Civ.P. 19 and 20, that subsection permits such additional parties to be joined only where an opposing party is also a party to the counterclaim. *See,e.g.,Republic Nat'l Bank v. Hales,* 75 F.Supp.2d 300, 310 n. 8 (S.D.N.Y.1999) ("Under Rule 13(h), parties may be properly joined as counterclaim defendants only where at least one party against

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22928602 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

whom a counterclaim/third-party claim is asserted was a party to the original action."(internal quotations omitted)), *aff'd,*4 Fed. Appx. 15 (2d Cir. Feb. 6, 2001); *accordFDIC v. Bathgate,* 27 F.3d 850, 873-74 (3d Cir.1994); *Various Mkts., Inc. v. Chase Manhattan Bank,* 908 F.Supp. 459, 470-71 (E.D.Mich.1995); 6 Charles Alan Wright et al., *Federal Practice and Procedure* § 1435, at 271 (2d ed.1990) (a counterclaim "may not be directed solely against persons who are not already parties to the original action, but must involve at least one existing party" (citing cases)).

Were it not for this problem, the counterclaim against Sony Electronics is so closely related to this action that it would probably qualify as a compulsory counterclaim under Rule 13(a), since it "arises out of the transaction or occurrence that is the subject matter of" Sony Financial's claim. In the amended counterclaim, Multi Video and Rhinoceros have alleged that accepting Sony Electronics' offer to enter the Beta Test Site Agreement was the event that triggered their entering into the Master Lease and the guaranties-the subject matter of Sony Financial's claims. Am. Countercl. ¶¶ 44(3)(v), 46.

The counterclaimants insist that there is a sufficiently close relationship between Sony Financial and Sony Electronics that they in fact constitute a single "opposing party." Indeed, case law reflects that there have been some generous interpretations of the term "opposing party" under which courts have determined that entities that were not actually the party to a lawsuit qualified as an "opposing party" for purposes of Rule 13. *See,e.g.,Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.,* 292 F.3d 384, 390-92 (3d Cir.2002) ("successor in interest" and assignee of rights of opposing party); *Avemco Ins. Co. v. Cessna Aircraft Co.,* 11 F.3d 998, 1001 (10th Cir.1993) (insurer deemed to have been subrogated to rights of insured); *Banco Nacional de Cuba v. First Nat'l City Bank,* 478 F.2d 191, 193 n. 1 (2d Cir.1973) (Republic of Cuba and Cuban bank were "one and the same for the purposes of this litigation"). But

the Court is aware of no case in which distinct corporate entities have been considered to be identical for purposes of Rule 13 for no reason other than the fact that they were closely related and acted in concert for purposes of effectuating a particular transaction. While Sony Electronics is apparently the sole member of Sony Financial, Am. Compl. ¶ 4, and the counterclaimants allege that the two parties worked in concert to set up the transactions at issue here, Am. Countercl. ¶¶ 44(3)(v), 46, no allegation has been made-let alone evidence presented-that their corporate forms have been disregarded. Rather, it appears that Sony Financial and Sony Electronics are two distinct albeit related corporate entities.

*5 While courts (including this one) are understandably eager to permit or require parties to bring related claims in a single lawsuit as a matter of efficiency, there is a danger in construing "opposing party" under Rule 13 too broadly. Doing so may lead to a future situation where a party is actually barred from bringing suit against the separate entity on the ground that its claim should have been brought as a compulsory counterclaim under Rule 13(a).*See,e.g.,Avemco,* 11 F.3d at 1001. Unless defendants have clear notice as to what entities constitute an "opposing party" under Rule 13, there is a danger that these defendants will later be unwittingly barred from asserting otherwise valid claims. There is no apparent guiding principle reflected in the case law regarding when an entity that is not in fact an opposing party may be deemed actually to have been the "opposing party" within the meaning of Rule 13. Whatever flaws Rule 13 may have in limiting counterclaims to those against an "opposing party," the rule at least has the virtue of clearly informing parties of the situations when they must either bring a claim against such a party or be barred from asserting it in some other proceeding. Here, it seems plain that Sony Electronics is not Sony Financial and the rule has not been satisfied.

Accordingly, the motion to dismiss the breach of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22928602 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

contract counterclaim against Sony Electronics should be granted.[FN1]

> FN1. Of course, the counterclaimants are free to initiate a separate suit against Sony Electronics on their claim. If properly filed in this Court, such a suit would be a prime candidate for consolidation with the instant action under Fed.R.Civ.P. 42(a).

## IV. *THE COUNTERCLAIM FOR FRAUD*

### A. *The Pleading*

Multi Video and Rhinoceros assert a counterclaim for fraud in the inducement and for continuing fraud and deceit with respect to the Beta Test Site Agreement and the other agreements in this case. Am. Countercl. ¶¶ 51-62. The fraud counterclaim alleges that "representatives of Sony [Electronics], including Robert St. John, Fabio Pansolini, Larry Thorpe, Steven Stubel [sic], George Hale, Rick Harding and others," induced Multi Video to enter into the Beta Test Site Agreement, and in connection therewith the various agreements with Sony Financial, by representing in substance that:
1. Sony Electronics had the capability to develop certain state-of-the-art equipment for the mutual benefit of Sony Electronics and Multi Video.
2. Sony Electronics had available technical expertise and support such that they could service and repair such equipment whenever necessary.
3. The equipment Sony Electronics wished to install for Multi Video's use during the testing stage was state-of-the-art, and was the latest and best development, which would allow Multi Video to expand its scope of services.

*See id.* ¶¶ 52(1)-(3). In reliance on these representations, Multi Video allegedly entered into the Beta Test Site Agreement and the various other agreements, including the Master Lease and the guaranties. *Id.* ¶¶ 53-54. These representations were repeated on many occasions over the next two years. *Id.* ¶¶ 52, 56.

*6 The counterclaim also alleges that Multi Video and Rhinoceros "in time discovered that the intentionally false representations ... Sony [Electronics] made, upon information and belief in concert with Sony Financial, ... were false and known to be false at the time they were made in that" in substance:
1. Sony Electronics knew that it lacked the capability to support, repair, debug, or improve the equipment and that it had recently failed to successfully complete certain Beta Test projects including one described by an Australian technician "in writing" as a "nightmare."
2. Sony Electronics' sole motive was to benefit itself, and not, as it claimed, to benefit Sony Electronics and Multi Video.
3. Sony Electronics acted in concert with Sony Financial to attempt to place counterclaimants in a position where they would be unable to seek legal redress by virtue of the language of the equipment leases and guaranties.

*See* Am. Countercl. ¶¶ 60(1)-(3).

