UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PFIZER INC,                              )
ROBERT JARVIK, M.D.,                     )
JARVIK HEART, INC.,                      )
                                         )
          Plaintiffs,                    )
                                         )
     v.                                  )   Civil Action No.  08-cv-02018-LAK
                                         )   ECF case
MATHEW I. GELFAND, M.D.,                 )
                                         )
          Defendant.                     )

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

David G. Ebert
**INGRAM YUZEK GAINEN CARROLL &
BERTOLOTTI, LLP**
250 Park Avenue - 6th Floor
New York, New York 10177
(212) 907-9603
debert@ingramllp.com
*Attorneys for Plaintiffs Pfizer Inc,  Robert
Jarvik, M.D., and Jarvik Heart, Inc.*

Of Counsel:
Rudolf E. Hutz
Jeffrey B. Bove
Mary W. Bourke
**CONNOLLY BOVE LODGE & HUTZ LLP**
1007 North Orange Street
Wilmington, DE 19899
(302) 658-9141

DATED:  April 10, 2008

275073_3/02519-0003

# TABLE OF CONTENTS

**Page**

INDEX OF UNREPORTED DECISIONS ...................................................................... ii

TABLE OF AUTHORITIES ........................................................................................ iii

I.      PRELIMINARY STATEMENT ...................................................................... 1

II.     SUMMARY OF ARGUMENT ........................................................................ 1

III.    STATEMENT OF FACTS ............................................................................... 1

       A.    The Parties ......................................................................................... 1

       B.    This Litigation .................................................................................... 2

IV.    ARGUMENT .................................................................................................... 3

       A.    Standard of Review On A Motion to Dismiss .................................... 3

       B.    Defendant's Motion To Dismiss Is Without Merit ............................ 4

V.     CONCLUSION ............................................................................................... 10

## <u>INDEX OF UNREPORTED DECISIONS</u>

*In re Pfizer, Inc. Secs. Litig.,*
___ F.Supp.2d ___, 2008 WL 540120 (S.D.N.Y., Feb. 28, 2008)........................Ex. 1

*Constellation Brands, Inc. v. Arbor Hill Assocs., Inc.,*
535 F. Supp. 2d 347, 2008 WL 515028 (W.D.N.Y., Feb. 26, 2008)....................Ex. 2

275073_3/02519-0003

<u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

*ACandS v. Aetna Cas. & Sur. Co.,*
    666 F.2d 819 (3d Cir. 1981)........................................................................ 6

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007)........................................................................ 3

*Bausch & Lomb Inc. v. Alcide Corp.,*
    684 F. Supp. 1155 (W.D.N.Y. 1987)........................................................ 7

*Beacon Theatres, Inc. v. Westover,*
    359 U.S. 500, 79 S. Ct. 949 (1959)........................................................ 9

*Bell Atl. Corp. v. Twombly,*
    ___ U.S. ____, 127 S. Ct. 1955,  167 L.Ed.2d 929 (2007)..................... 3-4

*Benitec Australia, Ltd. v. Nucleonics, Inc.,*
    495 F.3d 1340 (Fed. Cir. 2007)................................................................ 6

*Cardinal Chemical Co. v. Morton Intern., Inc.,*
    508 U.S. 83, 113 S. Ct. 1967 (1993)........................................................ 6

*Constellation Brands, Inc. v. Arbor Hill Assocs., Inc.,*
    535 F. Supp. 2d 347, 2008 WL 515028 (W.D.N.Y., Feb. 26, 2008)......... 7

*Crown Cork & Seal Co., Inc. v. Borden, Inc.,*
    779 F. Supp. 33 (E.D.Pa. 1991) .......................................................... 5-6, 7

*EMC Corp. v. Norand Corp.,*
    89 F.3d 807 (Fed. Cir. 1996)................................................................ 7, 8

*Flores v. S. Peru Copper Corp.,*
    343 F.3d 140 (2d Cir. 2003)................................................................ 3

*Great Am. Ins. Co. v. Houston Gen. Ins. Co.,*
    735 F. Supp. 581 (S.D.N.Y. 1990) ........................................................ 7

*In re Pfizer, Inc. Sec. Litig.,*
    ___ F. Supp. 2d ____, 2008 WL 540120 (S.D.N.Y., Feb. 28, 2008) ........ 3

*Iqbal v. Hasty,*
    490 F.3d 143 (2d Cir. 2007).................................................................. 4

*Levy v. Southbrook Int'l Invs., Ltd.,*
    263 F.3d 10 (2d Cir. 2001),
    *cert. denied,* 535 U.S. 1054, 122 S.Ct. 1911(2002) .................................................. 3

*Maryland Cas. Co. v. Pacific Coal & Oil Co.,*
    312 U.S.270, 61 S. Ct. 510 (1941)............................................................................... 5

*MedImmune, Inc. v. Genentech, Inc.,*
    __ U.S. ___, 127 S. Ct. 764, (2007)............................................................... 4-5, 6, 7

*Polymer Indus. Prods. Co. v. Bridgestone/Firestone, Inc.,*
    347 F.3d 935 (Fed. Cir. 2003)..................................................................................... 9

*Pub Affairs Assocs., Inc. v. Rickover,*
    369 U.S. 111, 82 S. Ct. 580 (1962) ............................................................................ 5

*Sony Elecs., Inc. v. Guardian Media Techs., Ltd.,*
    497 F.3d 1271 (Fed. Cir. 2007)................................................................................... 8

*Telectronics Pacing Sys., Inc. v. Ventritex, Inc.,*
    982 F.2d 1520 (Fed. Cir. 1992)................................................................................... 5

*Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp.,*
    482 F.3d 1330 (Fed. Cir. 2007)................................................................................... 4

<u>Rules and Statutes</u>

28 U.S.C. § 2201 ................................................................................................................ 3, 4

Fed. R. Civ. P. 12(b)(6)......................................................................................................... 1

Fed. R. Civ. P. 12(f)............................................................................................................... 1

Fed. R. Civ. P. 13(a) ............................................................................................................. 9

Fed. R. Civ. P. 38(a) ............................................................................................................. 9

Fed. R. Civ. P. 42(b) ............................................................................................................. 9

275073_3/02519-0003

I.    **PRELIMINARY STATEMENT**

This is an action by Pfizer Inc ("Pfizer Inc"), Robert Jarvik, M.D. ("Dr. Jarvik"), and

Jarvik Heart, Inc. ("JHI"), (collectively referred to as "Pfizer" or "Plaintiffs") against Mathew I.

Gelfand, M.D. ("Gelfand"), for a declaratory judgment of non-infringement, invalidity and

unenforceability of United States Patent No. 5,837,688 ("the '688 patent").

Gelfand precipitated Pfizer's complaint by threatening suit on his patent, seeking

hundreds of millions in damages and an injunction to stop the sales of the most widely used

medicine in the world.  Now, wishing to substitute his own suit for Pfizer's, Gelfand refuses to

file an answer to Pfizer's complaint.  Instead, Gelfand filed procedurally improper Counterclaims

alleging infringement of the '688 patent.  Compounding his failure to answer, Gelfand also has

moved to dismiss Pfizer's complaint as allegedly inconsistent with the Declaratory Judgment

Act.

Pfizer is moving pursuant to Rule 12(b)(6) and/or 12(f) of the Federal Rules of Civil

Procedure, to Dismiss and/or Strike Defendant's Counterclaims as improperly filed without any

associated pleading.

This is Pfizer's Memorandum in Response to Gelfand's Motion to Dismiss the complaint.

II.    **SUMMARY OF ARGUMENT**

Gelfand's Motion to Dismiss should be denied as unsupported by the law or the facts.

III.    **STATEMENT OF FACTS**

A.    **The Parties**

Pfizer Inc is a research-based pharmaceutical company that invents, develops,

manufactures and markets leading prescription medicines for humans and animals throughout the

world.  Its most important product, and the world's largest selling pharmaceutical, is Lipitor®, a

lifesaving cholesterol-lowering drug containing the active ingredient, atorvastatin calcium.

Complaint at ¶¶ 3, 11 (hereinafter "Com. ¶ __").[1]  Pfizer Inc introduced Lipitor® into the United States market in 1996.  Com. ¶ 12.  Pfizer Inc also developed, manufactures and markets a unique combination product comprised of two active ingredients, amlodipine besylate and atorvastatin calcium, which it has sold in the United States since 2004 under the registered name Caduet®.  Com. ¶¶ 13, 14.

Dr. Jarvik is an individual residing in New York, New York who serves as President and Chief Executive Officer of JHI.  Com. ¶ 6.  Dr. Jarvik is widely respected and recognized as the inventor of the Jarvik artificial heart.  Com. ¶ 9.  Dr. Jarvik has appeared in certain of Pfizer's advertisements for Lipitor®.  Counterclaim at ¶¶ 4, 32 (hereinafter "Counterclaim ¶ __").[2]

JHI is a New York Corporation, with offices located at 333 West 52nd Street, New York, New York 10019.  Com. ¶ 5.

Gelfand is a resident of the State of New York, with an address of 245 Fairway Road, Lido Beach, New York 11561.  Com. ¶ 6; Counterclaim ¶ 2.  Gelfand claims to be the inventor and owner of the '688 patent.  Com. ¶ 9; Counterclaim ¶¶ 9, 10.  The United States Patent and Trademark Office issued the '688 patent on November 17, 1998, entitled "Use of Thrombolytic Reagents for Prevention of Vascular Disease", on an application, Serial Number 758,615, filed by Gelfand on November 27, 1996.  Com. ¶ 2; Counterclaim ¶¶ 9.

**B.    This Litigation**

Beginning in August, 2005, Gelfand repeatedly accused one or more of the Plaintiffs in writing of infringing the '688 patent by reason of their activities in manufacturing, promoting and selling Lipitor® and Caduet®, threatening to seek millions in damages and an injunction

---

[1] A copy of the Complaint is annexed as Exhibit A to the accompanying affidavit of David G. Ebert, sworn to April 10, 2008 (hereafter, "Ebert Affidavit").

[2] A copy of the Counterclaim is annexed as Exhibit B to the Ebert Affidavit.

against the future sale of these important, lifesaving drugs. Com. ¶¶ 9,10, 17, 18, 19; Counterclaim ¶¶ 28, 43, 44. Gelfand even sent Pfizer a copy of a draft complaint which he threatened to file in this District.

Based upon these serious assertions of infringement, Pfizer properly brought this action for declaratory judgment of non-infringement, invalidity and unenforceability against Gelfand to resolve Gelfand's accusations. Pfizer even filed its complaint in Gelfand's choice of forum as stated in his own draft complaint. On March 24, 2008, although failing in violation of the Federal Rules of Civil Procedure to file an answer, Gelfand did respond to Pfizer's suit by filing: (1) Counterclaims, and (2) a Motion to Dismiss the Complaint, seeking to proceed solely on the counterclaims, while asserting that the complaint was "inconsistent with the Declaratory Judgment Act, 28 U.S.C. § 2201, et. seq." purportedly because the complaint is "merely pre-emptive" and "procedural fencing." Motion to Dismiss, p. 2.

## IV.    ARGUMENT

### A.    Standard Of Review On A Motion To Dismiss

In deciding a motion to dismiss, the Court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the non-moving party's favor. *Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 143 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054, 122 S. Ct. 1911(2002); *In re Pfizer, Inc. Secs. Litig.*, ___ F.Supp.2d ___, 2008 WL 540120 (S.D.N.Y., Feb. 28, 2008).[3] In order to overcome such a motion, the non-moving party "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (*quoting Bell Atl. Corp.*

---

[3] A copy of the decision in *In re Pfizer, Inc. Secs. Litig.*, ___ F.Supp.2d ___, 2008 WL 540120 (S.D.N.Y., Feb. 28, 2008) is annexed as Exhibit 1, hereto.

*v. Twombly*, ___ U.S. ____, 127 S. Ct. 1955, 1965 (2007)); *see also Iqbal v. Hasty*, 490 F.3d

143, 158-59 (2d Cir.2007) (declining to limit *Bell Atl.* holding to the antitrust context).

### B.     Defendant's Motion To Dismiss Is Without Merit

Procedurally, Defendant's motion to dismiss depends upon improper counterclaims.[4]

Plaintiffs have moved to dismiss Gelfand's counterclaims as improperly filed because they are

asserted in the absence of an answer or other pleading.  If the counterclaims are dismissed, the

entire factual basis for Gelfand's motion to dismiss the complaint ceases to exist.  Accordingly,

Gelfand's motion to dismiss should be denied if the Court grants Pfizer's motion to dismiss the

counterclaims.

Substantively, Gelfand fails to cite and discuss the proper jurisdictional basis for

declaratory judgments in the patent context which in this case are clearly satisfied.

The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction ... any court
> of the United States ... may declare the rights and other legal
> relations of any interested party seeking such declaration, whether
> or not further relief is or could be sought.

28 U.S.C. § 2201.

The test for a justiciable controversy applied by the Supreme Court in the *MedImmune*

case, and followed by the Federal Circuit in *Teva Pharmaceuticals USA, Inc. v. Novartis*

*Pharmaceuticals Corp.*, 482 F.3d 1330, 1337 (Fed. Cir. 2007), "is whether the facts alleged,

under all the circumstances, show that there is a substantial controversy, between the parties

having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment" *quoting, MedImmune, Inc. v. Genentech, Inc.*, __ U.S. ___, 127 S. Ct. 764

---

[4]  We observe that Gelfand has failed to comply with Local Civil Rule 7.1 requiring filing a
memorandum with his motion, nor did he specify the rules upon which his motion to dismiss is
predicated as demanded by Local Civil Rule 7.2.

275073_3/02519-0003

(2007); *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510

(1941).

      In *MedImmune*, the Supreme Court also stated that Article III requires:

> that the dispute be "definite and concrete, touching the legal
> relations of parties having adverse legal interests"; and that it be
> "real and substantial" and "admi[t] of specific relief through a
> decree of a conclusive character, as distinguished from an opinion
> advising what the law would be upon a hypothetical state of facts.

127 S. Ct. at 771 (citation omitted).

      There is no question that Plaintiffs have alleged a substantial controversy between the

parties. Gelfand does not deny that such a controversy exists and, in fact, his counterclaims

proclaim the dispute. As such, this Court plainly has declaratory judgment jurisdiction.

      There must be well-founded reasons for declining to entertain a declaratory judgment

action. *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112, 82 S. Ct. 580, 582 (1962).

Absent such reasons, precedent establishes that when, as here, there has been a direct charge of

infringement by the patentee, and an actual controversy exists due to ongoing activity that has

been accused of infringement, the accused infringer has the right to resolve the dispute via a

declaratory judgment action. *See Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520,

1526 (Fed. Cir.1992) (declaratory judgment actions evidencing a conflict of sufficient

immediacy and reality should be allowed to proceed). Pfizer's complaint, as the allegations

therein confirm, satisfies all of the requirements for declaratory judgment jurisdiction and should

not be dismissed.

      Contrary to Gelfand's assertion, the harm to Pfizer has not "already occurred." Motion to

Dismiss, p. 2 (*citing Crown Cork & Seal Co., Inc. v. Borden, Inc.*, 779 F.Supp. 33, 36 (E.D.Pa.

1991)).[5]  In *Crown Cork & Seal*, the harm alleged to support declaratory judgment jurisdiction

was the "cost of litigating."  *Id.*  The *Crown Cork & Seal* court found that the transaction

between the parties had concluded and thus the damages for breach of the contractual

relationship were already fixed.  This contrasts with the present situation where the potential for

damages for infringement is on going.  In fact, the *Crown Cork & Seal* court quoted the Third

Circuit in *ACandS v. Aetna Cas. & Sur. Co.*, 666 F.2d 819, 823 (3d Cir. 1981), where the court

held that a declaratory judgment was intended to avoid the "accrual of avoidable damages."

This is precisely the current situation.  See also *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495

F.3d 1340, 1350 (Fed. Cir. 2007) ("The Supreme Court in *MedImmune, Inc. v. Genentech, Inc.*

... has recently emphasized the importance the Declaratory Judgment Act plays in protecting

against the Hobson's choice of abandoning lawful endeavors or risking liability for

infringement.")

     Gelfand's assertion that the counterclaims and potential defenses raised by the

counterclaims subsume Pfizer's declaratory judgment claims is wrong.  It is well established that

Pfizer's declaratory judgment claims are separate claims for relief, independent of Gelfand's

infringement counterclaims.  *Cardinal Chemical Co. v. Morton Intern., Inc.*, 508 U.S. 83, 96,

113 S. Ct. 1967, 1975 (1993) ("A party seeking a declaratory judgment of invalidity presents a

claim independent of the patentee's charge of infringement."); *Benitec Australia, Ltd., supra.*

     Gelfand's further citation to the *Crown Cork & Seal* case as "procedural fencing" is inapt.

The *Crown Cork & Seal* court expressed concern about the proper venue for resolution of the

claims at issue.  The court remarked that a "declaratory judgment suit filed preemptively to

foreclose a defendant's choice of forum is inappropriate."  In the present case, there has been no

---

[5] Gelfand erroneously cites *Crown Cork & Seal* as a case from the Southern District of New York.

6

pre-emption of Gelfand's choice of forum.  Pfizer filed this case in the District of <u>Gelfand's</u> <u>choice</u>, as evidenced by his draft complaint, and Gelfand has not suggested that there is a more appropriate forum.  Gelfand's perturbation is only that Pfizer filed suit first, and Gelfand wants to substitute his counterclaims for Pfizer's complaint.  Gelfand has cited no case law suggesting that such a concern can form the basis for a dismissal of an otherwise properly grounded and well plead declaratory judgment complaint.

An argument nearly identical to Gelfand's was recently presented and rejected in *Constellation Brands, Inc. v. Arbor Hill Assocs., Inc.*, 535 F. Supp. 2d 347, 2008 WL 515028, at *9 (W.D.N.Y., Feb. 26, 2008),[6] in the context of alleged trademark infringement, where the court addressed similar arguments grounded on the race to the courthouse and found them without foundation.  Defendant Arbor Hill argued that the declaratory judgment plaintiff had "sandbagged" it in order win a race to the courthouse.  *Id.*  Arbor Hill cited various cases which, like *Crown Cork & Seal,* were argued to justify dismissal in such circumstances.[7]  The court distinguished the cases on the basis that they involved preemption of the forum of choice of the defendant and Arbor Hill had not filed in any other jurisdiction nor argued that another forum was appropriate.  The court also distinguished *EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996) (overruled in part on other grounds in *MedImmune, supra.*), where forum shopping was not involved. Nevertheless, the *Constellation Brands* court found the case "factually inapposite since it involved a party's attempt to apply pressure to another party in connection with ongoing negotiations over the sale and licensing of patents." *Id., citing EMC* at 815 ("[T]he

---

[6] A copy of the decision in *Constellation Brands, Inc. v. Arbor Hill Assocs., Inc.*, 535 F. Supp. 2d 347, 2008 WL 515028 (W.D.N.Y., Feb. 26, 2008) is annexed as Exhibit 2, hereto.