### B. *Discussion*

Fed.R.Civ.P. 9(b) requires that in "all averments of fraud and mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To satisfy Rule 9(b)'s particularity requirement, "a plaintiff should specify the time, place, speaker, and sometimes even the content of the alleged misrepresentations." *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986); *accord Harsco Corp.,* 91 F.3d at 347. The pleading must also "allege facts that give rise to a strong inference of fraudulent intent." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 812 (2d Cir.1996) (citations omitted); *accord, e.g., Chill v. Gen. Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996). This can be done "either: (a) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (b) by alleging facts to show that defendants had both motive and opportunity to commit fraud." *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.1999). The Second Circuit has stated that " '[m]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." ' *Chill,* 101 F.3d at 267-68 (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F .3d 1124, 1130 (2d Cir.1994)).

Judge Kaplan previously dismissed the fraud counterclaim because it did not allege fraud with particularity or provide a "sufficient basis for inferring that the speaker knew that what was said was false."*Sony,* 2003 WL 21396690, at *2. Judge Kaplan observed that "[t]his ... appears on its face to be a garden variety commercial dispute in which ... Sony [Electronics] then failed to live up to defendants' expectations."*Id.* The counterdefendants argue that the complaint still does not (1) allege fraud with particularity or (2) plead facts giving rise to a strong inference of fraudulent intent. Counterdef. Mem. at 4-8. As the Court agrees on the second point, it is unnecessary to reach the first.

*7 The only new factual allegation with respect to fraudulent intent is the example of the unsuccessful Australian beta test which is offered to establish Sony Electronics' knowledge that it could not repair, improve or upgrade the equipment at issue. Am. Countercl. ¶ 60(1).*Compare* Answer & Counterclaims, filed April 15, 2003 (Docket # 11), ¶ 51, *with* Am. Countercl. ¶ 60. The amended counterclaim refers to a statement "in writing" which allegedly demonstrates Sony Electronics' failures in Australia. *Id.* The "writing" relied on in the amended counterclaim is a March 2001 e-mail from Eric Whipp to Rich Torpey of Multi Video. *See* E-mail dated March 30, 2001 ("E-mail") (annexed as Ex. A to Counterdef. Mem.). Multi Video and Rhinoceros proffer this e-mail to support their claim for fraud following the execution of the initial contract. *See* Counterclaimants' Memorandum of Law in Opposition to Counterdefendants' Motion for Judgment on the Pleadings and Motion to Strike First Affirmative Defense, filed August 1, 2003 (Docket # 30), at 19. The e-mail, however, does not establish either that the beta test conducted in Aus-

tralia was unsuccessful or that Sony Electronics knew that the product did not and could not work. To the contrary, the e-mail describes Sony Electronics' ongoing efforts to provide service to the customer. *See* E-mail (referring to an engineer who was "flying out to help us"). The word "nightmare" was used to describe the writer's last few weeks, in which an engineer left, the company was busy doing a movie-of-the-week and problems with the software occurred, which Sony Electronics was attempting to remedy. *Id.*

Even if these allegations could be construed as showing that Sony Electronics knew that it could not perform under the Beta Test Site Agreement, the allegations would still be insufficient to support a claim of fraud. The Second Circuit has made clear that an allegation that a party entered into a contract with the intention of breaching it is insufficient to show fraudulent intent. *See,e.g.,Manning v. Utils. Mut. Ins. Co.,* 254 F.3d 387, 401 (2d Cir.2001) (allegedly false "statement of intent to perform under the contract cannot constitute fraud"); *Bridgestone/Firestone, Inc. v. Recovery Credits Servs., Inc.,* 98 F.3d 13, 19-20 (2d Cir.1996) (dismissing fraud claim where only false statements at issue were "intentionally-false statements ... indicating [defendant's] intent to perform under the contract"). Accordingly, case law is replete with dismissals of fraud claims that were predicated on allegations that the defendants did not intend to meet their contractual obligations. *See,e.g.,Alnwick v. European Micro Holdings, Inc.,* 281 F.Supp.2d 629, 643 (E.D.N.Y.2003); *Marriott Int'l, Inc. v. Downtown Athletic Club of N.Y. City, Inc.,* 2003 WL 21314056, at *6 (S.D.N.Y. June 9, 2003). The same principles should logically apply to assurances given by a supplier that it intends to continue performance under the contract.

*8 Furthermore, the only "motive" to commit fraud alleged is "to sell such equipment to the Counterdefendants [sic] accounting to millions of dollars, for [Sony Electronics'] own personal benefit." Am. Countercl. ¶ 60(2). This too is insufficient as "the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22928602 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Second Circuit has repeatedly held that routine and general benefits that are derived in the ordinary course of business do not constitute the type of 'concrete benefit' that is necessary to allege fraudulent intent under Rule 9(b)."*Schmidt v. Fleet Bank,* 1998 WL 47827, at *9 (S.D.N.Y. Feb. 4, 1998) (citing, *interalia,Chill,* 101 F.3d at 268;*Shields,* 25 F.3d at 1130). Thus, the counterclaim for fraud and deceit must be dismissed.

## V. *THE MOTION TO STRIKE*

Sony Financial also moves to strike the defendants' first affirmative defense, which alleges that the Master Lease was a "product of deceit" and was "induced by intentional acts of fraud and misrepresentation" by Sony Financial. Am. Countercl. ¶ 35. The standard for a motion to strike an affirmative defense under Fed.R.Civ.P. 12(f) is a "mirror image" of the rule governing a motion to dismiss for failure to state a claim. *Canadian St. Regis Band of Mohawk Indians ex rel. Francis v. New York,* 278 F.Supp.2d 313, 324, 332 (N.D.N.Y.2003) (Rule 12(f) motion should not be granted unless "it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense" (internal quotations omitted)). Accordingly, the motion to strike the first affirmative defense-insofar as it relies on Sony Financial's alleged fraud as its underpinning-should be granted.

*Conclusion*

For the foregoing reasons, Sony Electronics' and Sony Financial's motion to dismiss the counterclaims and to strike the affirmative defense should be granted.

*PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to file any objections. *Seealso*Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with extra copies sent to the Honorable Lewis A. Kaplan, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any requests for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *SeeThomas v. Arn,* 474 U.S. 140 (1985).

S.D.N.Y.,2003.
Sony Financial Services, LLC v. Multi Video Group, Ltd.
Not Reported in F.Supp.2d, 2003 WL 22928602 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
**Ulla-Maija, Inc. v. Kivimaki**
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
**ULLA-MAIJA, INC., Plaintiff,**
v.
**Ulla-Maija KIVIMAKI, Ulla-Maija Holding,**
LLC, Kivimaki, Inc., Bruce Barton Bulcott and Gus
Young, Defendants.
**No. 02 Civ. 3640(AGS).**

Jan. 23, 2003.