[7] Among the cases cited were: *Bausch & Lomb Inc. v. Alcide Corp.*, 684 F. Supp. 1155 (W.D.N.Y. 1987) and *Great Am. Ins. Co. v. Houston Gen. Ins. Co.*, 735 F. Supp. 581 (S.D.N.Y. 1990).

7

district court could properly view the declaratory judgment complaint as a tactical measure filed in order to improve EMC's posture in the ongoing negotiations-not a purpose that the Declaratory Judgment Act was designed to serve."). No similar argument has been or can be raised by Gelfand because there are and have been no ongoing negotiations between the parties. Moreover, the declaratory judgment plaintiff in *EMC* called the defendant the day after the suit was filed "and explained that the declaratory judgment complaint had been filed as 'merely a defensive step' and that [the plaintiff] 'would like to continue to discuss with you all the options hopefully in a more meaningful manner over the near term.'" *EMC*, 89 F.3d at 815.

The Federal Circuit has recently distinguished the *EMC* situation from one where there was "no affirmative evidence to suggest that appellants filed this suit in order to obtain a more favorable bargaining position in any ongoing license negotiations." *Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*, 497 F.3d 1271, 1290 (Fed. Cir. 2007). In *Sony*, the Federal Circuit vacated the district court's discretionary refusal to entertain the declaratory judgment action indicating a lack of factual support for the purported motive to influence the licensing negotiations. Here, there are also no allegations made by Gelfand that Plaintiffs have made any statements which could be construed as seeking an advantage over continuing licensing negotiations (there are none).

Gelfand's asserts, without legal or factual support, that the "only obstensible reason now for preserving Counter-Defendants' Complaint is to allow the race to the courthouse to adjust the burdens and process of proof in this action, and/or to deny Dr. Gelfand a trial by jury as to all aspects of his claims for patent infringement triable as of right by jury." But Pfizer, as alleged in the complaint, filed suit to resolve an actual controversy, precipitated by Gelfand's threats, over

8

the '688 patent as rapidly as possible. Having been threatened by Gelfand, Pfizer was under no

obligation to await Gelfand's determination as to the proper time to begin litigation.

Gelfand fails to provide any support for the notion that Pfizer's declaratory action

deprives Gelfand of a jury trial on any issue or that it has any impact upon the burdens and

process of proof. Both propositions are contrary to established law. The Declaratory judgment

statute "specifically preserves the right to jury trial for both parties." *Beacon Theatres, Inc. v.

Westover*, 359 U.S. 500, 504, 79 S. Ct. 948, 953 (1959); *See also*, Fed. R. Civ. P. 38(a) ("The

right of trial by jury ... is preserved to the parties inviolate.")

Counterclaims for infringement are compulsory under Fed. R. Civ. P. 13(a) in response to

a complaint for a declaratory judgment of non-infringement. *Polymer Indus. Prods. Co. v.

Bridgestone/Firestone, Inc.*, 347 F.3d 935, 938 (Fed. Cir. 2003) (Establishing a "uniform

national rule" that "[r]ule 13(a) makes an infringement counterclaim to a declaratory judgment

action for noninfringement compulsory."). As such, there are countless reported cases where

declaratory judgment claims for non-infringement, invalidity and unenforceability are litigated

along with counterclaims for infringement. There is no impact on the right to a jury trial or

burdens of proof.

Further, with respect to the process or order of proof at trial, a court has broad discretion

with regard to trial management. Federal Rule of Civil Procedure 42(b) provides:

> The court, in furtherance of convenience or to avoid prejudice, or
> when separate trials will be conducive to expedition and economy,
> may order a separate trial of any claim, cross-claim, counterclaim
> ... always preserving inviolate the right of trial by jury as declared
> by the Seventh Amendment to the Constitution or as given by a
> statute of the United States.

Fed. R. Civ. P. 42(b) (emphasis added).

Gelfand's arguments, as best they can be understood, are unsupported and meritless.

9

V.    **CONCLUSION**

For the reasons set forth above, Defendant's Motion to dismiss the complaint should be

denied.

RESPECTFULLY SUBMITTED,

**INGRAM YUZEK GAINEN CARROLL &
BERTOLOTTI, LLP**
*Attorneys for Plaintiffs Pfizer Inc, Robert
Jarvik, M.D., and Jarvik Heart, Inc.*

By:    David G. Ebert (DE 4078)

Of Counsel:                                250 Park Avenue - 6th Floor
Rudolf E. Hutz                             New York, New York 10177
Jeffrey B. Bove                            (212) 907-9603
Mary W. Bourke                             debert@ingramllp.com
**CONNOLLY BOVE LODGE & HUTZ LLP**
1007 North Orange Street
Wilmington, DE 19899
(302) 658-9141


DATED:  April 10, 2008

10

## CERTIFICATE OF SERVICE

I am an attorney admitted to practice before this Court and am associated with Ingram Yuzek Gainen Carroll & Bertolotti, LLP, attorneys for plaintiffs, Pfizer Inc., Robert Jarvik, M.D., and Jarvik Heart, Inc. ("Plaintiffs"). I hereby certify that on April 10, 2008, I caused copies of **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**, dated April 10, 2008, and the **AFFIDAVIT OF DAVID G. EBERT IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**, to be served by hand upon:

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street, Room 1310
New York, New York 10007

and to be served on the following:

Mitchell J. Rotbert
The Rotbert Law Group, LLC
*Attorneys for Defendant*
*Mathew I. Gelfand, M.D.*
7315 Wisconsin Avenue
Suite 1250 West
Bethesda, Maryland  20814

by depositing a true and correct copy of the same properly enclosed in a postpaid wrapper, in the official depository maintained and exclusively controlled by the United States.

Dated:  New York, New York
        April 10, 2008

Caitlin L. Bronner (CB - 4280)

1



--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

Page 1

In re Pfizer, Inc. Securities Litigation
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re PFIZER, INC. SECURITIES LITIGATION.
This Document Relates to: All Cases.
No. 06 Civ. 14199(LAK).

Feb. 28, 2008.

**Background:** Shareholders brought class action against drug manufacturer and three of its current and former officers and directors, alleging claims for securities fraud and control person liability. Defendants moved to dismiss.

**Holdings:** The District Court, Lewis A. Kaplan, J., held that:

(1) shareholders failed to plead allegations of fraud with requisite particularity;

(2) shareholders failed to sufficiently allege motive to state securities fraud claim; and

(3) shareholders failed to sufficiently allege conscious misbehavior or recklessness to state securities fraud claim.

Motion granted.

**[1] Securities Regulation 349B ⟨⟩60.53**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.53 k. Misrepresentation. Most Cited Cases
To satisfy the Private Securities Litigation Reform Act (PSLRA) and rule requiring that, in all averments of fraud or mistake, the circumstances constituting fraud or mistake be stated with particularity, the complaint in a securities fraud case must: (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state

where and when the statements were made; and (4) explain why the statements were fraudulent. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[2] Securities Regulation 349B ⟨⟩60.51**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51 k. In General. Most Cited Cases
Under the Private Securities Litigation Reform Act (PSLRA), the complaint in a securities fraud case must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, i.e., an intent to deceive, manipulate, or defraud. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b)(2); 15 C.F.R. § 240.10b-5.

**[3] Securities Regulation 349B ⟨⟩60.18**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
               349Bk60.18 k. In General. Most Cited Cases
To state a claim based on a misrepresentation or omission in violation of Rule 10b-5, one must allege that a defendant: (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

injury. 15 C.F.R. § 240.10b-5.

**[4] Securities Regulation 349B ⟡⟶60.53**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.53 k. Misrepresentation.
Most Cited Cases
To plead securities fraud with requisite particularity, plaintiffs must do more than allege that statements were materially misleading, they must demonstrate with specificity why and how that is so. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[5] Securities Regulation 349B ⟡⟶60.51**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51 k. In General. Most Cited Cases
When factual allegations are made on information and belief, the Private Securities Litigation Reform Act (PSLRA) requires that the complaint in a securities fraud case include adequate bases for the allegations, and it must identify sufficiently the sources upon which plaintiffs' beliefs are based and those sources must have been likely to have known the relevant facts. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b)(1); 15 C.F.R. § 240.10b-5.

**[6] Securities Regulation 349B ⟡⟶60.51**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets

         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51 k. In General. Most Cited Cases
When factual allegations are made in a securities fraud case on information and belief, pursuant to the Private Securities Litigation Reform Act (PSLRA), the factual allegations that are based on adequate sources must justify plaintiffs' conclusion that defendants' statements were materially misleading. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[7] Securities Regulation 349B ⟡⟶60.28(11)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
               349Bk60.28 Nondisclosure; Insider Trading
                  349Bk60.28(10) Matters to Be Disclosed
                   349Bk60.28(11) k. Materiality. Most Cited Cases
An omission is materially misleading, for purposes of a securities fraud claim, if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[8] Securities Regulation 349B ⟡⟶60.51**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51 k. In General. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

Cited Cases

Shareholders failed to plead with particularity facts sufficient to support allegation that statements of drug manufacturer and three of its current and former officers and directors regarding drug's efficacy were materially misleading, as required to plead a securities fraud claim under the Private Securities Litigation Reform Act (PSLRA), where studies cited by shareholders did not support their allegation that the drug was not effective, and shareholders did not allege how source who asserted that defendants had been warned of drug's shortcomings was likely to know the relevant facts. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

[9] Securities Regulation 349B ☞60.53

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.53 k. Misrepresentation.
Most Cited Cases

Facts alleged did not support shareholders' inference that drug intended to reduce coronary heart disease by raising so-called "good" cholesterol was unlikely to reduce artheroslerosis and thus made drug manufacturer and its officers and directors' positive statements about drug's efficacy materially misleading, as required to satisfy requirements of pleading securities fraud with particularity; rather, allegations supported at most an inference that evidence available during the class period was inconclusive on drug's efficacy, which would not support an inference that defendants actually drew a negative conclusion from inconclusive evidence. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

[10] Securities Regulation 349B ☞60.28(11)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
                    349Bk60.28 Nondisclosure; Insider Trading
                        349Bk60.28(10) Matters to Be Disclosed
                            349Bk60.28(11) k. Materiality. Most Cited Cases

An omission is material, for purposes of a securities fraud claim, if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

[11] Securities Regulation 349B ☞60.28(13)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
                    349Bk60.28 Nondisclosure; Insider Trading
                        349Bk60.28(10) Matters to Be Disclosed
                            349Bk60.28(13) k. Particular Matters. Most Cited Cases

Sudden drop in stock price after revelation of previously undisclosed information did not prevent conclusion that allegedly omitted information was absorbed by the market, such that it was not material for purposes of shareholders' securities fraud claim, where drop in stock price did not follow revelation of allegedly omitted fact that there was conflicting evidence about efficacy of drug manufacturer's drug, but, rather, it followed sudden news that clinical trials were being halted, a development that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

was significant independent of whether there previously had been conflicting evidence of drug's efficacy. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[12] Securities Regulation 349B ☞60.53**

349B Securities Regulation
 349BI Federal Regulation
  349BI(C) Trading and Markets
   349BI(C)7 Fraud and Manipulation
    349Bk60.50 Pleading
     349Bk60.53   k.   Misrepresentation.
Most Cited Cases
Shareholders failed to plead with particularity facts sufficient to support allegation that optimistic statements of drug manufacturer and three of its current and former officers and directors regarding drug's side effects were materially misleading, as required to plead a securities fraud claim under the Private Securities Litigation Reform Act (PSLRA), where studies cited by shareholders did not support their allegation that drug's side effects were unmanageable, and shareholders did not allege how source who asserted that defendants had been warned of drug's side effects had personal knowledge of relevant facts. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[13] Securities Regulation 349B ☞60.53**

349B Securities Regulation
 349BI Federal Regulation
  349BI(C) Trading and Markets
   349BI(C)7 Fraud and Manipulation
    349Bk60.50 Pleading
     349Bk60.53   k.   Misrepresentation.
Most Cited Cases
Shareholders failed to plead with particularity facts supporting their allegation that optimistic statements of drug manufacturer and three of its current and former officers and directors regarding drug's side effects were materially misleading when made, as required to plead a securities fraud claim under

the Private Securities Litigation Reform Act (PSLRA), where even shareholders' own source undermined any inference that defendants believed side effects of drug were unmanageable, and drug's ultimate failure was not evidence that side effects were thought to be unmanageable at time alleged misstatements were made. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[14] Securities Regulation 349B ☞60.51**

349B Securities Regulation
 349BI Federal Regulation
  349BI(C) Trading and Markets
   349BI(C)7 Fraud and Manipulation
    349Bk60.50 Pleading
     349Bk60.51   k.   In General.   Most Cited Cases
To state a securities fraud claim under the Private Securities Litigation Reform Act (PSLRA), plaintiffs must state with particularity facts giving rise to a strong inference that each defendant acted with the required state of mind, by alleging facts: (1) showing that defendants had both motive and opportunity to commit the fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[15] Securities Regulation 349B ☞60.51**

349B Securities Regulation
 349BI Federal Regulation
  349BI(C) Trading and Markets
   349BI(C)7 Fraud and Manipulation
    349Bk60.50 Pleading
     349Bk60.51   k.   In General.   Most Cited Cases
A complaint gives rise to a strong inference of scienter, as required to state a claim for securities fraud under the Private Securities Litigation Reform Act (PSLRA), only if a reasonable person

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

Page 5

would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b); 15 C.F.R. § 240.10b-5.

**[16] Securities Regulation 349B ⬅️60.53**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.53   k.   Misrepresentation.
Most Cited Cases
Even if statements made by drug manufacturer's officers and directors about drug intended to reduce coronary heart disease by raising so-called "good" cholesterol were actionable, shareholders failed to sufficiently allege motive to state securities fraud claim; defendants' alleged motives to portray likelihood of prosperity, and to increase value of their performance based compensation plans, were typical of every corporation and executive. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[17] Securities Regulation 349B ⬅️60.53**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.53   k.   Misrepresentation.
Most Cited Cases
To plead motive sufficiently to give rise to strong inference of scienter, securities fraud plaintiffs must allege facts demonstrating concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged; it is not sufficient to allege motives that are generally possessed by most corporate directors and officers, and general allegations that the defendants acted in

their economic self-interest are insufficient. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[18] Securities Regulation 349B ⬅️60.53**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.53   k.   Misrepresentation.
Most Cited Cases
Even if statements made by drug manufacturer's officers and directors about drug intended to reduce coronary heart disease by raising so-called "good" cholesterol were actionable, shareholders failed to sufficiently allege conscious misbehavior or recklessness to state securities fraud claim, where their factual allegations and sources did not support inference that defendants' statements were materially misleading, and those facts could not support an inference that defendants knew or should have known their statements were false or misleading when made. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[19] Securities Regulation 349B ⬅️60.45(1)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses to Liability
            349Bk60.45   Scienter,   Intent, Knowledge, Negligence or Recklessness
               349Bk60.45(1)   k.   In   General.
Most Cited Cases
To raise a strong inference of scienter based on recklessness, securities fraud plaintiffs must allege conduct that is highly unreasonable and which represents an extreme departure from the standards of ordinary care. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
**(Cite as: --- F.Supp.2d ----)**

Page 6

**[20] Securities Regulation 349B ☞60.51**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 k. In General. Most
Cited Cases
If a complaint in a securities fraud case fails adequately to allege motive, the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

**[21] Securities Regulation 349B ☞60.53**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.53 k. Misrepresentation.
Most Cited Cases
When the complaint in a securities fraud case alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 15 C.F.R. § 240.10b-5.

Samuel P. Sporn, Joel P. Laitman, Christopher Lometti, Jay P. Saltzman, Kurt Hunciker, Frank R. Schirripa, Daniel B. Rehns, Schoengold Sporn Laitman & Lometti, P.C., for Plaintiffs.
Dennis J. Block, Gregory A. Markel, Martin L. Seidel, Mollie E. O'Rourke, Cadwalader, Wickersham & Taft LLP, for Defendants.

### MEMORANDUM OPINION

LEWIS A. KAPLAN, District Judge.
*1 On December 2, 2006, Pfizer, Inc. ("Pfizer") an-nounced that it was halting clinical trials of the developmental drug torcetrapib.[FN1]By the close of the next trading day, the price of Pfizer common stock had declined by 10.62 percent.[FN2]Plaintiffs then brought a class action against Pfizer and three of its current and former officers and directors (collectively, the "Individual Defendants").[FN3] Plaintiffs seek recovery against defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [FN4] and Rule 10b-5 thereunder.[FN5]They assert an additional claim against the Individual Defendants under Section 20(a) of the Exchange Act.[FN6]The case is before the Court on defendants' motion to dismiss.

*Facts*

The lead plaintiff in this action is the Uniformed Sanitationmen's Association Compensation Accrual Fund. It purports to represent a class of all individuals and entities who purchased Pfizer securities between January 19, 2005, and December 2, 2006, (the "Class Period"). Pfizer is a Delaware corporation that develops, manufactures, and markets prescription medicines and consumer healthcare products.[FN7]

During the class period, Pfizer was developing torcetrapib, a drug intended to reduce coronary heart disease ("CHD") by raising so-called "good" cholesterol.

In colloquial terms, there are two varieties of cholesterol: "good" and "bad" cholesterol. Whether cholesterol is good or bad is defined by the type of lipoprotein to which the cholesterol is attached. Low density lipoproteins ("LDLs") carry cholesterol into arteries, where excess cholesterol often is deposited as plaque on arterial walls. The deposition of plaque-a process known as atherogenesis[FN8]-narrows arteries and restricts the flow of blood and oxygen to the heart.[FN9]Thus, the cholesterol attached to LDLs ("LDL-cholesterol") is known popularly as bad cholesterol. In contrast, high density lipoproteins ("HDLs") remove choles-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

Page 7

terol from the blood, transporting it to the liver for excretion, a process known as reverse cholesterol transport ("RCT").[FN10] Thus, the cholesterol attached to HDLs ("HDL-cholesterol") is known popularly as good cholesterol.

High HDL-cholesterol levels correlate generally with low cardiovascular risk,[FN11] a fact attributed to HDL's role in RCT.[FN12] Pfizer developed torcetrapib to raise HDL-cholesterol. It anticipated that torcetrapib would accomplish this by inhibiting the cholesterol ester transfer protein ("CETP"), which transfers cholesterol between HDLs and LDLs. This was intended to raise HDL-cholesterol levels by causing cholesterol to accumulate on HDL particles. Ultimately, Pfizer hoped artificially raising HDL-cholesterol would increase RCT and correlate with low cardiovascular risk.[FN13]

Phase II clinical tests of torcetrapib were designed to determine whether torcetrapib raised HDL-cholesterol levels.[FN14] Those trials showed that torcetrapib was effective at raising HDL-cholesterol, but they showed also a 2-3 mm increase in systolic blood pressure.[FN15]

*2 By 2004, Pfizer began Phase III of the clinical trials. As the clinical trials progressed, Pfizer updated the medical and financial communities on torcetrapib's development through public statements and press releases.