Manufacturer of wedding gowns and accessories brought action against competitor alleging trademark infringement, breach of contract, tortious interference, breach of fiduciary duty, and injurious falsehood. On manufacturer's motion to strike, the District Court, Schwartz, J., held that: (1) amended answer was stricken in its entirety; (2) conduct of representatives of manufacturer was relevant to manufacturer's injurious falsehood claim; (3) letter attached to answer was relevant to injurious falsehood claim; and (4) additional parties could be joined to action only through counterclaim when that counterclaim also was asserted against existing party.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** ⊂⇒**827**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak827 k. Leave of Court in General.
Most Cited Cases
Amended answer was stricken in its entirety because it was not properly filed, in lawsuit brought by manufacturer against competitor, since competitor did not obtain leave from court or consent from manufacturer before filing it. Fed.Rules

Civ.Proc.Rule 7(a), 15(a), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A** ⊂⇒**624**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak624 k. Time for Pleading. Most
Cited Cases
The rule of civil procedure that addresses the impact of a decision by the court on the schedule for pleadings does not provide for the revision of pleading schedules based on the filing of a motion regarding defenses and objections under that rule. Fed.Rules Civ.Proc.Rule 12(a)(4), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** ⊂⇒**1126**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(N) Striking Pleading or Matter
Therein
            170Ak1125 Immaterial, Irrelevant or Unresponsive Matter
                170Ak1126 k. Particular Allegations.
Most Cited Cases

**Federal Civil Procedure 170A** ⊂⇒**1127**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(N) Striking Pleading or Matter
Therein
            170Ak1127 k. Impertinent or Scandalous
Matter. Most Cited Cases
Allegations in answer of competitor who was formerly associated with manufacturer, that chief executive officer (CEO) and attorney employed by manufacturer looted the company, was not irrelevant or scandalous, in lawsuit brought by manufacturer against competitor alleging injurious falsehood; even though CEO and attorney were not parties to action as individuals, their conduct as representatives of manufacturer was relevant to manufacturer's injurious falsehood claim. Fed.Rules

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Civ.Proc.Rule 12(f), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ☞1126**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(N) Striking Pleading or Matter Therein
       170Ak1125 Immaterial, Irrelevant or Unresponsive Matter
        170Ak1126 k. Particular Allegations. Most Cited Cases
Letters attached to answer, that were written by competitor to manufacturer's accountant stating that manufacturer's chief executive officer (CEO) was involved in "ruining of her business" and "stealing of her name," were relevant to injurious falsehood claim brought by manufacturer, and, consequently, could not be stricken, since letters were evidence of what competitor actually said in her conversation with accountant, and allegations regarding conduct of CEO was relevant to issue of whether competitor's statement was made maliciously and recklessly and whether competitor knew statements to be false at time she allegedly made them. Fed.Rules Civ.Proc.Rule 12(c), (f), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☞1126**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(N) Striking Pleading or Matter Therein
       170Ak1125 Immaterial, Irrelevant or Unresponsive Matter
        170Ak1126 k. Particular Allegations. Most Cited Cases
Allegations of competitor, that chief executive officer (CEO) and attorney employed by manufacturer "embarked on a campaign to take over the careers of other fashion designers and exploit their names, leaving them with nothing," was not relevant, and, consequently, was stricken, in manufacturer's lawsuit claiming trademark infringement, breach of contract, tortious interference, breach of fiduciary duty, and injurious falsehood, since alleg-

ation related to supposed conduct undertaken by persons in their individual capacities, and allegations did not relate to any claims asserted by either manufacturer or competitor. Fed.Rules Civ.Proc.Rule 12(c), (f), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ☞1126**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(N) Striking Pleading or Matter Therein
       170Ak1125 Immaterial, Irrelevant or Unresponsive Matter
        170Ak1126 k. Particular Allegations. Most Cited Cases

**Federal Civil Procedure 170A ☞1127**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(N) Striking Pleading or Matter Therein
       170Ak1127 k. Impertinent or Scandalous Matter. Most Cited Cases
Allegation made in answer by competitor who was previously associated with manufacturer, that chief executive officer (CEO) used manufacturer "as his personal piggy bank" from time he started working for manufacturer, lacked specificity and contained inflammatory language, and, consequently, was required to be stricken from answer, in lawsuit brought by manufacturer claiming trademark infringement, breach of contract, tortious interference, breach of fiduciary duty, and injurious falsehood. Fed.Rules Civ.Proc.Rule 12(c), (f), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ☞1126**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(N) Striking Pleading or Matter Therein
       170Ak1125 Immaterial, Irrelevant or Unresponsive Matter

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

170Ak1126 k. Particular Allegations. Most Cited Cases

Allegations made by competitor in her answer, that manufacturer's attorney was listed in professional directory as entertainment attorney and that he was of counsel to law firm specializing in trademarks, was not relevant, and, consequently, would be stricken, in lawsuit brought by manufacturer claiming trademark infringement, breach of contract, tortious interference, breach of fiduciary duty, and injurious falsehood. Fed.Rules Civ.Proc.Rule 12(c), (f), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ⚏1126**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(N) Striking Pleading or Matter Therein
         170Ak1125 Immaterial, Irrelevant or Unresponsive Matter
            170Ak1126 k. Particular Allegations. Most Cited Cases

Allegations made in answer by competitor who was formerly associated with manufacturer, that chief executive officer (CEO) and attorney employed by manufacturer concealed prior licensing agreement by filing trademark application for "Ulla-Maija" mark in name of manufacturer, and that they falsely claimed ownership of mark, were relevant to trademark claims asserted by both parties and, therefore, would not be stricken from answer. Fed.Rules Civ.Proc.Rule 12(c), (f), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A ⚏773**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(C) Answer
         170AVII(C)3 Set-Offs, Counterclaims and Cross-Claims
            170Ak772 Set-Offs
               170Ak773 k. Counterclaims. Most Cited Cases

Additional parties can be joined to an action only through a counterclaim when that counterclaim also is asserted against an existing party. Fed.Rules Civ.Proc.Rule 13, 28 U.S.C.A.

*MEMORANDUM ORDER*

SCHWARTZ, J.