On December 2, 2006, Pfizer announced that it was "stopping all torcetrapib clinical trials" based on the recommendation of the Data Safety Monitoring Board ("DSMB") that monitored the trials. The recommendation was made "because of an imbalance of mortality and cardiovascular events."[FN16] Following this announcement, shares of Pfizer common stock declined by $2.96 per share, from a closing price of $27.86 per share on December 1, 2006, to a closing price of $24.90 per share on December 4, 2006.[FN17]

Plaintiffs allege that defendants, in the period prior to the cessation of Phase III trials, intentionally or recklessly made statements that were misleading because they failed to disclose facts that lessened the likelihood that torcetrapib ultimately would prove safe and efficacious. The misleading statements, plaintiffs claim, were "designed to artificially inflate the price of Pfizer securities" and were part of a "desperate effort to avert significant market loss due to the impending loss of patent protection by principal Pfizer drugs ...."[FN18] Plaintiffs allege that defendant McKinnell was motivated to maximize his severance package, but do not allege that any Individual Defendant sold stock during the class period.[FN19]

*Discussion*

*I. Standard Governing Motions to Dismiss*

In deciding a motion to dismiss, the Court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiffs' favor.[FN20] In order to survive such a motion, however, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' "[FN21]

Although this motion is addressed to the face of the pleadings, the Court may consider also the full text of "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[FN22] Defendants have submitted many exhibits in support of their motion, including Pfizer press releases and analyst call transcripts, academic literature, and analyst reports. The parties agreed that all of these documents could be considered on this motion to dismiss,[FN23] and the Court considers those documents that the complaint incorporates by reference or are amenable to judicial notice.

[1][2] As this is a securities fraud case, the complaint must satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").[FN24] It must state

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

the circumstances constituting fraud with particularity. In particular, it "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[FN25]Where an allegation regarding a misstatement or omission is made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed."[FN26]Finally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[FN27]

## II. Plaintiffs' Section 10(b) Claims

### A. Elements of a 10(b) Claim

**\*3** Section 10(b) makes it unlawful "for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."Rule 10b-5 in turn provides:

"It shall be unlawful for any person ...
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security."[FN28]

[3] To state a claim based on a misrepresentation or omission in violation of Rule 10b-5, as plaintiffs purport to do here, one must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the

purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."[FN29]

### B. Allegations that Statements were Materially Misleading

Defendants argue that plaintiffs have not pleaded with particularity facts sufficient to support the belief that defendants' statements were materially misleading. Plaintiffs, however, contend that they have alleged sufficiently that defendants' statements misrepresented (1) torcetrapib's potential for reducing artherosclerosis, and (2) the seriousness of its side effects.

[4][5][6][7] Plaintiffs must do more than allege that statements were materially misleading: "they must demonstrate with specificity why and how that is so."[FN30]Where, as here, factual allegations are made on information and belief, the complaint must allege adequate bases for the allegations.[FN31]It "must identify sufficiently the sources upon which [plaintiffs'] beliefs are based and those sources must have been likely to have known the relevant facts." [FN32]Second, the factual allegations that are based on adequate sources must justify plaintiffs' conclusion that defendants' statements about torcetrapib's were materially misleading.[FN33]An omission is materially misleading if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."[FN34]

### 1. Torcetrapib's Efficacy

[8] Plaintiffs allege, on information and belief, that defendants' statements were misleading because they cast the likelihood that torcetrapib would prove to be effective in a positive light when in fact this was unlikely.[FN35] They rest this allegation on four subsidiary assertions: (1) a study showed that "RCT was not increased by torcetrapib,"[FN36] (2) another study "demonstrated only that the patients

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

who took torcetrapib were no worse off than those who did not in terms of cholesterol removal ...,"FN37 (3) "there was conflicting evidence on whether CETP inhibition [the mechanism by which torcetrapib raised HDL] was pro- or anti-atherogenic,"FN38 and (4) "Pfizer had been warned internally that CETP inhibition would not work."FN39None, however, withstands analysis.

*(a) Do the Cited Sources Support Plaintiffs' Subsidiary Allegations?*

**\*4** The allegation that RCT was not increased by torcetrapib is said to be based on the Brousseau study.FN40Contrary to plaintiffs' allegation, however, Brousseau did not reach any conclusion about whether torcetrapib increased RCT.FN41 In fact, the study observed only that torcetrapib did not affect fecal concentrations of neutral sterols and bile acids, which it used to assess RCT indirectly. But it noted also that these surrogates might not be affected by an increase in RCT if torcetrapib were associated with "a decrease in hepatic cholesterol synthesis and a proportional increase in cholesterol synthesis in the peripheral tissues."FN42The complaint's reliance on Brousseau therefore is misplaced.

The claim that another study showed only that patients on torcetrapib were no worse off in terms of cholesterol removal than others rests on the Bamberger study abstract.FN43Plaintiffs suggest that Bamberger observed no affirmative evidence of cholesterol removal. In fact, however, the abstract reported statistically significant increases in the two measures of cholesterol removal that were observed and concluded that "partial inhibition of CETP with T[orcetrapib] does not compromise, *and may enhance,* the cholesterol efflux potential of HDL, which is considered the first step in reverse cholesterol transport."FN44Thus, plaintiffs' characterization of Bamberger, like their characterization of Brousseau, is misleading.

Plaintiffs' third allegation is based on scientific art-

icles published between 1993 and 2006.FN45These sources support plaintiffs' allegation "that there was conflicting evidence" about torcetrapib's potential efficacy.

Plaintiffs' final and most significant allegation-viz. that Pfizer had been warned internally that CETP inhibition would not work-is based entirely on an anonymous blog post.FN46Plaintiffs have identified their source-the text of the blog post-and included its full text in their complaint. But this is not sufficient.

In addition to identifying the source, the source must be shown to have been likely to know the relevant facts.FN47There is no reason to believe that the author of this blog, identified only as RADman-Zulu, is likely to have known the relevant facts.

Plaintiffs try to avoid this inevitable conclusion by attributing characteristics to the blog's anonymous author. They assert that RADmanZulu is "a former Pfizer Vice-President and Medical Therapeutic Head of Pfizer's Cardiovascular & Metabolic Group, who also acted as medical director of Pfizer's Cardiovascular Risk Factors Group in the [United States] ... [through the second half of 2002]."FN48 But the blog post, plaintiffs' purported source, does not contain any information about RADmanZulu's identity, and plaintiffs do not articulate any other basis for their belief.FN49

Even if we credited plaintiffs' assertion that RADmanZulu was employed at Pfizer through the end of 2002, the question of whether he would have been likely to know the relevant facts would remain. In the blog post, RADmanZulu claims that, "[e]arly in the program, people like Brian Brewer and Michael Brown warned Pfizer that blocking CETP was likely to accelerate atherosclerosis."FN50To support the inference that RADmanZulu would have been likely to know the relevant facts, plaintiffs rely entirely on his alleged positions at Pfizer.FN51But the complaint does not describe RADmanZulu's role at Pfizer or his participation in relevant events. Moreover, RADmanZulu's allega-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

Page 10

tion does not claim to be based on personal know-ledge and lacks detail that might suggest personal knowledge. For example, the blog post does not de-scribe when,[FN52] how, on what basis, by whom, or to whom the alleged warning was communicated. Even setting aside the numerous deficiencies with this source, RADmanZulu's assertion that someone warned Pfizer that CETP inhibition was likely to accelerate atherosclerosis does not support plaintiffs' larger claim that Pfizer was warned it would not work.

*(b) Does the Sufficiently Sourced Subsidiary Alleg-ation Justify Plaintiffs' Inference?*

**\*5 [9]** The next question is whether the facts al-leged, to the extent they are based on adequate sources, support plaintiffs' inference that torcetrap-ib was unlikely to reduce artherosclerosis and thus made defendants' positive statements materially misleading.

Only one of plaintiffs' subsidiary allegations is sup-ported by adequate sources-viz. that there was con-flicting evidence on whether CETP inhibition was pro- or anti-atherogenic. Drawing all inferences in plaintiffs' favor, the most this allegation supports is an inference that evidence available during the class period was inconclusive on torcetrapib's po-tential efficacy.

Defendants' knowledge that evidence of torcetrap-ib's efficacy was inconclusive does not support an inference that their optimistic statements were ma-terially misleading. Defendants were entitled to take an optimistic view of inconclusive evidence, so long as they did not make positive statements while withholding negative information that would have been material to an investor.[FN53]"[C]orporate officials need not present an overly gloomy or cau-tious picture" so long as "public statements are con-sistent with reasonably available data."[FN54]

This principle is applicable in the drug development context. In the *Carter-Wallace* cases, "the Second

Circuit concluded that the drug manufacturer's as-surances about safety 'did not become materially misleading until [it] had information that [the drug] had caused a statistically significant number of ... deaths and therefore had reason to believe that the commercial viability of [the drug] was threatened.' "[FN55]

To be sure, *Carter-Wallace* did not adopt a bright-line rule that a statement is materially misleading only if it conflicts with statistically significant evid-ence.[FN56]Thus, if a drug manufacturer in fact draws a pessimistic conclusion from statistically in-significant evidence, any optimistic statements it makes could be rendered materially misleading if it were to omit even statistically insignificant negat-ive evidence.[FN57]But plaintiffs' allegations do not support an inference that defendants actually drew a negative conclusion from the inconclusive evid-ence.[FN58]They allege only that Pfizer's optimistic statements were misleading because it failed to state also that there was conflicting evidence as to whether CETP inhibition would be pro- or anti-atherogenic. This is insufficient under *Carter-Wallace.*

**[10]** Furthermore, while plaintiffs assert that the al-legedly omitted facts relating to torcetrapib's effic-acy were material, allegations in the complaint be-lie that claim.[FN59]An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reason-able investor as having significantly altered the 'total mix' of information made available."[FN60]In this case, it is clear that the conflicting evidence of torcetrapib's efficacy was part of the total mix of in-formation available to the market.[FN61]

**\*6** Plaintiffs argue that there is a factual question about whether investors "read and digested" the available information.[FN62]But the relevant inquiry is not whether the truth was absorbed by the mar-ket, but whether it was available to the market.FN63Moreover, the complaint here alleges that the market absorbed all available information.FN64This allegation allows plaintiffs

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
**(Cite as: --- F.Supp.2d ----)**

Page 11

to avoid a fact intensive question of whether the market actually was aware of defendants' alleged misstatements. But it simplifies also the question of whether the market was aware of the allegedly omitted facts.

It is evident that the allegedly omitted information was available to the market because plaintiffs, in their effort to identify allegedly omitted information, rely entirely on sources that were available publicly during the class period.[FN65] Indeed, analysts' reports acknowledged the conflicting evidence of torcetrapib's efficacy.[FN66] According to plaintiffs, such reports were "publicly available and entered the public marketplace."[FN67]

[11] Finally, plaintiffs argue that the sudden drop in stock price after the "revelation of previously undisclosed information" prevents a conclusion that the allegedly omitted information was absorbed by the market. This is not persuasive. The drop in stock price did not follow the revelation of the allegedly omitted fact-that there was conflicting evidence about torcetrapib's efficacy. Rather, as plaintiffs explain elsewhere in the complaint, it followed the "sudden news ... that the clinical trials were being halted," a development that was significant independent of whether there previously had been conflicting evidence of torcetrapib's efficacy.[FN68]

### 2. Blood Pressure Side Effect

Plaintiffs allege, on information and belief,[FN69] that defendants' optimistic statements about torcetrapib's side effects were misleading because its side effects were unmanageable.[FN70] This assertion rests on subsidiary assertions that: (1) even small increases in systolic blood pressure may be dangerous,[FN71] and (2) "Pfizer believed, but did not disclose, that the metabolite(s) of torcetrapib could inhibit [monoamine oxidase], thereby causing increased blood pressure ...."[FN72]

### (a) Do the Cited Sources Support Plaintiffs' Subsi-

*diary Allegations?*

[12] Plaintiffs' first allegation is based on scientific research and statements made by Pfizer in other contexts.[FN73] These sources support plaintiffs' factual allegation that even small increases in blood pressure may be dangerous. However, this does not lead inevitably to the inference that the side effect was unmanageable or unjustifiable.

Plaintiffs' second allegation is based on the same RADmanZulu blog post discussed above.[FN74] RADmanZulu asserted that "[t]he current wisdom of the time is that one of the metabolites inhibited mono amine oxidase."[FN75] Even if we assume, as plaintiffs do, that RADmanZulu was employed at Pfizer through the second half of 2002, this source would be insufficient to support plaintiffs' allegation that "Pfizer believed" that torcetrapib could inhibit monoamine oxidase. RADmanZulu's assertion is vague: it does not claim a basis for personal knowledge, nor does it explain when, by whom, or on what basis the "current wisdom of the time" was held.

### (b) Does the Sufficiently Sourced Subsidiary Allegation Justify Plaintiffs' Inference?

*7 [13] Drawing all inferences in plaintiffs' favor, the plaintiffs' factual allegations and sources support an inference that small increases in blood pressure can be dangerous. But plaintiffs' sources and factual allegations do not support the inference that torcetrapib's side effects were unmanageable. Nor do the sources or factual allegations support an inference that defendants actually believed the side effect was unmanageable. Indeed, plaintiffs' own source, the blog post, undermines any inference that Pfizer believed the blood pressure side effect was unmanageable. According to RADmanZulu: "The Groton team felt that [blood pressure] could be managed by lowering the dose and hoped that atorvastatin would also lower [blood pressure]."[FN76]

Finally, torcetrapib's ultimate failure is not evid-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

ence that the side effects were thought to be unmanageable at the time the alleged misstatements were made. Fraud-by-hindsight is not sufficient to establish liability under Rule 10b-5.[FN77] In any case, plaintiffs have not alleged that torcetrapib failed because its side effects were unmanageable.[FN78] They acknowledge that the most they can allege is that torcetrapib failed because "there was a difference in deaths between the group which got the drug and the group that didn't."[FN79]

Plaintiffs have not pleaded with particularity facts sufficient to support their allegation that defendants' statements were materially misleading. Many of plaintiffs' factual allegations are not based on an adequate source or are unsupported by the purported source. Those allegations that are based on adequate sources do not support the inference that defendants' statements about torcetrapib's safety or efficacy were materially misleading. For the foregoing reasons, the complaint fails to state the circumstances constituting fraud with particularity as required by Rule 9(b) and the PSLRA.

## C. Scienter

[14][15] Even if the complaint had pleaded adequately the circumstances constituting fraud, it would be insufficient nonetheless. Plaintiffs must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind."[FN80] A complaint may satisfy this requirement "by alleging facts (1) showing that defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior."[FN81] A complaint gives rise to a strong inference of *scienter* "only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[FN82]

## 1. Motive and Opportunity

[16][17] To plead motive, plaintiffs must allege facts demonstrating "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[FN83] It is not sufficient to allege motives that are "generally possessed by most corporate directors and officers."[FN84] And "[g]eneral allegations that the defendants acted in their economic self-interest" are insufficient.[FN85]

*8 Plaintiffs attempt to plead motive by alleging that Pfizer had a "desperate need ... to assure the financial community of the existence of a new blockbuster drug."[FN86] This is not a unique motive. Rather, it is a way of saying, in a manner tailored to a pharmaceutical company, something that is true for all profit enterprises-each has an incentive to portray the likelihood that it will continue to prosper.

Courts in this district have found similar allegations of motive insufficient. For example, plaintiffs in *In re Bayer* sought to plead motive by alleging that "[Bayer] was under pressure to bring a 'blockbuster drug to market.' "[FN87] And in *In re Bristol-Myers Squibb,* the plaintiffs alleged motive based on the defendants' desire to " 'maintain a facade of future potential' for [its] drug pipeline, ... [and to] address potential concerns about patent expirations ...."[FN88] Both courts found these allegations insufficient. The latter court described such allegations as "nothing more than a pejorative characterization of ... ordinary corporate desires."[FN89]

Plaintiffs argue that McKinnell had motive to commit fraud in order to increase his severance package.[FN90] Performance based compensation plans "are typical of nearly every corporation" and are usually insufficient to plead motive.[FN91] "If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."[FN92] Plaintiffs' attempt to distinguish McKinnell's severance agreement from generic performance-based compensation plans is disingenuous.[FN93]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590

**(Cite as: --- F.Supp.2d ----)**

*2. Conscious Misbehavior or Recklessness*

[18][19][20][21] To raise a strong inference of *scienter* based on recklessness, plaintiffs must allege conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care."[FN94]If a complaint fails adequately to allege motive, "the strength of the circumstantial allegations of conscious misbehavior or recklessness 'must be correspondingly greater.' "[FN95]"Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts ...."[FN96]

Plaintiffs attempt create a strong inference of *scienter* by alleging that: (1) defendants had knowledge or access to information contradicting their public statements,[FN97] (2) "Pfizer intentionally established endpoints for the Phase II trial of increased HDL-[cholesterol] in order to ensure that the endpoints would be obtained, knowing full well that such endpoints ... potentially were associated with increased coronary heart risk,"[FN98] (3) "Pfizer intentionally violated AHA [American Heart Association] Rules in order to pre-announce its Phase III clinical results in order to 'spin' the adverse blood pressure side effect results found therein,"[FN99] and (4) "Pfizer knowingly designed the torcetrapib Phase III trials to allow the trial to continue until an unreasonably high statistical certainty was met."[FN100]

*9 Plaintiffs rely on the same factual allegations and sources to assert defendants' knowledge of or access to information contradicting their public statements. As addressed above, plaintiffs' factual allegations and sources do not support the inference that defendants' statements were materially misleading. "If the facts alleged in the Complaint are insufficient to support Plaintiffs' belief that false or misleading statements were made, those facts cannot support an inference that Defendants knew or should have known their statements were false or

misleading when Defendants made them."[FN101]

Even if plaintiffs' factual allegations about torcetrapib's efficacy and safety could be understood as contradicting defendants' statements, the contradictory information was publicly available.[FN102]Numerous courts have suggested or assumed that the contradictory information must have been non-public in order to raise a strong inference of intent.[FN103]That the information was publicly available when the allegedly misleading statements were made weakens any inference that defendants intended to defraud the market.

Plaintiffs' remaining allegations are conclusory statements of defendants' intent. The complaint makes no factual allegations that suggest that Pfizer violated AHA rules in order to spin the results, or that Pfizer designed Phase II studies to avoid uncovering adverse clinical results, or that Pfizer used an unreasonably high measure of statistical significance to postpone termination of Phase III.[FN104]Conclusory allegations of intent are not sufficient.[FN105] Plaintiffs cannot circumvent this requirement by providing subsidiary allegations that merely are conclusory allegations of intent.