*1 Plaintiff, a manufacturer of wedding gowns and accessories, filed the above entitled action alleging, *inter alia,* trademark infringement, breach of contract, tortious interference, breach of fiduciary duty, and injurious falsehood. Currently before the court are: (i) plaintiff's motion, pursuant to Fed.R.Civ.P. 12(c) and (f), to strike certain allegations contained in defendants' Answer and Counterclaims ("Answer"), and for judgment on the pleadings with respect to defendant's sixth and eighth counterclaims; (ii) plaintiff's motion, pursuant to Fed.R.Civ.P. 12(c) and (f), to strike defendants' Amended Answer and Counterclaims ("Amended Answer") in its entirety; (iii) a motion, filed by individual plaintiffs/counterclaim defendants Otto Felber, W. Bruce Bailey, Thomas Bachmann and Charles Bunstine, to strike the Amended Answer pursuant to Fed.R.Civ.P. 12(c), (f), and (h), as well as Fed.R.Civ.P. 13, 15, and 21; (iv) plaintiff's motion for sanctions and defendants' cross-motion for sanctions; and (v) individual plaintiff/counterclaim defendant Henry Welt's motion, pursuant to Fed.R.Civ.P. 12(c) and (h), to dismiss the Amended Answer with respect to defendants' claims against Welt.

For the reasons set forth below, (i) plaintiff's motion to strike the Amended Answer in its entirety is granted; (ii) the four individual plaintiffs'/ counterclaim defendants' motion to strike the Amended Answer in its entirety is denied as moot; (iii) plaintiff/counterclaim defendant Henry Welt's motion to dismiss the Amended Answer as against him is denied as moot; (iv) plaintiff's motion to strike certain parts of the Answer is granted in part and denied in part; (iv) plaintiff's motion for sanctions and defendants' cross-motion for sanctions are denied.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

## Background

### The Parties

Plaintiff Ulla-Maija, Inc. ("Plaintiff"), is a New York corporation with its principal place of business in New York City. Plaintiff produces wedding gowns and accessories using the trademark "Ulla-Maija."

Defendant Ulla-Maija Kivimaki ("Kivimaki"), an individual, is a designer of bridal gowns and evening wear, and was formerly employed by plaintiff as its President and Chief Designer.[FN1]

> FN1. Though Kivimaki is no longer employed by plaintiff Ulla-Miaja, Inc., she is still one of the company's shareholders.

Defendant Ulla-Maija Holding, LLC ("Ulla-Maija Holding") is a New York limited liability company controlled by defendant Kivimaki. Though the current ownership rights with respect to the "Ulla-Maija" trademark are in dispute, it is undisputed that as of May 5, 1997, Ulla-Maija Holding was the owner of the mark. On that date, plaintiff and Ulla-Maija Holding signed an agreement whereby the "Ulla-Maija" trademark was licensed to plaintiff in perpetuity, subject to certain conditions. (See Answer, Exh. A).

Defendant Kivimaki, Inc. is a New York corporation through which defendant Kivimaki has allegedly produced and sold wedding dresses bearing the "Ulla-Maija" trademark and/or similar marks.

Defendant Bruce Barton Bulcott is an individual residing in New York City who allegedly serves as an employee or agent of Kivimaki and Kivimaki, Inc. Though Bulcott was served with a summons and complaint on May 16, 2002, he has not appeared in this action.

*2 Defendant Gus Young is a foreign citizen. By order dated September 12, 2002, the Court dismissed the action as against defendant Young.

### Procedural History

Plaintiff filed this action on May 13, 2002. The complaint asserts fourteen causes of action, most of which arise primarily out of defendants' production and sale of wedding dresses that allegedly infringe plaintiff's trademark rights. On August 12, 2002, defendants Kivimaki, Ulla-Maija Holding, LLC, and Kivimaki, Inc. (hereinafter, "defendants") filed their Answer. The Answer asserts nine counter-claims, including claims pertaining to the "Ulla-Maija" trademark and the 1997 licensing agreement, as well as claims for breach of contract, breach of fiduciary duty, unfair competition, punitive damages, and attorneys' fees. On September 6, 2002, plaintiff filed a Reply to defendant's counter-claims.

On September 11, 2002, the Court held a conference regarding defendants' motion for a preliminary injunction.[FN2]At that conference the Court granted plaintiff leave to file a motion to strike certain parts of defendants' Answer pursuant to Fed.R.Civ.P. 12(f). (Transcript of Proceedings, September 11, 2002 at 25-26). By notice of motion dated September 18, 2002, plaintiff filed such motion, which also sought judgment on the pleadings with respect to defendants' sixth and eighth counterclaims (breach of fiduciary duty and punitive damages), and requested that the Court grant sanctions against defendants.

> FN2. Such motion sought temporary relief allowing defendants to continue to manufacture wedding dresses during the pendency of this action.

On September 24, 2002-eighteen days after plaintiff had filed its Reply to defendants' Answer and six days after plaintiff had filed its motion to strike parts of the Answer-defendants filed their Amended Answer although they had not obtained leave from the Court to do so. The Amended Answer names Ulla-Maija, Inc. as a plaintiff, but also includes Bunstine, Welt, Felber, Bailey and Bachmann as plaintiffs in the caption. The factual allegations in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

the Amended Answer are nearly identical to those contained in the Answer although the causes of action in the two pleadings differ. While the eighth and ninth counterclaims in the Answer seek punitive damages and attorneys' fees, respectively, the eighth and ninth counterclaims in the Amended Answer are for retaliatory discharge and breach of fiduciary duty,[FN3] respectively. By letter dated October 8, 2002, plaintiff requested leave to file a motion to strike defendants' Amended Answer and to seek sanctions against defendants. The Court granted such leave by order dated October 8, 2002. Defendants' cross-moved for sanctions against plaintiffs on December 4, 2002.

> FN3. Defendants' breach of fiduciary duty claim is asserted on behalf of Kivimaki and plaintiff Ulla-Maija, Inc. against the individuals Bunstine, Welt, Felber, Bailey and Bachmann.

By notice of motion dated November 1, 2002, Henry Welt moved to dismiss the Amended Answer as against him on the grounds of improper service.

### Discussion

#### 1. *Plaintiff's Motion to Strike the Amended Answer*

[1] Under Fed.R.Civ.P. 15(a) a party may amend its pleading once as matter of right, as long as such amendment is made before the opposing party has filed a responsive pleading.[FN4] However, if the opposing party has already filed a responsive pleading, a party seeking to amend its pleading must obtain leave of court, or consent of its adversary, before filing an amended pleading. Here it is undisputed that plaintiff filed its Reply to defendants' Answer on September 4, 2002, and under Fed.R.Civ.P. 7(a), such a Reply constitutes a responsive pleading. See *Cappiello v. Cappiello,* 1998 WL 242716, at *2 (Terr.V.I. Feb. 25, 1998); *Randolph Engineering Co. v. Fredenhagen Kommandit-Gesellschaft,* 476 F.Supp. 1355, W.D. Pa.1979. Thus, defendants were required under Fed.R.Civ.P.