*III. Plaintiffs' Section 20(a) Claims*

Plaintiffs assert also claims under Section 20(a) of the Exchange Act[FN106] against the individual defendants. Section 20(a) claims are necessarily predicated on a primary violation of securities law and impose "control person" liability on individual defendants.[FN107]Because plaintiffs have failed to state a claim for a primary violation of Section 10(b) of the Exchange Act, their Section 20(a) claim must be dismissed against all defendants.

*Conclusion*

For the foregoing reasons, defendants' motion to dismiss the amended complaint [docket item 13] is granted. Plaintiffs' request for leave to amend FN108 is denied without prejudice to a motion for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

leave to amend supported by a proposed amended complaint.

SO ORDERED.

FN1. Amended Class Action Complaint ("Cpt.") ¶ 17.

FN2. Cpt. ¶¶ 17, 153.

FN3. The Individual Defendants are: (1) Henry A. McKinnell, former chairman of the board of directors, and former chief executive officer; (2) John LaMattina, president of Pfizer global research and development; and (3) Joseph Feczko, chief medical officer.

FN4. 15 U.S.C. § 78j(b).

FN5. 17 C.F.R. § 240.10b-5.

FN6. 15 U.S.C. § 78t(a).

FN7. Cpt. ¶ 25.

FN8. *Id.* ¶ 57 n. 4. An anti-atherogenic compound curbs the accumulation of plaque while a pro-atherogenic promotes accumulation. *Id.*

FN9. *Id.* ¶¶ 54-56.

FN10. *Id.* ¶ 59.

FN11. *Id.* ¶¶ 2 n. 2; 58-59.

FN12. *Id.* ¶ 59.

FN13. *Id.*

FN14. *Id.* ¶ 162(d).

FN15. *Id.* ¶ 9.

FN16. *Id.* ¶ 151, Seidel Decl. (DI 15) Ex. 39.

FN17. Cpt. ¶ 153.

FN18. *Id.* ¶ 1-3.

FN19. *Id.* ¶ 28.

FN20. *Flores v. S. Peru Copper Corp.,* 343 F.3d 140, 143 (2d Cir.2003); *Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001), *cert. denied,* 535 U.S. 1054, 122 S.Ct. 1911, 152 L.Ed.2d 821 (2002).

FN21. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Iqbal v. Hasty,* 490 F.3d 143, 158-59 (2d Cir.2007) (declining to limit *Bell Atl.* holding to the antitrust context).

FN22. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* --- U.S. ----, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007) (citing 5B CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1357) (3d ed.2004 and Supp.2007); *see also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir.2002).

FN23. The parties agreed that defendants' exhibits could be considered on the motion to dismiss without converting the motion into a motion for summary judgment. Tr., Nov. 7, 2007, at 20:13-23; *see* FED. R. CIV. P. 12(b), (c); *Gurary v. Winehouse,* 190 F.3d 37, 42 (2d Cir.1999).

FN24. Pub.L. No. 104-67, 109 Stat. 737 (1995).

FN25. *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.) *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000); *accord In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69-70 (2d Cir.), *cert. denied,* 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

(2001).

FN26.15 U.S.C. § 78u-4(b)(1). The requirement of stating "all facts" is not applied literally. *See Novak,* 216 F.3d at 313-14.

FN27.15 U.S.C. § 78u-4(b)(2). The required state of mind is "an intent to deceive, manipulate, or defraud."*Ganino,* 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (internal quotation marks omitted)); *accord Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001).

FN28.17 C.F.R. § 240.10b-5 (2007).

FN29.*Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.) (quoting *In re IBM Corp. Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998) (internal quotation marks omitted)), *cert. denied,*546 U.S. 935, 126 S.Ct. 421, 163 L.Ed.2d 321 (2005); *accord Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000).

FN30.*Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir.2004); *see In re IAC/InterActiveCorp Sec. Litig.,* 478 F.Supp.2d 574, 591 (S.D.N.Y.2007).

FN31.*See Novak,* 216 F.3d at 306 (quoting 15 U.S.C. § 78u-4(b) (1)); *see also In re IAC/InterActiveCorp,* 478 F.Supp.2d at 591.

FN32.*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F.Supp.2d 385, 395 (S.D.N.Y.2005).

FN33.*In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d 15, 23 (S.D.N.Y.2004); *Fraternity Fund Ltd.,* 376 F.Supp.2d at 395.

FN34.*Starr v. Georgeson S'holder, Inc.,*

412 F.3d 103, 110 (2d Cir.2005) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation omitted and internal quotation marks omitted)).

FN35.*See* Cpt. ¶ 1, 6 (describing how omission made statements misleading); Pl. Mem. at 2 (same); *id.* at 11-12 (asserting materiality of omissions).

FN36. See Cpt. ¶¶ 116; 124, 135; 141; 149; 100; 113 (alleging that statements are misleading for this reason); *id.* ¶¶ 109; 111; 118; 122 (alleging that statements are misleading because "Phase II trials did not find any correlation between CETP inhibition and increased RCT").

FN37.*See id.* ¶ 113; 124; 12 (alleging that statements are misleading for this reason).

FN38.*See id.* ¶¶ 103; 116; 135; 141; 149 (alleging that statements are misleading for this reason); *Id.* ¶¶ 107; 120; 137 (alleging that statements are misleading because CETP inhibition "was equally likely to be linked to adverse coronary risks"); *Id.* ¶¶ 129; 131 (alleging that statements are misleading because studies suggested that CETP inhibition "could well increase coronary heart disease.").

FN39.*See id.* ¶¶ 103; 116; 135; 141; 149 (alleging that statements are misleading for this reason).

FN40.*See id.* ¶ 100-01 (citing the Brousseau study); ¶¶ 111; 113; 116; 118; 122; 124, 135; 141; 149; 109 (citing no source or paragraphs 100-01).

FN41. Seidel Decl. Ex. 12, at 1062.

FN42.*Id.*

FN43.*See* Cpt. ¶¶ 113, 124, 12 (quoting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

from the abstract to the Bamberger study). Based on the facts alleged in the complaint, defendants identify plaintiffs' source as the Bamberger study, which was presented by Pfizer at the November 2005 Conference of the American Heart Association. *See* Seidel Decl. ¶ 14; Def. Mem. at 9, 23. Plaintiffs do not contest that this was their source.

FN44. Seidel Decl. Ex. 13 (emphasis added).

FN45.*See* Cpt. ¶¶ 63-76 (summarizing studies from 1996 to 2006 that found CETP deficiency due to a genetic mutation was correlated with an increased risk of CHD); ¶¶ 103, 116; 135; 141; 149 (citing to paragraphs 63-76); ¶¶ 107, 120; 137 (citing to no source); ¶¶ 129; 131 (citing to paragraphs 12; 44; 54-87, but only paragraphs 63-76 support fact alleged).

FN46.*See id.* ¶¶ 44 (reprinting the text of the blog post); ¶¶ 103; 116; 135; 141; 149 (citing to paragraph 44; 100-02).

FN47.*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F.Supp.2d 385, 395 (S.D.N.Y.2005); *In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d 15, 23 (S.D.N.Y.2004).

FN48. Cpt. ¶ 43. The complaint alleges that RADmanZulu held these positions "during the relevant period," but at oral argument, plaintiffs specified that he was employed at Pfizer through the "second half of 2002." Tr., Nov. 7, 2007, at 21:15-17.

FN49. At oral argument, plaintiffs explained that they alleged RADmanZulu's identity based on "an investigation." Tr., Nov. 7, 2007, at 21:5-10. Plaintiffs did not elaborate on this investigation, and they do not claim to have spoken to the man they

assume to be the author of the blog. *Id.*

FN50. Cpt. ¶ 44.

FN51.*See, e.g.,* Pl. Mem. at 10 ("Needless to say, [RADmanZulu's] position ... makes him eminently qualified to know about adverse effects of Pfizer principal cardiovascular drug and the status of clinical tri- als.").

FN52. Although according to plaintiffs' own assertions, RADmanZulu left Pfizer during second half of 2002, and would have no basis for knowledge after that time.

FN53.*See, e.g., In re IAC/InterActiveCorp., Sec. Litig.,* 478 F.Supp.2d 574, 591 (S.D.N.Y.2007) (citing *Rombach v. Chang,* 355 F.3d 164, 173 (2d Cir.2004); *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002)).

FN54.*Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000) (citing *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 85 (2d Cir.1999); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129-30 (2d Cir.1994)).

FN55.*In re Bayer AG Sec. Litig.,* 03 Civ.2004(WHP), 2004 WL 2190357, at *8 (S.D.N.Y. Sept. 30, 2004) (quoting *In re Carter-Wallace Sec. Litig.,* 150 F.3d 153, 157 (2d Cir.1998))

FN56.*See, e.g., In Re Bayer AG,* 2004 WL 2190357, at *9;*In re Corning, Inc. Sec. Litig.,* Nos. 92 Civ. 345(TPG), 92 Civ. 1103(TPG), 2001 WL 986782, at *2 (S.D.N.Y. Aug. 27, 2001).

FN57.*See, e.g., In Re Bayer AG,* 2004 WL 2190357, at *9-10.

FN58. Plaintiffs argue otherwise in their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

memorandum: "Defendants had actual knowledge that ... CETP-inhibition would increase atherosclerosis and that torcetrapib did not increase the rate of RCT." Pl. Mem. at 15-16. But this assertion is not supported by the adequately sourced subsidiary allegation of the complaint and falls short of the circumstances in *In re Regeneron,* on which plaintiffs rely. In that case, the court observed that "[t]he key allegation is that the Defendants knew of the existence of the ... problem, rather than being aware of the possibility of the problem."*In re Regeneron Pharms., Inc. Sec. Litig.,* No. 03 Civ. 3111(RWS), 2005 WL 225288, at *24 (S.D.N.Y. Feb.1, 2005). Here, the most plaintiffs have alleged, even if one were to consider RADmanZulu's assertions, is that defendants were aware of the possibility of a problem.

FN59. Pl. Mem. at 12 (asserting materiality).

FN60.*Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000).

FN61. The Court is aware that whether an allegedly omitted fact was available to the market often is a fact intensive inquiry that is "rarely an appropriate basis for dismissing."*Id.* at 167."However, 'rarely appropriate' is not the same as 'never appropriate,' and '[m]ateriality is a mixed question of law and fact.'"*White v. H & R Block, Inc.,* No. 02 Civ. 8965(MBM), 2004 WL 1698628, at * 12 (S.D.N.Y. July 28, 2004).

FN62. Pl. Mem. at 30 n. 27.

FN63.*Starr v. Georgeson S'holder, Inc.,* 412 F.3d 103, 110 (2d Cir.2005) ("the relevant question is not whether the market 'truly knew' any specific piece of information, but whether the information was 'reasonably available.' ").

FN64. Cpt. ¶ 167.

FN65. The sole exception is that the RADmanZulu blog post was not available to the market during the class period.

FN66.*See, e.g.,* Seidel Decl. Exs. 14, 15, 24, 30; *see also* Seidel Decl. Exs. 5, at 22; 28.

FN67. Cpt. ¶ 166(d).

FN68.*Id.* ¶ 17.

FN69. Cpt. Preamble.

FN70.*Id.* ¶ 6;*see also id.* ¶ 1 (defendants misrepresented "that blood pressure side effects found in the clinical trials ... were of little concern"); Pl. Mem. at 2 (defendants "falsely minimized the significance of increased blood pressure").

FN71.*See* Cpt. ¶¶ 103; 105; 116; 127; 137; 141; 149 (emphasis added) (alleging that statements are misleading for this reason). The complaint alleges also that defendants failed to disclose that torcetrapib raised blood pressure and that Phase II studies had outliers who experienced larger increases in blood pressure. Plaintiffs make clear, however, that they do not allege a failure to disclose these facts. Pl. Mem. at 3 n. 2; Tr., Nov. 7, 2007, at 26:19-22. Thus the key to plaintiffs' allegations is that defendants omitted that the blood pressure increase was "dangerous" and "threatened the efficacy and approval of [torcetrapib]."*See, e.g.,* Cpt. ¶¶ 103, 127.

FN72.*See* Cpt. ¶¶ 103, 105; 111; 116; 118; 122; 127; 133; 141; 145; 149 (alleging that statements are misleading for this reason).

FN73.*See id.* ¶¶ 77-87 (citing studies and Pfizer statements made in other contexts); ¶¶ 103; 105; 116; 127; 137; 141; 149; 9;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

162 (citing to paragraphs 77-87).

FN74.*See id.* ¶ 44 (reprinting weblog post of RADmanZulu); ¶¶ 85; 103; 105; 111; 116; 118; 122; 127; 133; 141; 145; 149 (citing to paragraph 44).

FN75.*Id.* ¶ 44.

FN76.*Id.*

FN77.*See In re Carter-Wallace, Inc. Sec. Litig.,* 220 F.3d 36, 41-42 (2d Cir.2000) ("the eventual linking of [a side effect] to [a drug] cannot relate back to the time of the statements ... and reflect on [defendant's] reasonable belief").

FN78. Tr., Nov. 7, 2007, at 32:13-14.

FN79.*Id.* at 27:4-7.

FN80.15 U.S.C. § 78u-4(b)(2).

FN81.*ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007) (citing *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168-69 (2d Cir.2000)).

FN82.*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* --- U.S. ----, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007).

FN83.*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994); *see also Ganino,* 228 F.3d at 170;*Novak v. Kasaks,* 216 F.3d 300, 307 (2d. Cir.2000).

FN84.*Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001).

FN85.*Ganino,* 228 F.3d at 170.

FN86. Pl. Mem. at 21.

FN87.*In re Bayer AG Sec. Litig.,* 03 Civ.2004(WHP), 2004 WL 2190357, at *14 (S.D.N.Y. Sept. 30, 2004).

FN88.*In re Bristol-Myers Squibb Sec. Litig.,* 312 F.Supp.2d 549, 560-61 (S.D.N.Y.2004).

FN89.*Id.* at 561.

FN90. Pl. Mem. at 22; Pl. Reply at 4. Plaintiffs do not allege motive for the other individual defendants.

FN91.*In re Bristol-Myers Squibb,* 312 F.Supp.2d at 561.

FN92.*Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995).

FN93. Pl. Mem. at 22-23. Plaintiffs argue that McKinnell had a motive to commit fraud because he was awarded a severance package "which was dependent, in part, upon 'Pfizer's actual [stock] performance relative to the pharmaceutical peer group.'" Cpt. ¶ 28. But this portion of McKinnell's severance package reflects "McKinnell's outstanding performance-contingent share and performance share awards ... settled in accordance with the original terms and conditions of such awards."Pfizer's Dec. 21, 2006 Form 8-K.

FN94.*Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000) (internal quotation omitted).

FN95.*In re Bayer AG Sec. Litig.,* 03 Civ.2004(WHP), 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004) (quoting *Beck v. Mfrs. Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987)); *see also Kalnit v. Eichler,* 264 F.3d 131, 141 (2d Cir.2001); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* --- U.S. ----, 127 S.Ct. 2499, 2511, 168 L.Ed.2d 179 (2007).

FN96.*In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 76 (2d Cir.2001).

FN97. Cpt. ¶ 162(a)-(c).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590
(Cite as: --- F.Supp.2d ----)

FN98.*Id.* ¶ 162(d).

FN99.*Id.* ¶ 162(e).

FN100.*Id.* ¶ 162(f).

FN101.*Feasby v. Industri-Matematik Intern. Corp.,* 99 Civ. 8761(LTS), 2003 WL 22976327, at *5 (S.D.N.Y. Dec. 19, 2003) (quoting *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 813 (2d Cir.1996)).

FN102. With the exception of the allegations supported by RADmanZulu's blog.

FN103.*In re GeoPharma, Inc. Sec. Litig.,* 399 F.Supp.2d 432, 452-53 (S.D.N.Y.2005); *accord Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 758-59 (7th Cir.2007).

FN104. Plaintiffs' source suggests that Phase III used an appropriate measure of statistical significance. *See* Seidel Decl. Ex. 42, at 1144 (cited in Cpt. ¶ 91).

FN105.*Rombach v. Chang,* 355 F.3d 164, 176-77 (2d Cir.2004) (a "pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent" is insufficient to "support the inference that the defendants acted recklessly or with fraudulent intent.") (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994)).

FN106.15 U.S.C. § 78t(a).

FN107.*Rombach,* 355 F.3d at 177-78.

FN108. Plaintiffs requested leave to amend in a footnote of their memorandum. Pl. Mem. at 35 n. 36.

S.D.N.Y.,2008.
In re Pfizer, Inc. Securities Litigation

--- F.Supp.2d ----, 2008 WL 540120 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,590

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**

Westlaw.

535 F.Supp.2d 347
535 F.Supp.2d 347
**(Cite as: 535 F.Supp.2d 347)**

Page 1

Constellation Brands, Inc. v. Arbor Hill Associates,
Inc.
W.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
CONSTELLATION BRANDS, INC., Plaintiff
v.
ARBOR HILL ASSOCIATES, INC., Defendant.
Arbor Hill Associates, Inc., et al., Third-Party
Plaintiffs
v.
Nixon Peabody LLP, f/k/a Nixon Hargrave Devans
& Doyle LLP, Third-Party Defendant.
Nixon Peabody LLP, f/k/a Nixon Hargrave Devans
& Doyle LLP, Fourth-Party Plaintiff
v.
Harter, Secrest & Emery LLP, Brian Shaw, and
Stephen B. Salai, Fourth-Party Defendants.
**No. 02-CV-6498 CJS.**

Feb. 26, 2008.

**Background:** Holder of trademark "Arbor Mist,"
used in connection with sale of wine, brought de-
claratory judgment action, seeking determination
that mark did not infringe "Arbor Hill" mark used
by competitor. Parties moved and cross moved for
summary judgment.

**Holdings:** The District Court, Charles J. Siragusa,
J., held that:
(1) court would not exercise its discretion to decline
jurisdiction, on grounds that "Arbor Mist" holder
took advantage of "Arbor Hill" holder's promise not
to immediately sue to bring suit first;
(2) there were fact issues whether "Arbor Mist"
holder had committed fraud in procuring registra-
tion of mark;
(3) laches barred claim that "Arbor Hill" holder had
infringed "Arbor Valley" trademark, also held by
"Arbor Mist" holder; and
(4) there were fact issues whether there was actual
confusion between wines, precluding summary

judgment of noninfringement.

Partial summary judgment for "Arbor Hill" holder.

**[1] Declaratory Judgment 118A ⟐⟐9**

118A Declaratory Judgment
    118AI Nature and Grounds in General
        118AI(A) In General
            118Ak9 k. Defenses and Objections in
General. Most Cited Cases

**Declaratory Judgment 118A ⟐⟐237**

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
        118AII(N) Trademarks
            118Ak237 k. In General. Most Cited Cases
Court would not exercise its discretion to decline
jurisdiction, over declaratory judgment action seek-
ing determination that plaintiff's trademark did not
infringe defendant's mark, when defendant prom-
ised plaintiff it would wait until three days after set-
tlement discussions terminated unsuccessfully be-
fore commencing suit, and plaintiff sued one day
after end of negotiations, in judicial district where
defendant would have sued.