15(a) to obtain either leave from the Court or consent from the plaintiff before filing their Amended Answer. Since defendants did not obtain such leave or consent, the Amended Answer was not properly filed.

> FN4. If the pleading at issue does not require a responsive pleading, then the party seeking to amend the pleading may do so at any time within twenty days after service. Fed.R.Civ.P. 15(a). However, this portion of Rule 15(a) does not apply here since defendants' Answer and Counterclaims clearly required a responsive pleading from plaintiff.

*3 [2] Despite their non-compliance with the Fed.R.Civ.P. 15, defendants advance several arguments in opposition to plaintiff's motion to strike the Amended Answer. First, defendants contend that the Amended Answer was a timely filed response to plaintiff's motion to strike the original answer, and cite Fed.R.Civ.P. 12(a)(4) in support of that argument. (See Declaration of Raymond Dowd, dated November 22, 2002 at ¶ 7). However, Rule 12(a)(4) addresses the impact of a *court's decision* on the schedule for pleadings; it does not provide for the revision of pleading schedules based on the *filing* of a Rule 12 motion. Fed.R.Civ.P 12(a)(4).FN5 In this case, the Court has not issued any decision on any Rule 12 motion (prior to the instant decision), and thus Rule 12(a)(4) is not relevant to the issue of whether defendant's Amended Answer was timely filed.

> FN5. Though the first part of Rule 12(a)(4) mentions the "service" of a Rule 12 motion, the prescriptive portions of the rule (subsections (a) and (b)) deal only with court decisions on Rule 12 motions. Thus, plaintiff's filing of the Rule 12(f) motion with respect to the original Answer did not, in and of itself, create a window of time in which defendants could amend their original Answer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Defendants also argue that plaintiff's motion to strike the Amended Answer is barred under Fed.R.Civ.P. 12(g) since the motion is duplicative of an earlier motion. (See Dowd Declaration, November 22, 2002, at ¶¶ 9-11, 17). Specifically, defendants assert that the reply affidavit submitted by plaintiff's counsel in support of plaintiff's motion to strike portions of defendants' *original* Answer constituted a motion to strike the *Amended* Answer. (*Id.*). This argument is based on the fact that plaintiff's reply affidavit on the earlier motion discusses portions of defendants' Amended Answer. However, the reply affidavit on the earlier motion clearly states that a full discussion of the Amended Answer was "beyond the scope of this motion," and also specifically states that plaintiff would fully address issues relating to the Amended Answer in a later motion to strike. (See Reply Affidavit of Lawrence E. Fabian, dated October 15, 2002 at ¶¶ 10, 12-16). It is clear that plaintiff did not intend the earlier reply affidavit to constitute a motion to strike the Amended Answer, and the Court does not consider it to be such a motion. Thus, the motion to strike the Amended Answer, filed on November 1, 2002, is not duplicative of any earlier motion.

Finally, defendants argue that plaintiff's motion to strike the Amended Answer was untimely. (Dowd Declaration, November 22, 2002, at ¶¶ 12-15). However, at a conference on October 22, 2002, the Court specifically directed that plaintiff make any such motion by November 1, 2002. Plaintiff complied with that direction (the motion was filed on November 1, 2002), and thus defendants' timeliness argument fails.

Accordingly, because the Amended Answer was not properly filed plaintiff's motion to strike the Amended Answer in its entirety is granted.[FN6]

> FN6. Because the Court finds that the Amended Answer must be stricken on procedural grounds, it does not reach the issue of whether any of the specific counterclaims contained in the Amended Answer state a claim upon which relief can be granted. However, the Court notes that defendant Kivimaki's failure to obtain a right to sue letter from either the Equal Employment Opportunity Commission or the New York State Human Rights Commission, and her inadequate explanation for such failure, would be fatal to her claim under 42 U .S.C. § 2000e. *See, e.g.Shah v. New York State Dept. of Civil Service,* 168 F.3d 610 (2d Cir.1999).

The Court also notes that the Amended Answer's claim for breach of fiduciary duty does not contain the requisite particularity with respect to a demand for action made by Kivimaki on the board of Ulla-Maijia, Inc., nor does it contain particular allegations as to why such demand would have been futile. Thus, the Amended Answer would not meet the pleading requirements of N.Y. Bus. Corp. Law § 626(c) with respect to Kivimaki's shareholder's derivative claim for breach of fiduciary duty. See N.Y. Bus. Corp. Law § 626(c); *see alsoCharos v. Charos,* 264 A.D.2d 495, 694 N.Y.S.2d 702 (2nd Dep't.1999).

*2. Individual Plaintiffs'/Counterclaim Defendants' Motion to Strike the Amended Answer*

Because the Court has already granted corporate plaintiff Ulla-Maija, Inc.'s motion to strike defendants' Amended Answer in its entirety, the motion to strike filed by four of the individual plaintiffs/counterclaim defendants (Bunstine, Felber, Bailey and Bachmann) is denied as moot.

*3. Welt's Motion to Dismiss the Amended Answer*

**\*4** Because the Court has already granted corporate plaintiff Ulla-Maija, Inc.'s motion to strike defendants' Amended Answer, individual plaintiff/counterclaim defendant Henry Welt's motion to dismiss the Amended Answer is denied as moot.

*4. Plaintiff's Motion to Strike Certain Portions of Defendants' Answer*

[3] Plaintiff's motion with respect to defendants'

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Answer seeks the following relief: (i) an order, pursuant to Fed.R.Civ.P. 12(f), striking paragraphs 32, 109, 137, 138-163, 165, 166-174, 179-182, 184-187, 191, 217-223, 228-231, and paragraphs 6 and 8 of the "Wherefore" clause on pages 31-32; (ii) an order, pursuant to Fed.R.Civ.P. 12(c), granting plaintiff judgment on the pleadings with respect to defendants' Sixth and Eighth counterclaims; (iii) sanctions against defendants pursuant to Fed.R.Civ.P. 11.[FN7]As plaintiff's counsel states in his affidavit in support of the motion, "the essence of [the] motion is that defendants incorporated into their counterclaims certain redundant, immaterial, scandalous and scurrilous allegations[,] and asserted at least [two] counterclaims" against several individuals and one corporation that are not parties to this action. (See Affidavit of Lawrence E. Fabian, dated September 18, 2002, at ¶ 6).