**[2] Trademarks 382T ⟐⟐1384**

382T Trademarks
    382TVII Registration
        382TVII(D) Misuse of Federal Registration
            382Tk1381 False or Fraudulent Registra-
tion in General
                382Tk1384 k. Evidence. Most Cited
Cases
Claim that trademark registration was procured by
fraud must be established by clear and convincing
evidence. Lanham Trade-mark Act, § 14, 15
U.S.C.A. § 1064.

**[3] Federal Civil Procedure 170A ⟐⟐2493**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
**(Cite as: 535 F.Supp.2d 347)**

Page 2

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2493 k. Copyright, Trademark, and Unfair Competition Cases. Most Cited Cases
Material issues of fact, as to whether holder of trademark "Arbor Mist," used with sale of wine, had fraudulent intent, precluded summary judgment that holder did not commit fraud on Patent and Trademark Office (PTO) by falsely claiming that mark was not subject of litigation when applying for registration. Lanham Trade-mark Act, § 14, 15 U.S.C.A. § 1064.

**[4] Equity 150 &#9756;65(1)**

150 Equity
   150I Jurisdiction, Principles, and Maxims
      150I(C) Principles and Maxims of Equity
         150k65 He Who Comes Into Equity Must Come with Clean Hands
            150k65(1) k. In General. Most Cited Cases

**Trademarks 382T &#9756;1534**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(D) Defenses, Excuses, and Justifications
         382Tk1533 Delay in Assertion of Rights; Laches
            382Tk1534 k. In General. Most Cited Cases
To establish equitable defense of laches, in trademark infringement case, defendant must establish that (1) plaintiff was aware of defendant's use of the mark, (2) plaintiff unreasonably delayed challenging defendant's use of the mark, (3) defendant suffered prejudice as a result of the delay, and (4) defendant has clean hands.

**[5] Trademarks 382T &#9756;1536**

382T Trademarks

382TVIII Violations of Rights
   382TVIII(D) Defenses, Excuses, and Justifications
      382Tk1533 Delay in Assertion of Rights; Laches
         382Tk1536 k. Length of Delay. Most Cited Cases
Equitable doctrine of laches barred claim that trademark "Arbor Valley," held by winery, was infringed by competitor's "Arbor Hill" mark, when "Arbor Valley" mark holder was aware of competitor's mark for 12 years, 6 years longer than applicable statute of limitations, and did not make claim until competitor asserted that "Arbor Hill" mark was infringed by another of holder's marks.

**[6] Trademarks 382T &#9756;1039**

382T Trademarks
   382TII Marks Protected
      382Tk1039 k. Arbitrary or Fanciful Terms or Marks. Most Cited Cases
While trademark "Arbor Hill," used with sale of wine, was arbitrary mark entitled to Lanham Act trademark protection, it was not strong enough to warrant fullest available protection, when alleged to be infringed by mark "Arbor Mist" used by competitor; there was extensive third-party use of word "Arbor" in wine industry, and there was only modest regional success of wine sold under "Arbor Hill" mark. Lanham Trade-mark Act, § 32(a), 15 U.S.C.A. § 1114(a).

**[7] Trademarks 382T &#9756;1098**

382T Trademarks
   382TIII Similarity Between Marks; Likelihood of Confusion
      382Tk1093 Relationship Between Marks
         382Tk1098 k. Appearance, Sound, and Meaning. Most Cited Cases
Lack of similarity of trademarks weighed in favor of determination that mark "Arbor Mist," used in sale of wines, did not infringe competitor's "Arbor Hill" mark; aside from common use of word "Arbor," there were marked differences in bottle

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

shape and labels, creating different general impressions. Lanham Trade-mark Act, § 32(a), 15 U.S.C.A. § 1114(a).

**[8] Trademarks 382T ☜1104**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1100 Relationship Between Goods or Services Underlying Marks
            382Tk1104 k. Markets and Territories; Competition. Most Cited Cases
Competitive proximity factor did not overwhelmingly favor determination that wine trademark "Arbor Hill" was infringed by competitor's sale of wine under "Arbor Mist" trademark; although both were often sold in same liquor stores, "Arbor Mist" product was low alcohol wine and fruit juice mix, millions of bottles of which were sold nationally, while "Arbor Hill" mark was used with pure wine sold regionally in modest quantities. Lanham Trade-mark Act, § 32(a), 15 U.S.C.A. § 1114(a).

**[9] Trademarks 382T ☜1619**

382T Trademarks
    382TIX Actions and Proceedings
        382TIX(C) Evidence
            382Tk1613 Admissibility
                382Tk1619 k. Surveys. Most Cited Cases
Survey purporting to show confusion between trademarked wines was inadmissible, when only conclusion from survey was that 15.4% of participants thought that wines came from same source, due to appearance of common word "Arbor"; survey did not provide public reaction to actual market conditions. Lanham Trade-mark Act, § 32(a), 15 U.S.C.A. § 1114(a).

**[10] Trademarks 382T ☜1086**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion

382Tk1083 Nature of Confusion
    382Tk1086 k. Actual Confusion. Most Cited Cases
Actual confusion factor favored determination that trademark "Arbor Hill," used in sale of wine, was infringed by "Arbor Mist" mark used by competitor; "Arbor Hill" mark holder claimed that over six-year period 6,240 visitors to its winery inquired whether they could purchase "Arbor Mist" wine products. Lanham Trade-mark Act, § 32(a), 15 U.S.C.A. § 1114(a).

**[11] Trademarks 382T ☜1111**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1111 k. Intent; Knowledge of Confusion or Similarity. Most Cited Cases
Seller of wine under trademark "Arbor Mist" acted in good faith, in determining whether there was likelihood of confusion with mark "Arbor Hill" supporting trademark infringement claim; persons proposing "Arbor Mist" were not aware of "Arbor Hill" mark, and "Arbor Mist" product was distributed nationally, minimizing any idea that "Arbor Mist" mark holder was seeking to benefit from "Arbor Hill" holder's strictly regional reputation. Lanham Trade-mark Act, § 32(a), 15 U.S.C.A. § 1114(a).

**[12] Trademarks 382T ☜1105**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1100 Relationship Between Goods or Services Underlying Marks
            382Tk1105 k. Relative Quality. Most Cited Cases
Lower quality of allegedly infringing product was not factor weighing against finding of infringement, by wine sold under "Arbor Mist" label, of trademark "Arbor Hill" used by competitor; rather than showing inferiority, evidence simply indicated that allegedly infringing wine was sweeter, and lower in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alcoholic content, appealing to different market. Lanham Trade-mark Act, § 32(a), 15 U.S.C.A. § 1114(a).

**[13] Trademarks 382T ☞1112**

382T Trademarks
 382TIII Similarity Between Marks; Likelihood of Confusion
  382Tk1112 k. Persons Confused; Circumstances of Sale. Most Cited Cases
Relative lack of sophistication of buyers weighed in favor of determination that $3 to $4 per bottle wine sold under "Arbor Mist" trademark would be confused with wine sold under allegedly infringed trademark "Arbor Hill," priced at $7 to $12 per bottle. Lanham Trade-mark Act, § 32(a), 15 U.S.C.A. § 1114(a).

**[14] Federal Civil Procedure 170A ☞2493**

170A Federal Civil Procedure
 170AXVII Judgment
  170AXVII(C) Summary Judgment
   170AXVII(C)2 Particular Cases
    170Ak2493 k. Copyright, Trademark, and Unfair Competition Cases. Most Cited Cases
Material issues of fact as to whether there was actual confusion precluded summary judgment that wine sold under trademark "Arbor Mist" did not infringe trademark "Arbor Hill," used by competitor.

**Trademarks 382T ☞1800**

382T Trademarks
 382TXI Trademarks and Trade Names Adjudicated
  382Tk1800 k. Alphabetical Listing. Most Cited Cases

**Trademarks 382T ☞1800**

382T Trademarks
 382TXI Trademarks and Trade Names Adjudicated
  382Tk1800 k. Alphabetical Listing. Most Cited Cases

**Trademarks 382T ☞1800**

382T Trademarks
 382TXI Trademarks and Trade Names Adjudicated
  382Tk1800 k. Alphabetical Listing. Most Cited Cases
Arbor Hill.

Arbor Mist.

Arbor Valley.

Allen J. Baden, Esq., Susan A. Smith, Esq., Kenyon & Kenyon, New York, NY, Paul V. Nunes, Esq., Underberg & Kessler LLP, Rochester, NY, for plaintiff, Constellation Brands, Inc.
A. Paul Britton, Esq., Kenneth Payment, Esq., Harter, Secrest and Emery, LLP, Rochester, NY, for defendant, Arbor Hill Associates, Inc. and third-party plaintiffs, Arbor Hill Associates, Inc., John H. Brahm, and Katharine Brahm.

### DECISION AND ORDER

CHARLES J. SIRAGUSA, District Judge.

### INTRODUCTION

This is an action between two wine producers involving, *inter alia,* claims of trademark infringement. Now before the Court are the following motions: 1) a motion to dismiss and for summary judgment [# 115] by defendant-third-party plaintiff Arbor Hill Associates ("AHA") [FN1]; and 2) a cross-motion for summary judgment [# 117] by plaintiff Constellation Brands, Inc. ("Constellation."). For the reasons that follow, AHA's motion is granted in part and denied in part, and Constellation's motion is denied.

### BACKGROUND

This action primarily involves a dispute between Constellation and AHA over the use of three federally-registered wine trademarks containing the word "arbor." [FN2]Specifically, AHA owns the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trademark "Arbor Hill", while Constellation owns the marks "Arbor Valley" and "Arbor Mist." Unless otherwise indicated, the following are the undisputed facts of the case.

In or about 1964, AHA's owners, John Brahm and Katharine Brahm, purchased a farm in Naples, New York, which they named the Arbor Hill Vineyard. Between 1966 and 1986, the Brahms leased the Arbor Hill Vineyard to the Widmer Winery ("Widmer"), of which John Brahm was an employee and part-owner. In or about 1986, Constellation FN3 purchased Widmer and, a short time later, terminated John Brahm's employment. (Brahm Affidavit ¶ 7). Subsequently, the Brahms decided to go into business for themselves, and formed AHA for that purpose. In early 1987, AHA selected the name "Arbor Hill" for a line of gourmet wine-based food products, which it intended to produce and sell. AHA federally registered the Arbor Hill trademark for food products, but on the advice of counsel, did not register the name for wine. In or about September 1987, AHA opened a retail shop in Bristol Springs, New York, named the Arbor Hill Grapery, from which it began selling Arbor Hill food products, such as wine sauces, jellies, and vinegars. At all relevant times, The Arbor Hill Grapery was located within a few miles of Constellation's facilities in Ontario County, New York, and according to AHA, during the relevant time some of Constellation's management personnel passed by Arbor Hill's facilities and signs on a daily basis.

In 1987, Constellation, which already produced a large variety of wines under different names, began selling grape table wine under the federally registered trademark Arbor Valley. Constellation's Arbor Valley wine was produced and shipped from Batavia, New York, primarily to distributors outside of New York State, although it was eventually sold to some distributors in New York. Specifically, between 1987 and February 1990, Constellation sold Arbor Valley wine exclusively to a distributor in Stratford, Connecticut. The earliest that Constellation sold Arbor Valley wine to customers located

in New York State was February 1990, when it sold 144 cases to a customer in Deer Park, Long Island. (Roberts Declaration, Exhibit A). Constellation's first sale of Arbor Valley to a customer in upstate New York was in 1991, when it sold six cases to a customer in Batavia. (*Id.*). However, AHA maintains that it never heard of Constellation's Arbor Valley mark until 2001. In that regard, AHA never observed any Arbor Valley wine being sold in Western New York. Moreover, although AHA's attorneys conducted a trademark search in 1987 in connection with the federal registration of the Arbor Hill mark for food products, the search did not reveal Constellation's use of the name Arbor Valley.

In or about August 1988, AHA began selling grape table wine under the brand name "Finger Lakes Lake Boat" ("Lake Boat"), with the label stating that the wine was "made and bottled by Arbor Hill Grapery."Sometime prior to June 1989, AHA also began selling wine under the brand name "Arbor Hill." (Brahm Reply Decl. Exhibit BBB). Since then, AHA has sold Arbor Hill wine from the Arbor Hill Grapery and other local outlets, including liquor stores, restaurants and two retail wine stores owned by Constellation. (Brahm Affidavit ¶ 31). AHA indicates that sales of Arbor Hill wines have been "modest," but that the trademark has nevertheless "become a familiar part of the retail wine landscape in the Finger Lakes region and in western New York."(*Id.* at ¶ 30) In that regard, between 1993 and 2004, AHA's annual gross revenues for the sale of Arbor Hill products ranged between $200,000 and $550,000. (Smith Declaration, Exhibit 19). During that same period, AHA spent between $10,000 and $30,000 per year advertising Arbor Hill products. (*Id.*, Exhibit 18). More recently, between 1994 and 2004, AHA spent approximately $30,000 per year on such advertising. (*Id.*). AHA also has "more than 15,000 customers visit [the Arbor Hill Grapery] for wine tasting" annually. (Brahm Reply Affidavit, ¶ 22).

Constellation indicates that it does not know when

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

if first became aware of "the Arbor Hill Grapery." (Kane Declaration, Exhibit 11, p. 55). However, AHA contends that Constellation has been aware of AHA's use of the Arbor Hill mark for wine since about 1988. In that regard, John Brahm, who was previously employed by Constellation [FN4], told various Constellation management personnel that he was starting a business using the Arbor Hill name. (Brahm Affidavit ¶ 31(a)). Subsequently, AHA purchased some of its wine-making ingredients directly from Constellation. (*Id.* at ¶ 31(d)). AHA also points to the close geographic proximity between the Arbor Hill Grapery and Constellation's facilities in Ontario County, New York, as well as the fact that Arbor Hill wine was being sold from the Arbor Hill Grapery and other outlets in the area, including two retail wine stores owned by Constellation.(*Id.* at ¶ 31(b) & (c)). Additionally, AHA indicates that Marvin Sands, the former chairman and founder of Constellation, received a bottle of Arbor Hill wine in 1991, and later complimented John Brahm on the wine. (*Id.* at ¶ 31(e)). And finally, Arbor Hill wines received media coverage during the relevant time. (*Id.* at ¶ 31(f)).

Moving to the crux of the instant case, in 1998, Constellation began selling a new wine beverage under the name Arbor Mist. Arbor Mist is a product consisting of wine mixed with fruit juice. (Encherman Affidavit ¶ 20) ("The concept evolved into a 'wine with fruit' beverage wine product-a great tasting, low-alcohol wine with a splash of fruit and other sweeteners."). Constellation developed Arbor Mist to appeal to consumers who did not like traditional wine. (Encherman Affidavit ¶ 19) ("Constellation learned that many consumers did not like table wines because they were too dry, and that these consumers also were unsatisfied with the few low-alcohol sweet wines in the marketplace ... because of the perceived social stigma."). Constellation first decided that it would sell the as-yet-unnamed product in a distinctive frosted bottle, which it believed would make "the product seem cold, refreshing, and classy."(*Id.,* ¶ 20). The Arbor Mist name was later selected by Constellation mar-

keting employee William R. Encherman ("Encherman"). (Fondiller Dep. at 82). Encherman indicates that, when he was attempting to name the new product, his wife suggested the partial name "_____ Mist." (Encherman Affidavit ¶ 23). Encherman liked the word "mist," "because it conjured up the frosted bottle and the cold refreshment of the drink."(*Id.*). Subsequently, while Encherman and his colleague Rob Vlosky ("Vlosky") were brainstorming possible names to go with the word "mist," they looked through a book and came upon the name "Arbor Low," "which is a location in the Peak District of England, near Derbyshire."(*Id.* at ¶ 27 & Exhibit I). Encherman and Vlosky liked the word "arbor," because to them, "it was synonymous with grapes and wine, but did not sound too fruity."(*Id.*). At the time they selected the name Arbor Mist, neither Encherman nor Vlosky was aware of AHA's Arbor Hill wine. (*Id.* at ¶ 31).

With regard to the alleged connection between the word "arbor" and wine making, Constellation states that

a grape arbor is a generic term for a place where grapes are grown.... Arbors are commonly used in the merchandising of wine-our company and our competitors often provide arbor displays (with or without grapes) for liquor stores and other retailers for use in their stores to display our wines.

(*Id.* at ¶ 45). On the other hand, although AHA admits that the word "arbor" suggests "vines," it maintains that "[a]n 'arbor' is not necessarily a 'grape arbor' or vineyard."(AHA Memo of Law p. 3). Nevertheless, in addition to Arbor Valley, Arbor Hill and Arbor Mist, there are a number of other wines produced and sold in the U.S. that use the word "arbor" as part of their trademark. These wines include Arbor, Arbor Crest, Arbor Brook, Arbor Knoll, Arbor Frost, Arbor Trails, Thornapple Arbor, Bel Arbors, Old Arbor, and California Arbor. (Smith Declaration, Exhibits 9-12, 16; Encherman Affidavit, Exhibits C-I).

Constellation registered the name Arbor Mist as a federal trademark in 1998. Prior to adopting the Ar-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

Page 7

bor Mist mark, Constellation had its trademark attorneys perform a trademark search for the name "Arbor Mist," to see "whether [that name was] available for use as a brand name."(Fondiller Dep. at 16, 18). Constellation did not, however, have its attorneys specifically render an opinion as to whether the name Arbor Mist would infringe the Arbor Hill mark, though it was aware of the nearby Arbor Hill Grapery. (Fondiller Dep. at 53-54, 60).

On or about January 13, 1999, AHA applied for trademark registration for the name Arbor Hill for wine, which the Patent and Trademark Office ("PTO") granted on June 27, 2000, although as already mentioned, AHA had been using the Arbor Hill mark for wine since at least 1989.

In or about April 2001, AHA approached Constellation, complaining that the Arbor Mist mark infringed AHA's Arbor Hill mark.[FN5]AHA provided Constellation with a draft complaint alleging trademark infringement, and suggested that the parties attempt to reach an out-of-court settlement. Subsequently, AHA and Constellation had settlement negotiations for more than a year, during which time AHA agreed not to commence litigation without notice to Constellation. AHA's counsel described that agreement as follows:

At the request of [Constellation's attorney], I ... agreed that Arbor Hill would not commence any litigation unless and until the discussions between the parties concluded unsuccessfully. Moreover, at our first substantive settlement discussion, at a meeting between counsel, [Constellation's attorney] specifically asked me for a commitment that Arbor Hill would not deem the negotiations failed and would not commence an action without giving him three days' prior notice (he advised me that Constellation would want to use the time to issue a press release). I agreed.

(Payment Aff. ¶ 6) (citation and internal quotation marks omitted). In September 2002, settlement negotiations between AHA and Constellation were at "an apparent impasse," and AHA's counsel told

Constellation's counsel that the impasse "would probably mean litigation," although he wanted to consult with AHA before doing anything. (Id. at ¶¶ 7-9). On the day following that conversation, October 1, 2002, Constellation commenced the subject action.