> FN7. By letter dated December 10, 2002, plaintiff withdrew the sanctions portion of its motion in light of its second motion for sanctions, which was filed on November 1, 2002.

As an initial matter, the Court notes that motions to strike "are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation."*Schramm v. Krischell,* 84 F.R.D. 294, 299 (D.Conn.1979). However, a court should strike the disputed matter if it is " 'irrelevant' under any state of facts which could be proved in support' of the claims being advanced." *Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co.,* 657 F.Supp. 136, 144 (E.D.N.Y.1987), quoting *Trusthouse Forte, Inc. v. 795 Fifth Avenue Corp.,* 1981 WL 1113 (S.D.N.Y. Aug.31, 1981). Accordingly, the Court must assess whether each of the paragraphs enumerated in plaintiff's motion has any relevance to the subject matter of the litigation.

(a) *Final Clause of Paragraph 32*

In paragraph 32 of the Complaint plaintiff alleges

that it has spent a significant amount of time promoting "itself, ["the Ulla-Maija"] trademark, and its distinctive products."(Complaint ¶ 32). In their Answer, defendants deny this allegation, except to admit that "up until July 17, 2000, plaintiff spent time and money promoting the ULLA-MAIJA trademark, after which Charles Bunstine and Henry Welt commenced looting the company."(Answer ¶ 32). Plaintiff argues that because Bunstine and Welt are not parties to this action, the allegation that they "looted" the company is irrelevant and scandalous. However, plaintiff's twelfth cause of action (injurious falsehood), alleges that defendant Kivimaki told plaintiff's accountant that "the owners of plaintiff had 'ruined [her] company' and that the shareholders of plaintiff 'stole [her] name and now [she] can't work anywhere." ' (Complaint ¶ 111). Bunstine was the Chairman and Chief Executive Officer of Plaintiff (Bunstine Affidavit ¶ 1), and Welt was an attorney employed by plaintiff. Clearly, if either of those individuals stole monies from plaintiff, such fact would be relevant to the issue of whether Kivimaki's statements regarding the "stealing of her name" and the "ruining of her business" were false. Thus, even though Bunstine and Welt are not parties to the litigation as individuals, their conduct as representatives of plaintiff is relevant to plaintiff's injurious falsehood claim. Accordingly, the motion to strike the final portion of paragraph 32 of the Answer is denied.

(b) *Final Portion of Paragraph 109 and Accompanying Exhibit*

\*5 [4] In paragraph 109 of the Answer, defendants respond to plaintiff's allegation regarding the alleged false statements made by Kivimaki to plaintiff's accountant. (See *supra;* Complaint ¶ 111). Defendants deny plaintiff's allegations, and also allege that: (i) Bunstine, Welt, and Otto Felber (an investor in Ulla-Maija, Inc.) locked Kivimaki out of the company's offices; (ii) Bunstine cancelled Kivimaki's health insurance; (iii) Kivimaki expressed concerns that Bunstine had "stolen her business and was going to ruin it"; and (iv) plaintiff

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

did not furnish Kivimaki with designs for approval, as required under the 1997 trademark license agreement. (Answer ¶ 109). In support of those allegations, defendants have attached a "memorandum of the conversation" between Kivimaki and plaintiff's accountant as Exhibit D to the Answer. That exhibit, which is actually a letter, written by defendant Kivimaki on October 25, 2000 and addressed to an individual named Gary Lyman, describes how on September 28, 2000, Kivimaki told plaintiff's bookkeeper that (i) Bunstine had "stolen [her] business"; and (ii) plaintiff had not presented dress designs to Kivimaki as it was required to do. (Answer, Exh. D).

As with the final clause of paragraph 32, the allegations in paragraph 109 and Exhibit D pertain to the issue of whether Kvimiaki's statements to plaintiff's accountant can be deemed falsehoods. The letters contained in Exhibit D are evidence of what Kivimaki actually said in her conversation with plaintiff's accountant and thus are clearly relevant to plaintiff's injurious falsehood claim. Similarly, the allegations in paragraph 109 regarding the conduct of Bunstine, Welt, and Felber, are relevant to the issue of whether plaintiff's statement regarding the "ruining of her business" and the "stealing of her name" were made maliciously and recklessly, and whether Kivimaki knew the statements to be false at the time she allegedly made them. Accordingly, plaintiff's motion to strike is denied with respect to paragraph 109 of the Answer and its accompanying Exhibit.

(c) *Paragraphs 137, 138-163, and 165*

[5] As discussed *supra,* allegations regarding the alleged "ruining" of Kivimaki's business and the alleged "stealing of her name" by Bunstine, Welt, and the Ulla-Maija, Inc. investors are relevant to plaintiff's injurious falsehood claim. Paragraphs 137, 138-157, 159-160, 163, and 165 of the Answer contain such allegations, or contain factual allegations relevant to the creation of the trademark agreement between plaintiff and defendant Ulla-

Maija Holding, and are thus relevant to the claims in this action.[FN8]

> FN8. Paragraph 160 refers to an Exhibit F, which defendants allege to be a memorandum written by Bunstine on June 8, 2000 and sent to defendant Kivimaki. However, the exhibit attached as Exhibit F to the Answer is a facsimile transmission, dated October 3, 1997, sent by Bruce Bailey to a Patricia Kluge. It appears that the memorandum referred to in paragraph 160 is actually attached to the Answer as Exhibit H.

However, in paragraph 158 defendants allege that "Welt, Bunstine, Felber and Bailey embarked on a campaign to take over the careers of other fashion designers ... and exploit their names, leaving them with nothing."(Answer ¶ 158). This allegation, which relates to alleged conduct undertaken by the named individuals in their individual capacities, is not relevant to any of the claims asserted by either plaintiff or defendants in this action. And although paragraph 161 and the first two sentences of paragraph 162 relate to Bunstine's conduct as CEO of plaintiff, the factual allegations contained therein are scurrilous and unsupported by fact. Accordingly, plaintiff's motion to strike is granted with respect to paragraphs 158, 161, and the first two sentences of paragraph 162.

*6 The final sentence of paragraph 162 refers to notes taken by defendant Kivimaki after plaintiff's board meeting on July 17, 2000, and which are attached to the Answer as an exhibit.[FN9] These notes are clearly relevant to the trademark claims made by both plaintiff and defendants, as well as to Kivimaki's counterclaims for breach of her employment contract. Accordingly, the reference to the notes in paragraph 162, as well as the exhibit itself, should not be stricken from the Answer.