In its complaint, Constellation seeks, as its first claim, a declaratory judgment that there is no likelihood of confusion between the Arbor Mist and Arbor Hill marks, and that the Arbor Mist mark does not, therefore, infringe the Arbor Hill mark. Alternatively, as a second claim, Constellation requests that, if the Court finds that a likelihood of confusion exists, that the Court further find that the Arbor Hill mark infringes Constellation's Arbor Valley mark. In other words, Constellation alleges that its Arbor Mist mark does not infringe AHA's Arbor Hill mark, but that if it does, then AHA's Arbor Hill mark must necessarily infringe Constellation's Arbor Valley mark, which was in use first.

Arbor Hill answered the complaint and asserted counterclaims for trademark infringement, unfair competition, and false advertising under the Lanham Act and New York State law. In that regard, AHA alleges, for example, that Arbor Mist is "sold for as little as $1.99 per bottle and is not considered a high-quality wine by the wine community."(Amended Answer with Counterclaims ¶ 63). In fact, AHA contends that Arbor Mist is not truly "wine," since its alcohol content is too low. (Id. at ¶ ¶ 63, 110). On the other hand, AHA contends that its wines have "won numerous awards in wine competitions and have grown steadily in both reputation and popularity over the years."(Id. at ¶ 59).

On November 12, 2004, while this action was pending, Constellation's patent attorney, Stephen Baker ("Baker"), whose offices were located in New Jersey, and who knew nothing about the instant litigation, notified Constellation that it was time to file a "combined Section 8 and Section 15 affidavit" concerning the Arbor Mist mark with the PTO. For purposes of this decision, it is sufficient

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

to note that, in a combined Section 8 and Section 15 affidavit, the affiant must swear to two statements of fact: 1) that the mark has been in use for five years; and 2) that the mark has not been the subject of any legal dispute. *See,* 15 U.S.C. § 1065. Baker indicates that since the Arbor Mist mark had been registered for five years, and since he was not aware of any legal dispute involving the mark, he recommended that Constellation file the affidavit, to provide evidence supporting the mark's incontestability:

> A registration becomes incontestable as a matter of law on its fifth anniversary whether or not you file a declaration, assuming there's no litigation [involving the mark]. The Section 15 Affidavit doesn't render the registration incontestable, it's simply evidence that would support a claim of incontestability.

(Baker Deposition p. 37, 40).

Specifically, Baker contacted Constellation's Vice President and General Counsel, Ronald Fondiller ("Fondiller"), who was the individual at Constellation responsible for overseeing such trademark matters. (Fondiller Dep. at 9) ("I am the one that interacts with outside counsel on normal maintenance matters, whether trademarks [need] to be renewed or allowed to lapse or whatever may be needed."). In an email, Baker advised Fondiller that a combined Section 8 and Section 15 affidavit should be filed, and Fondiller directed Baker to send the proposed affidavit to an individual at Constellation named Chris Benzinger ("Benzinger"), who would sign the affidavit. (Baker Dep. at 42).[FN6] However, Baker advised Fondiller that no such signature was needed, since he could file the affidavit himself: "Mr. Fondiller [replied to my email], 'Please have Chris Benzinger sign.' I replied, 'There is nothing that has to be signed. I will photograph a bottle and file over my ... signature unless you instruct to the contrary.' Mr. Fondiller instructed me to file."(Baker Dep. at 42). However, Fondiller indicates that when he directed Baker to file the declaration, he did not recall the specific contents of the form affidavit that would be used:

> Q. Did Constellation know of the content of the declaration you just referred to prior to its filing?

> A. Constellation in this case would be me. I did not recall the specific content of the [Section] 8 and 15 affidavit.

> Q. You did-I'm not sure I understand your answer when you say "I did not recall." You did not recall it at what time?

> A. Really at any-at the time that I was informed that it was time to file one in connection with Arbor Mist.

> Q. Did you give any instructions to Mr. Baker with regard to this declaration that we're talking about?

> A. Yes.

> Q. And those instructions were?

> A. To file it.

> Q. Did you have any discussions with Mr.-well, did you have any discussions with Mr. Baker as to the content of this declaration at the time that you gave the instruction to file it?

> A. No.

(Fondiller Dep. at 79-80).

Prior to executing the affidavit, Baker obtained proof that the Arbor Mist mark was still in use, by purchasing a bottle of the product. (Baker Dep. at 50). Baker was also aware that the mark had been in continuous use, because he had seen the product in stores. (*Id.* at 51). Additionally, Baker believed that the Arbor Mist mark was not the subject of litigation, because he was familiar with Constellation's trademark affairs as a result of having represented Constellation "since at least 1964." (Baker Dep. at 52-54, 59-61).

> I have worked with Canandaigua [Wine Company] and its successors [Constellation] since at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

lest 1964. I have litigated in Federal District Court.... I have handled oppositions in the U.S. Patent Trademark Office. I'm afraid I made an assumption that if there was anything going on, I would have known of it. Since I did not know of it, I felt confident in saying that [there was no litigation involving the mark.] That was clearly a mistake.

(Baker Dep. at 53).[FN7] Because of this incorrect assumption, Baker did not ask anyone at Constellation whether there was any ongoing litigation involving the Arbor Mist mark. (*Id.* at 54-55). Nor did Baker submit the proposed affidavit to anyone at Constellation before filing it with the PTO. (Fondiller Deposition pp. 78-81). Consequently, Baker's sworn affidavit incorrectly stated that there was "no proceeding involving said [Arbor Mist trademark] rights pending and not disposed of either in the Patent and Trademark Office or in the courts."That statement was incorrect since the subject action was pending at the time.

Constellation maintains that the erroneous filing was a mistake, but not fraud. Nevertheless, upon learning that the affidavit had been filed, AHA accused Constellation of attempting to defraud the PTO. On or about January 14, 2005, Constellation voluntarily withdrew the affidavit. However, AHA amended its answer to assert a counterclaim, alleging that the Court should cancel Constellation's Arbor Mist mark, as punishment for Constellation's alleged attempt to defraud the PTO. In that regard, AHA maintains that Fondiller "must have known" the contents of a Section 15 affidavit. In support of that accusation, AHA indicates that during the years leading up to the filing of the incorrect affidavit by Baker, during which Fondiller worked as an attorney for Constellation and was responsible for the company's trademark matters, Constellation filed ten Section 15 affidavits with the PTO, in connection with various trademarks. (Salai Reply Decl. ¶ ¶ 3-6).[FN8] According to AHA, those filings suggest that Fondiller had "considerable experience with Section 15 affidavits," and was "necessarily

familiar with the averments that must be made in a Section 15 incontestability affidavit, including the key averment that the trademark in question is not the subject of litigation."(*Id.* at ¶ ¶ 5-6).

The parties subsequently conducted discovery on the issue of trademark infringement. On January 26, 2007, AHA filed the subject summary judgment motion [# 115], seeking three types of relief: 1) an Order dismissing Constellation's First Cause of Action (for a declaratory judgment of non-infringement), on the grounds that Constellation breached an agreement with Arbor Hill not to commence litigation while the parties were exploring settlement; [FN9] 2) an Order granting summary judgment on Constellation's Second Cause of Action (for trademark infringement), on the grounds of laches, and because there is no infringement; and 3) an Order granting summary judgment on AHA's Eighth Counterclaim (for cancellation of Constellation's Arbor Mist mark), on the grounds that Constellation committed fraud on the PTO.

On January 26, 2007, Constellation filed the subject cross-motion for summary judgment [# 117], seeking a declaration that its Arbor Mist mark does not infringe the Arbor Hill mark, and granting judgment on Count I of its complaint (declaratory judgment of non-infringement), and on AHA's counterclaims, Counts I (Federal Trademark Infringement), II (Violation of § 133 of the New York General Business Law), III (Federal Unfair Competition), IV (Violation of New York Common Law), VII (Intentional Infringement), and VIII (Cancellation of Arbor Mist registration on grounds of fraud).

In opposition to Constellation's motion, AHA contends, *inter alia,* that there has been confusion among consumers since Constellation adopted the Arbor Mist mark, and that Arbor Hill's goodwill among consumers is likely to be damaged since Arbor Mist is an inferior product. (*See,* Amended Answer [# 82] ¶ 71). For example, AHA indicates that numerous customers at the Arbor Hill Grapery have assumed that AHA produced Arbor Mist. (Brahm Affidavit in Opposition to Summary Judgment ¶

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

32). AHA also indicates that it received "a number of phone calls, emails, and letters from confused consumers."(*Id.* at ¶ 36). AHA states that, as a result of these incidents, it created a "form" which it asked customers to fill out when it "found that they were confused as to who was making Arbor Mist," and that "[n]early 30 such confused customers signed such forms."(*Id.*). From the documentation that AHA has submitted, it appears that of the total instances of alleged confusion, four were inquiries by individuals wondering if Arbor Hill produced Arbor Mist, one of the instances involved a mistake by a telephone operator, six of the instances involved people who actually bought Arbor Mist products and thought that it was produced by Arbor Hill, and 36 [FN10] of the instances involved people who assumed that they could buy Arbor Mist at the Arbor Hill Grapery. (*Id.*, Exhibits W-Y, Exhibits JJ-YY). Additionally, AHA has identified two instances in which local publications, The Finger Lakes Business Almanac and the Rochester Democrat and Chronicle, mistakenly referred to Arbor Mist as Arbor Hill.(*Id.* at ¶¶ 38-39). However, with regard to the mistake by the Finger Lakes Business Almanac, the Court notes that the mistake was made in a photo caption, while the article itself correctly identified Constellation's product as Arbor Mist. (Salai Declaration in Opposition to Constellation Summary Judgment Motion, Exhibit U).

AHA has also submitted an affidavit from a former employee, Loana J. Shields ("Shields"), who states that during her six years of employment at the Arbor Hill Grapery, beginning in 1999, "at least fifteen to twenty people per week visited the store looking to purchase Arbor Mist products," and that she "received complaints from customers who were dissatisfied with Arbor Mist products and believed that Arbor Hill produced Arbor Mist due to the similarity between the two products names."(*Id.*, Exhibit II). Although issues of credibility cannot be resolved on a summary judgment motion, the Court notes that Shield's affidavit is curious in two respects. First, although Shields claims that between 1999 and 2005 she encountered at least fifteen to

twenty customers per week at the Arbor Hill Grapery who believed that they could purchase Arbor Mist, AHA has only produced proof of 36 such instances, even though it began documenting such instances of confusion, by asking confused customers to sign pre-printed forms, in the Fall of 2000. (Brahm Affidavit in Opposition to Summary Judgment ¶ 36). However, what is more curious about Shield's affidavit is that on September 22, 2000, Shields herself signed one of AHA's pre-printed forms, indicating that she was confused about the relationship between Arbor Hill and Arbor Mist, approximately one year after she began working at the Arbor Hill Grapery. (*Id.*, Exhibit Y, Exhibit II).[FN11]

AHA has also submitted a two-page "pilot survey," conducted by a research firm, purporting to show consumer confusion involving the Arbor Hill and Arbor Mist marks. (*Id.*, Exhibit Z). The pilot survey was conducted among 52 consumers of "domestic wine, and/or wine coolers and/or fruit flavored wines," in Syracuse, New York, and purportedly shows that between 15.4% and 17.3% of the respondents were "confused into believing either that Arbor Hill came from, was connected with, or received authorization from the makers of Arbor Mist,""based only upon the brand name."(*Id.*). The surveyor described his methodology as follows:

To simulate a reverse confusion situation, each respondent was handed a bottle of Arbor Mist and asked to examine it as if he/she 'happened to see it in a store and were thinking about whether to buy it.'After the respondent indicated he/she was done, the bottle was removed from view. At this point, respondents were asked questions regarding their household composition and TV viewing behavior. Next, using a rotated order across respondents, each respondent was shown an array of 3 bottles of wine bearing the following labels: Arbor Hill, Argent Mist (a fictitious brand designed to serve as a 'control') and Beringer. At this point, the respondents were asked a series of questions designed to assess confusion as to source, confusion as to associ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

ation or connection, and confusion as to sponsorship or authorization, and the reasons for their confusion.

(*Id.*) The survey report does not indicate what questions were asked, nor does it state the respondent's verbatim responses. The report states that the "pilot survey" or "first phase" survey is not a complete survey, and is intended to be used "as the basis for making a 'go' or 'no go' decision on whether to proceed with a complete survey."(*Id.,* Exhibit AA, p. 4).

However, Constellation opposes the introduction of the pilot survey, since AHA declined to produce the survey in discovery on the grounds that it was work product.[FN12] Alternatively, Constellation contends that the pilot survey "does not have any of the elements of an admissible survey."(Constellation Reply Memo at 13) Additionally, Constellation maintains that, since 1998, it has sold "hundreds of millions of bottles of Arbor Mist," and has never received any telephone calls or other communications indicating confusion between Arbor Mist and Arbor Hill wine. (Encherman Affidavit ¶ 53).

Counsel for the parties appeared before the undersigned for argument of the motions on May 31, 2007. Subsequently, the parties made various supplemental submissions. The Court has now considered all submissions, as well as the arguments of counsel.

## ANALYSIS

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142

(1970)."[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1] [a] (Matthew Bender 3d ed.)."In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim."*Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996)(*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied,*517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996). Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial."Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED.R.CIV.P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party."*Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993).

At the outset, the Court will consider the arguments raised in AHA's motion.

*AHA's Application to Dismiss Constellation's Declaratory Judgment Claim*

[1] As discussed above, AHA maintains that the Court should dismiss Constellation's declaratory

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

judgment claim, since Constellation "sandbagged" AHA in order to win a race to the courthouse. Specifically, AHA alleges that, although its counsel and Constellation's counsel had an oral agreement not to commence litigation without giving opposing counsel three-day's notice, Constellation violated that agreement, in order to "intimidate" AHA and "win a race to court." AHA maintains that Constellation's alleged misconduct in this regard should prompt the Court to dismiss Constellation's declaratory judgment claim.

In support of this argument, AHA cites various cases including *Bausch & Lomb Inc. v. Alcide Corp.,* 684 F.Supp. 1155 (W.D.N.Y.1987) and *Great Am. Ins. Co. v. Houston Gen. Ins. Co.,* 735 F.Supp. 581 (S.D.N.Y.1990), which indicate that a district court may decline to exercise jurisdiction over a declaratory judgment action in certain circumstances. *See, Bausch & Lomb Inc. v. Alcide Corp.,* 684 F.Supp. at 1159 ("A declaratory judgment action is an exception to the general rule that a Federal Court must exercise the jurisdiction which is conferred upon it. The determination of whether or not to exercise jurisdiction is left to the sound discretion of the district court.") (citations omitted). However, these cases are factually inapposite to the situation here, since they involve attempts by parties to select more convenient forums by filing pre-emptive declaratory judgment lawsuits. *See, e.g., Great Am. Ins. Co. v. Houston Gen. Ins. Co.,* 735 F.Supp. at 586 ("[T]he misuse of the Declaratory Judgment Act to gain a procedural advantage and preempt the forum choice of the plaintiff in the coercive action militates in favor of dismissing the declaratory judgment action.")[FN13] In this case, AHA does not claim that it would have brought suit against Constellation in a different venue, but rather, it is undisputed that AHA intended to commence its lawsuit here in the Western District of New York. Nor does AHA claim to be at any procedural disadvantage, apart from arguing that it is "unfair" that Constellation should get to appear before a jury as a plaintiff instead of as a defendant. (AHA Memo of Law [# 116-1] p. 12)

(Arguing that Arbor Hill "should be entitled to appear before a jury in the posture of a plaintiff seeking to vindicate its rights, not as a declaratory action defendant."); (Payment Declaration at ¶ 16) ("Constellation's decision to 'get the jump' on its adversary-by filing an action while simultaneously asking me to forebear from filing-served an illegitimate purpose that the Court should not countenance.").

In any event, while AHA may have agreed to give Constellation a three-day notice before commencing a lawsuit, it does not appear that Constellation ever gave a reciprocal assurance. Moreover, while AHA suggests that it was "sandbagged" by Constellation's commencement of this lawsuit, it does not allege that there was any reasonable likelihood that further negotiations between the parties would have been successful. On the contrary, AHA's attorneys had indicated that they would likely sue Constellation, once they had discussed the matter with AHA's owners. Overall, AHA has not presented a compelling argument for declining jurisdiction over Constellation's declaratory judgment claim, and consequently, Arbor Hill's application to dismiss that claim is denied.

*AHA's application to cancel the Arbor Mist mark on grounds of fraud*

[2] Next, AHA contends that the Court should grant summary judgment on AHA's eighth counterclaim, and cancel the federal registration of Constellation's Arbor Mist mark pursuant to 15 U.S.C. § 1064, on the grounds that Constellation attempted to defraud the PTO by submitting a false Section 15 affidavit. In that regard, generally,

[a] party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by clear and convincing evidence. The allegedly fraudulent statements may not be the product of mere error or inadvertence, but must indicate a deliberate attempt to mislead the PTO. Moreover, the knowing misstatement must have been with respect to a material fact-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 13

one that would have affected the PTO's action on the applications.

*Orient Exp. Trading Co., Ltd. v. Federated Dept. Stores, Inc.,* 842 F.2d 650, 653 (2d Cir.1988) (citations and internal quotation marks omitted). A party seeking such cancellation faces a "heavy burden," and must "present proof that leaves nothing to speculation, conjecture, or surmise. Should there be any doubt, it must be resolved against the party making the claim. Merely making a false statement is not sufficient to cancel a mark."*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.,* 440 F.Supp.2d 249, 267 (S.D.N.Y.2006) (citations and internal quotation marks omitted); *see also, Pilates, Inc. v. Current Concepts, Inc.,* 120 F.Supp.2d 286, 313 (S.D.N.Y.2000) ("Fraud in a trademark cancellation is something that must be 'proved to the hilt' with little or no room for speculation or surmise; considerable room for honest mistake, inadvertence, erroneous conception of rights, and negligent omission; and any doubts resolved against the charging party.") (citation omitted).

Moreover, "a court 'must view the evidence presented through the prism of the substantive evidentiary burden' in determining whether a genuine issue of fact has been raised sufficient to withstand summary judgment."*Association Ben. Services, Inc. v. Caremark Rx, Inc.,* 493 F.3d 841, 854 (7th Cir.2007) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 254, 106 S.Ct. 2505, 91 L.Ed.2d 202). Consequently, the quantum of proof required to prevail on a summary judgment motion is greater where, as here, the fraud claim must be proven by clear and convincing evidence. *See, Id.*(Holding that the plaintiff's contentions were "insufficient to prevent summary judgment on an element of a claim, such as fraud, that ultimately must be proven by clear and convincing evidence."); *see also, Compuware Corp. v. Moody's Investors Servs., Inc.,* 499 F.3d 520, 525 (6th Cir.2007) (" 'When determining if a genuine factual issue as to actual malice exists in a [defamation] suit brought by a public figure, a

trial judge must bear in mind the actual quantum and quality of proof necessary to support liability,' meaning that the court must grant summary judgment to the defendant 'if the evidence presented ... is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.'") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 254, 106 S.Ct. 2505, 91 L.Ed.2d 202.);*see also,*6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:68 (4th ed.) ("[F]raud in trademark registration procurement, though often alleged, is seldom proven.").