> FN9. Though the Answer refers to the notes as Exhibit G, the notes are actually contained in Exhibit I.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 9

### (d) *Paragraphs 166-174*

These paragraphs refer to Bunstine's alleged sexual harassment of an Ulla-Maija employee named Chani Sanchez. These allegations do not relate to any of the claims asserted by the parties in this action and are thus irrelevant. Accordingly, plaintiff's motion to strike is granted with respect to paragraphs 166-174 of the Answer.

### (e) *Paragraphs 179-182*

In paragraph 179 of the Answer, defendants allege that on two occasions prior to the filing of this action, attorney Welt recommended to defendant Kivimaki that she hire plaintiff's current counsel, Lawrence E. Fabian. However, the Answer does not allege that Fabian ever actually represented Kivimaki, nor does it allege that Kivimaki ever even contacted Fabian about representing her. Thus, Welt's alleged recommendation of attorney Fabian is irrelevant and such allegation is stricken from the Answer.

[6] The first sentence of paragraph 180 alleges that "[f]rom the time Bunstine joined Ulla-Maija, Inc., he started using it as his personal piggy bank."(Answer ¶ 180). This sentence lacks specificity and contains inflammatory language and should therefore be stricken from the Answer. However, the second sentence of the paragraph contains a specific allegation regarding alleged mismanagement of Ulla-Maija, Inc. by Bunstine and is thus relevant to plaintiff's claim for injurious falsehood. See *supra*.

Paragraphs 181 and 182 contain specific allegations regarding Bunstine's conduct with respect to the "Ulla-Maija" trademark application and plaintiff's compliance with the 1997 trademark license agreement. Such allegations are relevant to both plaintiff's and defendants' trademark claims, and therefore should not be stricken.[FN10]

> FN10. The Court notes that although paragraphs 181 and 182 refer to Exhibits I and

J, respectively, the documents referred to in those paragraphs (i.e. a letter from attorney David Kashman dated July 14, 2000, and a printout from the U.S. Patent and Trademark Office website dated August 9, 2002) are in fact attached to the Answer as Exhibits L and M.

Accordingly, plaintiff's motion is granted with respect to paragraph 179 and the first sentence of paragraph 180 of the Answer; the motion is denied with respect to the second sentence of paragraph 180 and paragraphs 181 and 182.

### (f) *Paragraphs 184-187*

[7] Paragraphs 184-186 contain allegations regarding plaintiff's counsel, Lawrence E. Fabian. Specifically, defendants allege that Fabian (i) is listed in the Martindale-Hubbell directory as an "entertainment attorney"; (ii) is of counsel to a law firm specializing in trademarks; (iii) has worked, and continues to work, under the supervision of attorney Welt; and (iv) is taking direction from Welt and Bunstine regarding litigation strategy in this action. However, the substance of Fabian's listing in a professional directory as well as his status with respect to a particular law firm is irrelevant to this action. His association with Welt and his consultation with Bunstine are also irrelevant to the parties' claims. (Indeed, it would be surprising if Bunstine, as CEO of plaintiff, was *not* involved in planning plaintiff's litigation strategy). Accordingly, the motion to strike these paragraphs from the Answer is granted.

*7 [8] Paragraph 187 alleges that Fabian, Welt, and Bunstine were involved in filing a trademark application for the "Ulla-Maija" mark in the name of plaintiff. Defendants maintain that such filing concealed the 1997 licensing agreement and falsely claimed ownership of the mark. Such allegations are clearly relevant to the trademark claims asserted by both parties and therefore should not be stricken from the answer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Accordingly, plaintiff's motion to strike is granted with respect to paragraphs 184-186 and denied with respect to paragraph 187.

### (g) Paragraph 191

In paragraph 190, defendants allege that in April 2002, Bunstine sent a letter to "all bridal stores in the USA and all bridal industry clients falsely claiming that [Kivimaki] violated Ulla-Miajia, Inc.'s trademark rights and was ripping off Ulla-Maija's designs and using 'inferior' quality." (Answer ¶ 190). The next paragraph alleges that "[d]ue to Bunstine's actions and his *threats of legal action* against potential customers and suppliers, [Kivimaki] has been severely damaged."(*Id.* ¶ 191, emphasis added). Clearly, the letters allegedly sent by Bunstine and the effect of these letters on defendants' business are relevant to defendants' counterclaim for unfair competition. However, paragraph 190 of the Answer does not mention any threats of legal action made by Bunstine. And although that paragraph states that a copy of one of the letters allegedly sent by Bunstine was attached to the Answer, there is no such attachment. Thus, there are no specific factual allegations indicating that Bunstine made any threats of legal action against potential customers. Accordingly, the portion of paragraph 191 referring to such threats as the basis for damages sustained by defendants are stricken. However, plaintiff's motion to strike is denied with respect to the portion of paragraph 191 that refers to "Bunstine's actions," (*id.*), since the sending of the alleged letters would constitute such actions.

### (h) Paragraphs 217-223, 228-231

[9] Defendants' sixth counterclaim (*Id.* ¶¶ 217-223) is asserted against the individuals Welt, Felber, Bunstine, Bailey, and Bachmann, as well as against Global Design Holdings (a corporation). Defendants' eighth counterclaim (*Id.* ¶¶ 228-231) is asserted against Welt, Felber, Bunstine, Bailey, and Fa-

bian. However, while factual allegations regarding these parties may be relevant to defendants' counterclaims against plaintiff, the individuals themselves are not parties to this action and thus are not proper counterclaim defendants. Furthermore, under Fed.R.Civ.P. 13, additional parties can only be joined to an action through a counterclaim when that counterclaim is also asserted against an existing party. *SeeConnell v. Bernstein-McCauley, Inc.,* 67 F.R.D. 111 (S.D.N.Y.1975); *Invest-Import v. Seaboard Surety Co.,* 18 F.R.D. 499 (S.D.N.Y.1955); 4 Wright & Miller, Federal Practice and Procedure § 1435 (1990). Here it is undisputed that the sixth and eighth counterclaims in the Amended Answer are not asserted against plaintiff Ulla-Maija, Inc. Accordingly, defendants' sixth and eighth counterclaims are dismissed pursuant to Fed.R.Civ.P. 12(c), and paragraphs 217-223, 228-231, as well as paragraphs 6 and 8 of the "wherefore" clause on page 32 of the Answer, are stricken as immaterial pursuant to Fed.R.Civ.P. 12(f).