[3] In the instant case, it is undisputed that Baker made an incorrect statement of fact in an affidavit submitted to the PTO. In that regard, Baker relied upon his own personal knowledge and his assumption that he would have known of any litigation involving the Arbor Mist mark. AHA has not come forward with any evidence to dispute Baker's explanation of his actions. Instead, AHA contends that Fondiller acted with fraudulent intent when he directed Baker to file the affidavit, even though Fondiller has stated under oath that he did not recall the specific contents of a combined Section 8 and Section 15 affidavit when he gave that direction. By way of proof, AHA relies on inferences drawn from the fact that, during the years leading up to the filing of the subject affidavit, while Fondiller was employed as legal counsel by Constellation, Constellation filed a number of other combined Section 8 and Section 15 affidavits with the PTO in connection with other trademarks.

At the outset, although Constellation contends that the filing of a false Section 15 affidavit cannot provide a basis for cancelling a trademark registration, the weight of case authority, though scant, is to the contrary. *See, Robi v. Five Platters, Inc.,* 918 F.2d 1439, 1444 (9th Cir.1990) ( "[F]iling a fraudulent incontestability affidavit provides a basis for canceling the registration itself.") (citing *Crown Wallcovering Corp. v. Wall Paper Mfrs. Ltd.,* 188 U.S.P.Q. 141, 143-44 (1975)); *Sunrise Jewelry Mfg.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

*Corp. v. Fred S.A.*, 175 F.3d 1322, 1327 (Fed.Cir.1999) (The court's analysis indicates that the filing of a fraudulent Section 15 affidavit could warrant cancellation of the trademark); *but see*,3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:58 (4th ed.) ("Fraud made in a § 15 affidavit to obtain incontestability status would seem not to go to the continuance of the registration itself and hence would not constitute a ground for cancellation of the registration. Some decisions have held, however, that it does justify cancellation.") (footnotes omitted). In any event, in this case the Court finds that there are triable issues of fact as to fraudulent intent. Consequently, AHA's motion for summary judgment on its eighth counterclaim is denied.

*AHA's Application for Summary Judgment on Constellation's Second Cause of Action for Infringement of the Arbor Valley trademark*

Constellation's second cause of action alleges that AHA's Arbor Hill mark infringes Constellation's Arbor Valley mark. Essentially, the claim indicates that if the Arbor Mist mark infringes the Arbor Hill mark, then the Arbor Hill mark must necessarily infringe the Arbor Valley mark. However, Constellation clearly does not believe that the Arbor Mist mark infringes the Arbor Hill mark, and this cause of action is merely a fall-back position. Nevertheless, AHA maintains that this claim is barred by the equitable doctrine of laches, since Constellation was aware of AHA's use of the Arbor Hill mark for at least a decade before bringing this action. The Court agrees that the claim is barred by laches.

[4] The equitable defense of laches applies in cases involving trademark infringement. *See, Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191, 193 (2d Cir.1996). To establish the defense, the defendant must show four elements: 1) plaintiff was aware of defendant's use of the mark; 2) plaintiff unreasonably delayed challenging defendant's use of the mark; 3) defendant suffered prejudice as a result of the delay; and 4) defendant has clean hands. *See,*

*Id.* at 192;*see also, Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1040, 1042 (2d Cir.1980). Moreover,

[a]lthough laches is an equitable defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant in the application of a laches defense. Because the Lanham Act establishes no limitations period for claims alleging unfair competition or false advertising, and because there is no corresponding federal statute of limitations, we look to the most appropriate or the most analogous state statute of limitations for laches purposes. That statute of limitations then determines which party possesses the burden of proving or rebutting the defense.

* * *

[P]rior to the running of the most closely analogous state statute of limitations there is no presumption of laches and the burden remains on the defendant to prove the defense. Alternatively, once the analogous statute has run, a presumption of laches will apply and plaintiff must show why the laches defense ought not be applied in the case.

*Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d at 191 (citations and internal quotation marks omitted). For trademark infringement claims, the analogous state statute of limitations is New York's six-year fraud statute. *Id.*

[5] In the instant case, Constellation waited far longer than six years before asserting its trademark claim against AHA. In that regard, AHA has produced evidence indicating that Constellation had to have been aware of AHA's use of the Arbor Hill mark by the late nineteen-eighties or early nineteen-nineties. As just one example, as mentioned above, Marvin Sands, the President of Constellation's predecessor, Canandaigua Wine Company, acknowledged sampling Arbor Hill wine in 1991. In opposition, Constellation states only that it has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
**(Cite as: 535 F.Supp.2d 347)**

no idea when it became aware of AHA's use of the Arbor Hill mark. However, "where the question of laches is an issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry." *Polaroid Corp. v. Polarad Elecs. Corp.,* 182 F.Supp. 350, 355 (S.D.N.Y.1960) (*quoting Johnston v. Standard Mining Co.,* 148 U.S. 360, 13 S.Ct. 585, 37 L.Ed. 480), aff'd, 287 F.2d 492 (2d Cir.1961). In short, Constellation either knew, or should have known, that AHA was making and selling Arbor Hill wine, in competition with Constellation's Arbor Valley wine, approximately twelve years before commencing this action. Consequently, the presumption of laches applies. The Court further notes, in any event, that AHA suffered prejudice, by continuing to develop and promote its Arbor Hill wines, and that there is no indication that AHA acted in bad faith.

Constellation, however, maintains that laches should not apply, on the somewhat convoluted theory that, if it is determined that the Arbor Mist mark infringes AHA's Arbor Hill mark, such result would constitute a change in the applicable law of trademarks, which in fairness should allow Constellation to claim that the Arbor Hill mark infringes Constellation's Arbor Valley mark.[FN14] Viewed another way, Constellation concedes that, but for a change in the applicable law, its second cause of action is barred by laches. In support of this argument, Constellation cites *Travelers Ins. Co. v. Cuomo,* 14 F.3d 708, 714 (2d Cir.1993), *rev'd on other grounds by New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), *Omega S.A. v. Omega Eng'g, Inc.,* 228 F.Supp.2d 112, 140-41 (D.Conn.2002), and *Bio-Technology Gen. Corp. v. Genentech, Inc.* 80 F.3d 1553, 1564 (Fed.Cir.1996), which generally hold that a plaintiff cannot be found to have been dilatory in pursuing its rights when it reasonably believed that it was prevented from doing so, based upon the then-current state of the law. However, the cases cited by Constellation are inapplicable in the instant case, since there has been no change in the

relevant law applicable to trademark infringement claims. To the extent that Constellation alleges that a ruling in AHA's favor, in connection with Constellation's declaratory judgment claim, would necessarily require a change in such applicable law, the Court disagrees. Consequently, AHA is entitled to summary judgment on Constellation's infringement claim, based on laches.

*Constellation's Application for Summary Judgment on its First Cause of Action Regarding Federal Trademark Infringement*

The Court will now consider Constellation's motion for summary judgment on its first cause of action, which seeks a declaratory judgment that the Arbor Mist mark does not infringe AHA's Arbor Hill mark. To succeed on a claim for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(a), in general,

> a plaintiff has two obstacles to overcome: the plaintiff must prove that its mark is entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with plaintiff's mark. The bottom line is if no such likelihood of confusion is found, a defendant will generally not be held to have infringed plaintiff's mark.

*Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1074 (2d Cir.1993).[FN15]

As for the first prong of this analysis, "[w]hether the mark is entitled to protection depends on whether it is inherently distinctive or, if merely descriptive, has acquired 'secondary meaning.' " *Arrow Fastener Co., Inc. v. Stanley Works,* 59 F.3d 384, 390 (2d Cir.1995). On this point,

> [t]o be valid and protectible, a mark must be capable of distinguishing the products it marks from those of others. There are five different categories of terms with respect to the protection of a mark: generic, descriptive, suggestive, arbitrary, and fanciful. The categories reflect both the eligibility for protection and the degree of protec-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

Page 16

tion accorded. A mark is generic if it is a common description of products and refers to the genus of which the particular product is a species. A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put. A mark is suggestive if it merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods. An arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark.

The five categories focus the inquiry on the distinctiveness of the mark. Fanciful, arbitrary, and suggestive marks are deemed inherently distinctive. Their intrinsic nature serves to identify a particular source of a product, so they will be automatically protected. Marks which are descriptive are not inherently distinctive, and a showing that the mark has acquired distinctiveness-"secondary meaning"-is required before protection will be extended. Generic marks are not protectible.

*Lane Capital Management, Inc. v. Lane Capital Management, Inc.,* 192 F.3d 337, 344 (2d Cir.1999) (citations omitted). Here, the Court finds that the Arbor Hill mark is arbitrary, and is therefore entitled to protection.[FN16]

The second prong of the two-prong analysis described above is whether there is a likelihood of confusion between the Arbor Mist mark and the Arbor Hill mark. To establish "likelihood of confusion," the party alleging infringement must prove

that numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark. For a finding of infringement a probability of confusion, not a mere possibility, must be found to exist.

The factors ordinarily weighed in determining the likelihood of confusion are the familiar *Polaroid*

factors, which include: 1) the strength of the plaintiff's mark;[ FN17] 2) the similarity of plaintiff's and defendant's marks; 3) the competitive proximity of the products; 4) the likelihood that plaintiff will "bridge the gap" and offer a product like defendant's; 5) actual confusion between products; 6) good faith on the defendant's part; 7) the quality of defendant's product; and 8) the sophistication of buyers. The *Polaroid* factors are not dispositive, and additional factors may be considered or initial factors abandoned.

*Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d at 1077 (referring to *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,*368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961)) (citations omitted); *see also, Star Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d 373, 383 (2d Cir.2005) ("Likelihood of confusion includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification. In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.") (citations omitted).

*Strength of the Arbor Hill mark*

[6] The Court has determined that the Arbor Hill mark is arbitrary, and arbitrary marks are generally considered to be strong. *Star Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d at 385 ("Among marks relying solely on inherent distinctiveness for their protectability, arbitrary or fanciful ones are the strongest."). However, "[o]nce a mark has been classified, the second step in determining strength is to consider its degree of distinctiveness, an inquiry that concerns both the inherent inventiveness of the mark itself and the amount of third-party usage of the term as a mark, especially in the market in question."*Id.* at 385;*see also, Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 479 (2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

Cir.1996) (Holding that, in determining the strength of a mark, "consideration of the recognition that the mark actually enjoys in the marketplace is not error," and may "cast doubt on the otherwise firm conclusion that [a mark] is strong.") (citation omitted). Here, there is extensive third-party use of the word "arbor" in the wine industry, which detracts from the strength of the Arbor Hill mark. *See*, *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir.1993) ("[E]xtensive third party use of the words sport and stick weighs against a finding that WWW's trade name is strong.") (citation and internal quotation marks omitted), *limited on other grounds by Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39 (2nd Cir.1994). Moreover, the fact that AHA has had only modest, regional success with Arbor Hill wine also detracts from the strength of the mark. *Id.* ("WWW has had only very modest sales since it entered the business.... This evidence indicates a low national recognition of WWW's product.") (citation omitted). Consequently, the Court finds that the Arbor Hill mark is "deserving of trademark protection, but not entitled to the fullest protection available under the law."*Id.* (*quoting W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 808 F.Supp. 1013, 1023 (S.D.N.Y.1992)).

*Similarity of the marks*

[7] With regard to the second *Polaroid* factor, "[i]n assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers."*Star Indus., Inc. v. Bacardi & Co., Ltd.*, 412 F.3d at 386;*see also, W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d at 573 (Holding that, in assessing the similarity of the marks, a court should "look at the general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember.") (citation omitted)."The similarity of the marks is a key factor in determining likelihood of confusion."*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir.2006)

(citation omitted).

In the instant case, the marks are "marginally similar" in that they both contain the word "arbor." *See*, *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d at 46 ("Dentyne Ice and Ice Breakers are at best marginally similar because of the common use of 'Ice.' "). Additionally, both wines are sold in bottles that are roughly the same size and shape, which is basically the same size and shape of most wine bottles. However, apart from those facts, there is very little similarity between the appearance of the marks and products. (*See*, Exhibit A attached hereto.) Although both marks contain the word "arbor," they do not sound the same. Nor do the names produce the same effect, since "Arbor Hill" suggests a geographic location or place, *i.e.*, a particular hill, while "Arbor Mist," used in connection with wine, more generally suggests a connection to a grape arbor and/or vines. The marks use different typefaces and styles, with the Arbor Hill name appearing in black lettering on a white paper label, while the Arbor Mist name appears in stylized white lettering on a distinctive, clear plastic label. Additionally, Arbor Hill labels bear the name of the particular type of wine, *e.g.*, "Riesling," while Arbor Mist labels bear the names of various combinations of fruit juice and wine, such as "Strawberry White Zinfandel." Arbor Hill labels bear the image of a tree, while Arbor Mist labels have pictures of various fruits. Arbor Hill labels indicate that the wine is from the "Finger Lakes," while Arbor Mist labels have no such geographic designation. The Arbor Hill bottle is a traditional-looking, dark-green wine bottle, with a gold foil wrapper on the neck of the bottle, while the Arbor Mist bottle is a more distinctive, clear-frosted glass bottle, with a black foil wrapper on the bottle neck. Bottles of Arbor Mist are also unlike bottles of Arbor Hill wine in that each variety of Arbor Mist has a distinctive color, which is visible through the clear frosted bottle. Finally, the Arbor Hill bottle appears to be sealed with a cork, while the Arbor Mist bottle appears to have a screw-off cap.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
**(Cite as: 535 F.Supp.2d 347)**

In short, the two products create very different impressions. *See, Nabisco, Inc. v. Warner-Lambert Co.,* 220 F.3d at 47 ("The cumulative effect of the differences between the parties' products and in the commercial presentation of their marks creates distinct marketplace impressions.") Moreover, these differences, which are so obvious when viewing the products side by side, are sufficiently memorable to dispel confusion among consumers who may be viewing the products serially. *See, Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d 532, 538 (2d Cir.2005) ("Whether simultaneous viewing by consumers is likely to result in confusion is not relevant when it is serial viewing that is at issue given the market context or the type of confusion claimed. In such a case, a district court must ask not whether differences are easily discernable on simultaneous viewing, but whether they are likely to be memorable enough to dispel confusion on serial viewing.") Consequently, the Court finds that this factor weighs heavily in Constellation's favor.

*Competitive proximity of the products*

[8] With regard to the third *Polaroid* factor,

[t]he 'proximity-of-the-products' inquiry concerns whether and to what extent the two products compete with each other. We look to the nature of the products themselves and the structure of the relevant market. Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold.

*Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d at 480 (citations omitted). In the instant case, the products are both alcoholic beverages, which are sometimes sold through the same channels of trade, such as liquor stores, although unlike Arbor Hill, Arbor Mist is also sold in supermarkets and mass-merchandise stores. Although Arbor Mist is less expensive than Arbor Hill, that does not negate the

fact that they compete with each other. *Star Indus., Inc. v. Bacardi & Co., Ltd.,* 412 F.3d at 387 ("That Georgi vodka costs half as much as Bacardi rum and is displayed on different shelves in the same store does not imply that the products are not in competition."). However, the nature of the two products is clearly different, since Arbor Hill is traditional table wine, while Arbor Mist is a mix of wine and fruit juice, with a lower alcohol content than most wine. (*See, e.g.,* Payment Declaration at ¶ 2) (AHA's counsel refers to Arbor Mist as a "wine cooler beverage product."). In fact, one of AHA's counterclaims in this action accuses Constellation of engaging in false advertising by calling its Arbor Mist products "wine," since they "are not wines." (AHA Amended Answer and Counterclaims, ¶ 99). Additionally, the products differ greatly as to "geographic distribution" and "market position," with Arbor Hill wine having modest regional sales and Arbor Mist having sales of millions of bottles nationwide. *See, W.W.W. Pharm. Co., Inc. v. Gillette Co.,* 984 F.2d at 573.Consequently, although the products compete with each other, this factor does not overwhelmingly favor AHA. *Star Indus., Inc. v. Bacardi & Co., Ltd.,* 412 F.3d at 387 ("Appellees are correct to point out that vodka, rum, and malt beverages do reside in distinct sub-markets of the market for alcoholic beverages. Vodka and rum, while sold in the same stores to the same consumers for similar purposes, are distinct varieties of product; and this is more so with malt beverages ... which contain a much smaller concentration of alcohol. Our finding of competitive proximity is thus tempered, and the factor does not overwhelmingly favor Star.").

*Bridging the gap*

This fourth *Polaroid* factor "refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."*Star Indus., Inc. v. Bacardi & Co., Ltd.,* 412 F.3d at 387.In this case, there is no gap to bridge, since the parties already compete in the same market. This is true even

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
**(Cite as: 535 F.Supp.2d 347)**

though one party sells table wine and the other produces a wine fruit juice beverage. *See, Id.*(Finding no bridge to gap, despite the fact that one party produced rum and malt beverages and the other produced vodka). Therefore, this factor is irrelevant to the Court's *Polaroid* analysis. *Id.* ("Because, as we have held above, Star's and appellee's products are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis in this case.") (citations omitted).

*Actual consumer confusion*

[9] When considering actual consumer confusion, the question is whether consumers will think that Arbor Mist comes from the same source as Arbor Hill wine. *Playtex Prods., Inc. v. Georgia-Pacific Corp.,* 390 F.3d 158, 166 (2d Cir.2004) ("The question is whether consumers will think that "Quilted Northern Moist-Ones" come from the same *source* as "Wet Ones" products.") (emphasis added, citations omitted). When balancing the *Polaroid* factors, evidence of actual consumer confusion is particularly relevant. *See, Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 151 (2d Cir.2003) ("It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion. We have therefore deemed evidence of actual confusion 'particularly relevant' to the inquiry.") (citation omitted).