### 5. Cross-Motions for Sanctions

*8 By notice of motion dated November 1, 2002, plaintiff moved for an order, pursuant to Fed.R.Civ.P. 11(b), sanctioning defendants Kivimaki, Ulla-Maija Holding, Kivimaki, Inc., and their counsel Dowd & Marrotta LLC for: (i) serving frivolous pleadings without basis in fact or law; (ii) refusing to withdraw those pleadings after notice from plaintiff, and (iii) forcing plaintiff to file motions to dismiss the frivolous pleadings. By notice of cross-motion dated December 4, 2002, defendants cross-moved for sanctions against plaintiff and it's counsel, Lawrence E. Fabian, for (i) serving motions and other papers for improper purposes; and (ii) failing to withdraw such papers after notice and thus causing defendants to incur attorneys' fees and costs. Defendants' cross-motion seeks monetary sanctions as well as an order disqualifying attorney Fabian from simultaneous representation of plaintiff and any of the individuals named in defendants' Amended Answer (i.e. Bunstine, Bach-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

mann, Bailey, and Felber).

The decision as to whether to award sanctions pursuant to Rule 11 is subject to the Court's discretion. *See Margo v. Weiss*, 213 F.3d 55, 64 (2d Cir.2000); *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 333 (2d Cir.1999). Given the totality of the circumstances, the Court finds that sanctions are not warranted at this time. Accordingly, both plaintiff's motion and defendants' cross-motion for sanctions are denied.


Conclusion

For the reasons set forth above, (i) plaintiff's motion to strike the Amended Answer in its entirety is granted; (ii) the four individual plaintiffs'/ counter-claim defendants' motion to strike the Amended Answer in its entirety is denied as moot; (iii) plaintiff/counterclaim defendant Henry Welt's motion to dismiss the Amended Answer as against him is denied as moot; (iv) plaintiff's motion to strike certain parts of the Answer is granted in part and denied in part; (iv) plaintiff's motion for sanctions and defendants' cross-motion for sanctions are denied.

Defendants are directed to file a Second Amended Answer and Counterclaims, in accordance with this order (see Discussion Section 4., *supra* ), within twenty (20) days of the date of this order.

SO ORDERED.

S.D.N.Y.,2003.
Ulla-Maija, Inc. v. Kivimaki
Not Reported in F.Supp.2d, 2003 WL 169777 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**4**

**Westlaw.**

Not Reported in F.Supp.                                                                Page 1
Not Reported in F.Supp., 1993 WL 535120 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Pitts v. L. Epstein of New York, Inc.
S.D.N.Y.,1993.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Steven M. PITTS, Plaintiff,
v.
L. EPSTEIN OF NEW YORK, INC., Express, Inc.,
d/b/a/ Limited, Defendants.
L. EPSTEIN OF NEW YORK, INC., Metro Interior
Demolition, Inc. Third-Party Plaintiffs,
v.
CHARLES PANKOW BUILDERS, LTD., Pem-
brook Management s/h/a Pembrook Management,
Inc., Third-Party Defendants.
**No. 92 CIV. 0802 (RPP).**

Dec. 17, 1993.

Roemer & Featherstonhaugh, New York City, by
Jeffrey J. Conklin, for plaintiff.
White, Quinlan, Staley & Ledwith, Garden City,
NY by Terence M. Quinlan, for defendant L. Ep-
stein.
Law Offices of James Barron, New York City by
Raymond J. Sofield, for defendant Metro Interior
Demolition, Inc.
Amhuty, Demers & McManus, Albertson, NY by
Frank J. Pecorelli, Jr., for defendant Express, Inc.
Callahan, Shepp, Yuhas, Adams & Carfora, New
York City, for third-party defendant Charles
Pankow Builders, Ltd.
Stockfield, Fixler & Gulino, New York City, for
defendants/third-party plaintiffs Corporate Property
Investors and Pembrook Management, Inc.

OPINION AND ORDER

ROBERT P. PATTERSON, JR., District Judge.
*1 Subsequent to a jury verdict on October 8, 1993,
awarding damages to plaintiff, defendant L. Epstein
of New York, Inc. ("Epstein") moves for summary
judgment on its cross-claim against defendant
Metro Interior Demolition, Inc. ("Metro") filed

herein on July 16, 1993. The cross-claim is based
on a contract between those defendants dated July
15, 1991, pursuant to which Metro, the subcontract-
or, agreed to procure insurance for the benefit of
Epstein, the contractor, and to have Epstein named
as an additional insured for any personal injuries or
property damage arising out of the work performed
under the construction contract, including the oper-
ations of Epstein.

Contractual provisions for such insurance do not vi-
olate Section 5-322.1 of the General Obligations
Law of the State of New York and are enforced by
the courts of New York. *Kinney v. G.W. Lisk Com-
pany, Inc.,* 557 N.Y.S.2d 283, 284 (N.Y.1990); *Wil-
liamson v. Borg Florman Dev. Corp.,* 594 N.Y.S.2d
778, 779 (1st Dep't 1993), *appeal denied,*601
N.Y.S.2d 580 (N.Y.1993).

Metro's answering papers point out that Epstein's
cross-claim was not contained in its answer which
was served on or about April 21, 1992, although
other cross-claims were asserted in that answer and
that, accordingly, the cross-claim was not properly
pled. *Langer v. Monarch Life Ins. Co.,* 966 F.2d
786, 810 (3d Cir.1992). Metro points out further
that Epstein did not obtain the Court's consent to
amend its answer, although more than twenty days
had elapsed since the filing of the answer in viola-
tion of Rule 15(a) of the Federal Rules of Civil Pro-
cedure.

Metro also claims that summary judgment cannot
be granted because there are genuine issues of ma-
terial fact relating to whether Metro failed to adhere
to the terms of the contract. Lastly, Metro argues
that the contract provision that "any controversy or
claim arising out of or relating to the contract or
breach thereof shall be submitted to Alternative
Dispute Resolution or to the American Arbitration
Association" requires this matter be sent to arbitra-
tion.

In *Langer* the district court struck "cross-claims"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 535120 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

which had been improperly pleaded. *Id.* at 808. The Third Circuit approved the striking of the cross-claims stating, "Federal Rules of Civil Procedure 12(b) and 13(g) require that cross-claims be stated in a pleading and under Rule 7(a) cross-claims should be contained in a defendant's answer. *Id.* at 810 (citing *In re Cessna Distributorship Litigation,* 532 F.2d 64, 67 & n. 7 (8th Cir.1976).

Accordingly, Epstein's motion for summary judgment is grounded on an improper cross-claim which is hereby stricken. Epstein's motion for summary judgment is denied.

IT IS SO ORDERED.

S.D.N.Y.,1993.
Pitts v. L. Epstein of New York, Inc.
Not Reported in F.Supp., 1993 WL 535120 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.