In the instant case, AHA has presented evidence regarding actual instances of consumer confusion, as well as survey evidence. With regard to the survey evidence, AHA states that its "professional market survey" "confirm[s] that there [is] a significant tendency for consumers to be confused by the similarity between Arbor Mist and Arbor Hill; a sizeable percentage of consumers surveyed assumed that the two products were produced by the same company."(AHA Memo of Law in Opposition at 14). However, the Court declines to consider the pilot survey, since AHA did not produce it in discovery. *See,*FRCP 37(c)(1); *see also, Malaco Leaf, AB v. Promotion In Motion, Inc.,* 287 F.Supp.2d 355,

376 (S.D.N.Y.2003) ("This Court declines to consider any survey or expert report, including the Pilot Survey, offered to defendants for the first time on a summary judgment motion and inexplicably not produced during discovery."). Even if AHA had produced the survey summary during discovery, the Court would exclude it in any event, since it does not satisfy the criteria for admissibility. In that regard,

[s]urvey evidence is generally admissible in cases alleging trademark infringement under the Lanham Act. To assess the admissibility of survey evidence, the court should consider a number of criteria, including whether: (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts. A trademark survey must also approximate marketplace conditions. While errors in survey methodology usually go to weight of the evidence, a survey should be excluded under Rule 403, Fed.R.Evid., when its probative value is substantially outweighed by its prejudicial effect or potential to mislead the jury. Thus, a survey should be excluded under Rule 403 when it is so flawed in its methodology that the survey proves little and the jury is very likely to be misled. While courts in the Second Circuit rely mainly on Rule 403 to exclude unreliable surveys, we note that Rule 702 is clearly applicable as well, because the result of a survey is essentially expert testimony, and Rule 702 requires that such testimony must be reliable. The bottom line is that if the survey suffers from substantial methodological flaws, it will be excluded under both Rule 403 and Rule 702.

*Malletier v. Dooney & Bourke, Inc.,* 525 F.Supp.2d 558, 580-581 (S.D.N.Y.2007) (citations, internal quotation marks and footnote omitted)."The neces-

535 F.Supp.2d 347
535 F.Supp.2d 347
**(Cite as: 535 F.Supp.2d 347)**

Page 20

sary foundation will normally be laid through the testimony of the persons responsible for the various parts of the survey."*Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1205 (S.D.N.Y.1983) (citations omitted).

Here, AHA's "survey" is a two-page summary of a pilot survey involving 52 consumers of alcoholic beverages who were shown a bottle of Arbor Mist, and then sometime later, shown three other bottles of wine "bearing the following labels: Arbor Hill, Argent Mist (a fictitious brand designed to serve as a 'control'), and Beringer."(Brahm Affidavit, Exhibit Z).[FN18] The summary indicates that

> based only upon the brand name, 17.3% of the 52 respondents definitely were confused into believing either that Arbor Hill came from, was connected with, or received authorization from the makers of Arbor Mist. The corresponding percentage for the control brand (Argent Mist) was only 1.9%. Thus, after subtracting for 'noise,' our best empirically derived estimate of likely reverse confusion is (17.3-1.9=) 15.4%.

(*Id.*) (Emphasis added). The summary does not include photographs of the actual bottles used. Moreover, although the summary states that the consumers "were asked a series of questions designed to assess confusion as to source, confusion as to association or connection, and confusion as to sponsorship or authorization, and the reasons for their confusion," it does not provide the actual questions asked or answers given. (*Id.*). Consequently, the Court cannot determine if the summary evidence is reliable. Moreover, it has been held that surveys such as AHA's have little probative value where they show only that a certain number of consumers will assume that some type of relationship exists between two companies with similar names. *Beneficial Corp. v. Beneficial Capital Corp.,* 529 F.Supp. 445, 451 (S.D.N.Y.1982) ("The survey establishes no more than that the names are similar, a factor as to which there can be little genuine dispute in any event, and that portions of the general public will make the reasonable assump-

tion, that, in the absence of any other information, two companies with similar names are likely to have a business connection. However, this proposition provides no indication of public reaction under actual market conditions.").

AHA's remaining evidence of actual confusion consists of anecdotal and documentary evidence. For example, AHA has received phone calls and letters regarding Arbor Mist from consumers, and has documented other incidents involving visitors to the Arbor Hill Grapery who expressed an interest in purchasing Arbor Mist. Overall, it appears that six instances involved actual purchasers of Arbor Mist, and as many as 6240 instances, over a six-year period, involved people who stopped at the Arbor Hill Grapery assuming that they could buy Arbor Mist.FN19It appears that most, if not all, of these persons assumed that there was a connection between the products, based solely on the similarity of the names. On the other hand, Constellation maintains that it has not encountered any instances of consumer confusion.

[10] Viewing the evidence in the light most-favorable to AHA, this factor favors AHA. *See, Lon Tai Shing Co., Ltd. v. Koch+Lowy,* No. 90 Civ. 4464(DNE), 1991 WL 170734 at *11 (S.D.N.Y. Jun.20, 1991) (Holding that a plaintiff may use "confusion by only a small percentage of buyers" to establish actual confusion.); *see also, Virgin Enters. Ltd. v. Nawab,* 335 F.3d at 151 (Holding that, where "Plaintiff submitted to the district court an affidavit of a former employee of defendant Cel-Net, who worked at a mall kiosk branded as Virgin Wireless, which stated that individuals used to ask him if the kiosk was affiliated with plaintiff's VIRGIN stores,'"[t]he district court correctly concluded that this evidence weighed in plaintiff's favor" with regard to the "actual confusion" *Polaroid* factor.).

*Good faith*

[11] The sixth *Polaroid* factor asks "whether the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
**(Cite as: 535 F.Supp.2d 347)**

Page 21

defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."*W.W.W. Pharm. Co., Inc. v. Gillette Co.,* 984 F.2d at 575.In that regard, "[g]ood faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel."*Id.* Mere knowledge of the senior user's similar mark does not necessarily establish bad faith. *Id.; see also, Star Indus., Inc. v. Bacardi & Co., Ltd.,* 412 F.3d at 388 ("[I]n some cases even where a trademark search resulted in knowledge of the earlier mark, in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, this Court has found the junior user to be in good faith.") (citations omitted).

Here, AHA concedes that Constellation was not attempting to benefit from Arbor Hill's goodwill when it selected the Arbor Mist name. (Brahm Reply Affidavit, ¶ 63) ("[G]iven that Constellation intended to market Arbor Mist nationally, it is apparent that Constellation could not have expected that the goodwill associated with Arbor Hill in western New York, would help Constellation sell bottles of Arbor Mist elsewhere in the country."). Nevertheless, AHA insists that Constellation acted in bad faith, since it was aware of the Arbor Hill mark when it selected the Arbor Mist mark. However, it is undisputed that neither Encherman nor Vlosky was aware of Arbor Hill when they selected the name Arbor Mist. *See, Star Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d at 389 (Finding no evidence of bad faith, where certain "regional vice presidents" of defendant's company were aware of plaintiff's mark, but individuals who actually selected defendant's mark were not.). To the contrary, Encherman and Vlosky selected the word "arbor" because of its association with wine, and the word "mist" because it went well with the product's frosted bottle and suggested "refreshment." AHA denies that the word "arbor" is *necessarily* connected with wine, and the Court agrees. However, it is

also clear that, to a certain extent, the word "arbor" is suggestive of grapes and wine in the same way that the word "orchard" is suggestive of apples. Consequently, the name Arbor Mist reflects the product's characteristics. Finally, Constellation had already been using the word "arbor" as part of its Arbor Valley trademark for over a decade. Overall, Constellation's prior knowledge of the Arbor Hill mark does not indicate bad faith.

AHA also contends that Constellation acted in bad faith by "fail[ing] to seek a legal opinion as to whether Arbor Mist would infringe the Arbor Hill mark."(AHA Memo of Law p. 17). However, it is again undisputed that Constellation conducted a trademark search for the name "Arbor Mist." The fact that Constellation did not obtain a specific opinion concerning the Arbor Hill mark does not indicate bad faith. *See, Star Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d at 388 ("[I]n cases even where a trademark search resulted in knowledge of the earlier mark, in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, this Court has found the junior user to be in good faith."); *see also, Juicy ZCouture, Inc. v. L'Oreal USA, Inc.,* No. 04 Civ.7203(DLC), 2006 WL 1012939 at *28 (S.D.N.Y. Apr.19, 2006) ("Failure to perform a trademark search, standing alone, does not prove bad faith, even where a defendant is aware of other products using similar names.") Therefore, the Court finds that this *Polaroid* factor favors Constellation.

*Quality of the defendant's product*

[12] This seventh *Polaroid* factor "considers whether the senior user's reputation could be tarnished by the inferior merchandise of the junior user."*Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d at 483 (citations and internal quotation marks omitted)."Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

Page 22

product."*Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d at 1079 (citation omitted). The fact that the junior user's product is cheaper does not necessarily indicate poor quality. *Star Indus., Inc. v. Bacardi & Co., Ltd.,* 412 F.3d at 389.On the other hand, "a very marked difference in quality between the two products would militate against finding a likelihood of confusion as consumers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user."*Id.* (citation and internal quotation marks omitted). However, similar to the issue of bad faith, this factor is not "of high relevance to the issue of likelihood of confusion."*Virgin Enterprises Ltd. v. Nawab,* 335 F.3d at 151.Instead, "[t]he issue of the quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion."*Id.* at 152.

In this case, AHA maintains that Arbor Mist is a "clearly inferior" product that is viewed with disdain by the wine making community. (AHA Memo of Law in Opposition at 22). As discussed above, AHA's contention in this regard, if proven, might actually "militate against finding a likelihood of confusion."*Star Indus., Inc. v. Bacardi & Co., Ltd.,* 412 F.3d at 389.However, although AHA has produced some hearsay evidence that a few consumers did not like Arbor Mist, it has not produced proof that Arbor Mist is an inferior-quality product. *See, Jaret Intern., Inc. v. Promotion in Motion, Inc.,* 826 F.Supp. 69, 77 (E.D.N.Y.1993) ("The parties make self-serving assertions about the quality of their candies but no expert opinion or empirical evidence was offered on this issue."). Instead, the record indicates only that, compared to AHA's wines, Arbor Mist is a sweeter, lower-alcohol drink that appeals to a different segment of consumers. Consequently, the Court finds that this factor favors Constellation.

*Sophistication of the purchasers*

[13] The eighth and final *Polaroid* factor "recognizes that the likelihood of confusion

between the products at issue depends in part on the sophistication of the relevant purchasers."*Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d at 480 (citations and internal quotation marks omitted). On this point, a court

consideres the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods. Consumer sophistication may be proved by direct evidence such as expert opinions or surveys. In addition, in some cases a court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price.

*Star Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d at 390 (citations and internal quotation marks omitted). Courts have found that consumers generally use less care when purchasing inexpensive products, and more care when purchasing expensive items. *See, W.W.W. Pharm. Co., Inc. v. Gillette Co.,* 984 F.2d at 575 ("Generally, purchasers of small items like lip balm are considered casual purchasers prone to impulse buying."); *Star Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d at 390 (citations omitted) ("Liquor stores, which sell a limited variety of products, are not as cluttered and frantic as ... supermarkets.... In comparison with the items available at such supermarkets, $24 bottles of liquor are relatively expensive.... Unhurried consumers in the relaxed environment of the liquor store, making decisions about $12 to $24 purchases, may be expected to exhibit sufficient sophistication to distinguish between Star's and Bacardi's products, which are differently labeled.").

In the instant case, neither party has presented any direct evidence of consumer sophistication. At most, the record indicates that Arbor Hill wines range in price from $7 to $12 per bottle, while Arbor Mist is priced at $3 to $4 per bottle. (Smith Declaration Exhibit 7, Encherman Affidavit ¶ 51). Additionally, the record indicates that Arbor Hill wine is sold in wine shops, liquor stores, and restaurants,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

while Arbor Mist is sold in "liquor stores, super-markets, and mass merchandisers."(Encherman Affidavit ¶ 52). From these facts, it is possible that purchasers of Arbor Hill's products would tend to be more sophisticated and unhurried than purchasers of Arbor Mist. However, neither product is particularly expensive, and consumers of both products might therefore be presumed to be unsophisticated under the *Polaroid* analysis. Consequently, although the Court does not believe that it takes a high level of sophistication to distinguish between the two products, this factor favors AHA.

*Balancing the Polaroid factors*

[14] The legal principles applicable to this final step of the *Polaroid* analysis are well settled:

Where the predicate facts are beyond dispute, the proper balancing of these [*Polaroid* ] factors is considered a question of law. When balancing the factors, district courts generally should not treat any single factor as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins. Instead, the court should focus on the ultimate question of whether consumers are likely to be confused.

*Playtex Prods., Inc. v. Georgia-Pacific Corp.,* 390 F.3d at 162 (citations and quotation marks omitted). As already mentioned, in this regard, the party alleging infringement must prove "that numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of de-

fendant's mark. For a finding of infringement a probability of confusion, not a mere possibility, must be found to exist."*Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d at 1077.

Balancing all of the *Polaroid* factors, the Court cannot grant summary judgment. To summarize the findings above, four of the factors favor AHA, namely, strength of the mark, competitive proximity, actual confusion, and sophistication of buyers. On the other hand, three of the *Polaroid* factors weigh in Constellation's favor, namely, similarity of the marks, good faith, and quality of defendant's product. The fourth *Polaroid* factor, bridging the gap, is irrelevant here, since the parties already compete.[FN20]However, the Court finds that there are triable issues of fact as to actual confusion, which preclude summary judgment. Consequently, Constellation's summary judgment motion is denied.

### CONCLUSION

For all of the foregoing reasons, AHA's motion for summary judgment is granted as to Constellation's Second Cause of Action for infringement, and is otherwise denied. Constellation's summary judgment motion is denied in its entirety.

Exhibit A

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

Page 24

# Exhibit A





FN1. The Court will refer to Arbor Hill Associates, Inc., John H. Brahm and Katharine Brahm collectively as "AHA."

FN2. This also involves a state-law dispute between AHA and the law firm of Nixon Peabody LLP ("Nixon Peabody"), arising from Nixon Peabody's prior representation of AHA in connection with the Arbor Hill trademark.

FN3. Widmer was actually purchased by Canandaigua Wine Company, which later changed its name to Constellation. However, for the sake of simplicity, the Court will refer to Canandaigua Wine Company herein as Constellation.

FN4. *See* footnote 2.

FN5. AHA became aware of Constellation's use of the name Arbor Mist as soon

as the product was introduced in 1988.

FN6. The record indicates that, in addition to Fondiller, Baker would sometimes deal directly with Fondiller's assistants. (Baker Dep. at 22-23).

FN7. And more specifically, Baker had handled various matters involving the Arbor Mist mark during the preceding five years. (Baker Dep. at 60-61).

FN8. AHA presented evidence that 15 such affidavits were filed during Fondiller's tenure leading up to the filing of the subject motions, however, only ten of those Section 15 affidavits pre-date the filing of the Section 15 affidavit at issue in this case. (Salai Reply Declaration, Exhibit CCC). Fondiller, who had been employed by Constellation since 1994, described his responsibilities, in relevant part, as follows: "I was responsible [for trademark mat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
(Cite as: 535 F.Supp.2d 347)

Page 25

ters].... When the company desires to name a new product, potential names are submitted to me or to my secretary, and they're referred to outside counsel for searching and clearance. Additionally, when we notice names that infringe, in our view, our marks, I'm the one that instructs outside counsel to act or not as the case may be. And I am the one that interacts with outside counsel on normal maintenance matters, whether trademarks to be renewed or allowed to lapse or whatever may be needed."(Fondiller Deposition pp. 8-9).

FN9. This application is made pursuant to FRCP 12(b)(1).

FN10. This total is based on both the pre-printed forms and the separate affidavits from customers submitted by AHA. (*Id.,* Exhibits W-Y, Exhibits JJ-YY).

FN11. On September 22, 2000, Shields executed a pre-printed form which states: "To whom it may concern: I stopped at Arbor Hill Winery in Bristol Springs today and asked for Arbor Mist Wines. I had assumed that Arbor Hill was the producer of Arbor Mist. Signed: Loana J. Shields."(Brahm Affidavit in Opposition, Exhibit Y). On February 18, 2006, Loana J. Shields executed an affidavit, stating in relevant part that she became "an Arbor Hill employee in December 1999."(*Id.,* Exhibit II).

FN12. Constellation's First Set of Interrogatories, Interrogatory No. 28, asked AHA to "[i]dentify all consumer or marketing surveys or studies conducted by or for AHA, or by or for any other entity affiliated with, related to or sponsored by AHA, concerning Arbor, Arbor Hill, Arbor Mist, Arbor Valley or Arbor Frost, and for each such survey, identify all documents embodying the results of each such survey

and all other documents relating to each survey."AHA's answer to this interrogatory states: "Arbor Hill commissioned a survey during its consideration of whether to commence an action against Constellation. The survey was conducted by Jacob Jacoby Associates. AHA has not yet determined whether it will use the survey as evidence in connection with this matter and consequently, until it makes such determination, the results of the survey are work product."(Kane Supplemental Declaration [# 135], Exhibit D). AHA never supplemented its response to that interrogatory. (*Id.,* Exhibit E).

FN13.*EMC Corp. v. Norand Corp.,* 89 F.3d 807 (Fed.Cir.1996), another case cited by Arbor Hill, did not involve forum shopping. Nevertheless, the case is factually inapposite since it involved a party's attempt to apply pressure to another party in connection with ongoing negotiations over the sale and licensing of patents. *Id.* at 815 ("[T]he district court could properly view the declaratory judgment complaint as a tactical measure filed in order to improve EMC's posture in the ongoing negotiations-not a purpose that the Declaratory Judgment Act was designed to serve.")

FN14. On this point, Constellation contends that the Arbor Valley mark has priority over the Arbor Hill Mark. On the other hand, AHA insists that the Arbor Hill mark has priority in upstate New York. However, based upon its rulings herein, the Court need not resolve that issue.

FN15. The precise elements of a claim for trademark infringement under the Lanham Act are as follows: "Under § 1114 of the Lanham Act, plaintiff in a trademark infringement action must show that defendant (1) without consent, (2) used in commerce, (3) a reproduction, copy or color-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

535 F.Supp.2d 347
535 F.Supp.2d 347
**(Cite as: 535 F.Supp.2d 347)**

Page 26

able imitation of plaintiff's registered mark, as part of the sale or distribution of goods or services, and (4) that such a use is likely to cause confusion."*Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d at 1075.

FN16. Although the word "arbor" is the only term in common between the parties' marks, "the Court must analyze [the Plaintiff's] mark as a composite when determining whether it qualifies for trademark protection."*Nabisco v. Warner-Lambert Co.,* 32 F.Supp.2d 690, 696-97 (S.D.N.Y.1999), *aff'd*220 F.3d 43 (2d Cir.2000).

FN17."The central consideration in assessing a mark's protectability, namely its degree of distinctiveness, is also a factor in determining likelihood of confusion."*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 115 (2d Cir.2006).

FN18. AHA did not submit an affidavit from the individual(s) who conducted the pilot survey.

FN19. The figure of 6240 consumers is based on the affidavit of AHA employee Loana J. Shields, who, as mentioned earlier, indicated that over a period of six years, or 312 weeks, approximately 15 to 20 people per week stopped at the Arbor Hill Grapery looking to purchase Arbor Mist. The Court has used the higher figure of 20 people per week.

FN20. In any event, AHA has not shown that it intends to enter the market for wine and fruit juice beverages, nor has it shown that consumers would reasonably expect it to do so.

W.D.N.Y.,2008.
Constellation Brands, Inc. v. Arbor Hill Associates, Inc.

535 F.Supp.2d 347

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.